# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-DP-00727-SCT

*ALAN MICHAEL RUBENSTEIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2000 |
| TRIAL JUDGE: | HON. KEITH STARRETT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ELIZABETH JANE HICKS |
| | DAVID PAUL VOISIN |
| | JAMES L. WARREN |
| | JAMES E. SHIELDS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | JUDY T. MARTIN |
| | MELANIE K. DOTSON |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | DEWITT (DEE) BATES, JR. |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 12/01/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. Alan Michael Rubenstein was indicted in the Circuit Court of Pike County, Mississippi, for the capital murder of Krystal Perry (Krystal)[1] while engaged in the commission of felonious child abuse, the murder of Evelyn Anne Loque Perry (Annie)[2] and Darrell Perry (Darrell)[3] and wire fraud. The count of wire fraud was dismissed. Rubenstein's first trial resulted in a mistrial when the jury failed to reach a unanimous verdict on the murder charges. Rubenstein was tried a second time, and the jury convicted him on all three murder charges. Following a sentencing hearing on the capital murder charge, Rubenstein was sentenced to death by the jury on February 5, 2000, for the capital murder of Krystal.

¶2. Circuit Judge Keith Starrett sentenced Rubenstein to serve two consecutive terms of life imprisonment for the murders of Annie and Darrell.[4] Rubenstein filed a motion for new trial which was denied by the trial court.

### FACTS

¶3. On December 16, 1993, Annie, her husband, Darrell, and their four-year-old daughter, Krystal, were found murdered in a cabin in Summit, Mississippi. Rubenstein, Darrell's stepfather, owned the cabin. Rubenstein was the one who "discovered" the bodies.

---

[1] In the record, the child's name is spelled "Krystal" and "Crystal." For consistency we will use "Krystal" unless taken as a quote from the record.

[2] In the record, the mother's name is "Anne," but she went by "Annie."

[3] In the record, the father's name is spelled three ways, "Darrell," "Darryl" and "Daryl." For consistency, we will use "Darrell" unless taken as a quote from the record.

[4] At the time this case was tried Honorable Dunn Lampton was the District Attorney.

¶4.     Rubenstein, a resident of Louisiana, used the cabin as a weekend home.  On November 5 or 6, 1993, Rubenstein had driven Annie, Darrell and Krystal from New Orleans, Louisiana, to the cabin in Mississippi.  Annie and Darrell did not have a vehicle at the cabin.

**Zula Loque**

¶5.     Annie's mother, Zula Loque, testified that she became concerned about  her daughter. She testified that she called Darrell's mother, Doris Rubenstein (Doris).  After Thanksgiving, she spoke to Rubenstein and asked for directions to the cabin. She asked if he had checked on them.  He told Loque that she could ride with him to the cabin the next day.  Rubenstein canceled the trip to the cabin and rescheduled for the next day.  However, he canceled again. Loque asked for directions, and Rubenstein told her that he would not be able to give her directions and that is was so remote that she would not be able to find the cabin.  Sometime later, Rubenstein informed Loque that he checked on them at the cabin, but they were not there.

**C.V. Glynnis[5]**

¶6.     C.V. Glynnis was the Sheriff of Pike County, Mississippi from 1993-1995.  Glynnis was sheriff at the time the three bodies were discovered at Johnson Station Road on December 16, 1993.  When Sheriff Glynnis arrived at the scene, he saw two adult bodies in the living room and a child's body in the bedroom.  All three people were dead.

¶7.     Sheriff Glynnis was unable to determine the cause of death.  However, the victims had plainly been dead for some time based on the decomposition of the bodies.  The cabin itself was very neat.

---

[5]  In the record, the Sheriff's name is spelled two ways, "Glennis," and "Glynnis".  For consistency, we will use "Glynnis" unless taken as a quote from the record.

¶8.     Law enforcement first became aware of the situation when Rubenstein called Investigator Donald Lindley.  Rubenstein was not under suspicion.

¶9.     Rubenstein rode to the Summit Police Department with Sheriff Glynnis.  Once at the police station, Rubenstein told Sheriff Glynnis who the victims were in the cabin, why they were at the cabin and the last time that he seen them.

¶10.    Sheriff Glynnis typed a lengthy statement that Rubenstein gave to him.  Rubenstein stated that Darrell, Annie and Krystal were in New Orleans November 4 or 5.  He drove them to Summit on November 5 or 6.  Darrell and Annie told Rubenstein to leave because some people were coming to the house and he did not need to be there.  On November 16, Darrell made a collect call and talked to the Rubensteins.  On November 27 or 28, Rubenstein drove to the house and knocked on the door.  No one came to the door. While Rubenstein normally had a key to the house, he did not bring his key on that day. Rubenstein spoke to Shawn, a next door neighbor, and he told Rubenstein that Darrell was in New Orleans.  Darrell had recently been released from prison, and had a troubled past and the couple argued a lot.  Annie apparently had a black boyfriend named Sidney Page while Darrell was in prison.  Rubenstein and his wife had custody of Krystal.  When Rubenstein entered the house on December 16, he found the bodies and did not disturb anything.

¶11.    Rubenstein never mentioned anything to Sheriff Glynnis about an insurance policy he and his wife had on Krystal.

¶12.    Sheriff Glynnis recovered information from the medical examiner, Dr. Emily Ward, which indicated that the victims were either stabbed to death or strangled to death.

**Gail Jackson**

¶13.   Gail Jackson (Jackson) testified that she lived next door to the cabin where Darrell, Annie and Krystal were discovered.  Jackson testified that she knew Darrell and Annie because they would ask to borrow her telephone, and they cut across her yard to go to the little store located about a block and a half from her house.  She never saw them with a vehicle, and they had no telephone in the cabin.  Before the bodies were discovered, Jackson had not seen them in approximately five weeks.  She testified that she noticed the same lights stayed on in the cabin never changing for approximately four and a half weeks.  Jackson stated that she never saw anyone over at the cabin during this period of time.

¶14.   Approximately a week and a half before the bodies were discovered, Jackson sent her son over to the cabin to check on them.  Her son heard the television on but no one came to the door.  She testified that approximately two weeks before the bodies were found she began to smell an awful odor coming from the house.  Jackson was at work when the bodies were discovered by Rubenstein.

**Creshon Jackson**

¶15.   Gail Jackson's son, Creshon Jackson, testified.  Creshon was familiar with Rubenstein. He testified that he knew him since he moved in the cabin some where around 1992.  He testified that the cabin was next door to his house.

¶16.   Creshon testified that on December 16, 1993, Rubenstein came to the trailer and told him that he had discovered some bodies in the cabin.  He did not say whose bodies he found.

¶17. Creshon testified that he would talk to Darrell when Darrell cut across his yard with Annie and Krystal to go to the corner store. They always walked to the store. Darrell also used his telephone. Occasionally, they would have a beer together. Creshon testified that he never saw any vehicle come pick them up at the cabin. Creshon stated that Darrell and Annie never discussed leaving the cabin. The only person he ever saw at the cabin was Rubenstein.

¶18. Creshon testified that several weeks before the bodies were found, he had not seen Darrell, Annie or Krystal. He testified that at night he could see the television going inside the cabin. He testified that, on one occasion, he went to the cabin and knocked on the door while he and his mom were outside putting up Christmas decorations. He heard the television on, but no one came to the door. Creshon testified that he never told anyone that he saw Darrell, Annie or Krystal leave to go to New Orleans or that they left in a brown rusty van with three black men.

**Glen Allen Applewhite**

¶19. Glen Allen Applewhite, was the criminal investigator for the Mississippi Highway Patrol on December 16, 1993. Officer Applewhite did not know that it was a homicide until receiving the autopsy report. The television was on, nothing was out of place or disturbed. Only after finding the little girl lying on the bed completely naked, did it appear that the situation was not normal. If the child was in the den with the adults, then the deaths would have appeared to be asphyxiation. The autopsy reports were returned the next day. The police continued to develop leads on the case.

¶20. Based on Sheriff Glynnis's interview with Rubenstein, Officer Applewhite and his staff focused on Sidney Page and Walter Stevenson as probable suspects. Officer Applewhite

6

contacted the Louisiana authorities. Due to the holiday season, it was not until January 5th that Officer Applewhite made contact with Louisiana officials.

¶21. Officer Applewhite spoke with Rubenstein at his home in Louisiana on January 5, Officer Applewhite was unable to gain any information from Doris Rubenstein because she appeared either over-medicated or intoxicated. Tonya Rubenstein indicated that she saw Darrell and Annie at Mudbugs on December 2. Officer Applewhite then went to the residence of Zula Loque, Annie's mother. Loque told him that Darrell and Annie were completely dependent on Rubenstein for food, money and transportation.

¶22. Officer Applewhite also went to the home of Annie's best friend, Sue Bellows. Sue told Applewhite that Rubenstein went to Summit on November 16 to pick up Darrell and Annie and bring them to Marrero for her birthday party on November 18. This was somewhat inconsistent with Rubenstein's statement that Darrell called on November 16, but Rubenstein only went to the cabin around Thanksgiving.

¶23. The first time Officer Applewhite learned of an insurance policy on Krystal was January 12 when David Perry, Darrell's brother, told him. The policy amount was $250,000.

¶24. Lisa French told Officer Applewhite that she saw a snub nosed green van in the area about November 16. Officer Applewhite followed up on the lead but never found out any information on the van.

¶25. No finger prints were found at the house. No finger prints of Rubenstein were found in the house. No DNA or blood samples linked Rubenstein to the crime. Officer Applewhite checked the mailbox for letters. The earliest letters were post-marked November 15, 1993,

and the latest postmarked letters were December 8, 1993.  Also there was only a gallon of milk in the fridge with an expiration date of November 16, 1993.

¶26.    Annie was stabbed eight times.  Darrell had a number of stab wounds as well.  Some of them were defensive wounds.

### Dr. Steven Hayne

¶27.    Dr. Steven Hayne, a forensic pathologist, testified as to the cause and manner of death of the victims.  At the time of the deaths, Dr. Emily Ward was the medical examiner.  Dr. Hayne testified as to the findings in Dr. Ward's autopsy reports.

¶28.    Annie was determined to have died of multiple stab wounds.  There were eight stab wounds in the chest area, two of which were lethal wounds to the left lung.  Annie's body had no evidence of defensive wounds.

¶29.    As for Darrell, his body was also in an advanced state of decomposition like Annie's. His body had numerous stab wounds and slash wounds.  There was a slash wound across Darrell's neck which measured about seven inches.  The slash was very deep, and to the point that bone was visible on the autopsy.  There was one slash wound and two wounds to Darrell's arms; these wounds indicated defensive posturing.  In addition, there were four stab wounds which were lethal.  Two of these stab wounds were to the chest, and the other two wounds were to the abdomen and consequently, internal organs.  Darrell's death was due to the stab wounds to the trunk of his body, the chest, abdomen and wounds to the lung, liver and heart.  Darrell's stab wounds were considerably deeper than the wounds received by Annie.  The shortest stab wound on Darrell was two and a half inches which is twice as deep as any wound on Annie's body.  Darrell's defensive wounds indicate a struggle took place.

¶30. There were no blood samples taken due to the decomposed state of Annie and Darrell's body. However, a urine sample indicated that they both had nicotine, caffeine and acetaminophen in their systems.

¶31. The autopsy report showed that Krystal had suffered a hemorrhage to the neck area. The cause of death for Krystal was determined to be strangulation. Dr. Hayne testified that the death occurred weeks to months before they were discovered.

¶32. In response to the State's question on whether Krystal's death was painful and the length of time it took for her to die, Dr. Hayne stated:

Hayne: With considerable pressure on the side of the neck, there would be compression of the major vessels of the side of the neck, both the right and the left sides, to include the carotid arteries and the jugular veins. With compression of those structures, blood flow to the brain would cease and unconsciousness would intervene in a period of a few seconds to a few tens of seconds. If complete occlusion occurs, it's estimated any where from approximately four seconds to fifteen seconds from unconsciousness would occur.

Certainly during that time frame, or even longer, if compression were not complete initially, there would be pain and suffering from compression of those structures of the neck, not only light headedness, but certainly air starving and the like.

State: During that period of time, would the child have experienced panic?

Hayne: Yes, sir.

State: Terror?

Hayne: Yes, sir.

Dr. Hayne had no opinion on whether Krystal was killed at a different time than Annie and Darrell. Based upon the autopsy report, Dr. Hayne thought Krystal died on or about the same time as the adults due to the decomposition of the bodies.

9

¶33. A few hairs were found under Krystal's body and were determined to be those of a Caucasian.

**Earl Ballinger**

¶34. Earl Ballinger met Rubenstein at the Jefferson Parish Correctional Center about October 14, 1998, when both men were fighting extradition to Mississippi. Ballinger never met Rubenstein prior to October 1998, and he did not know about the deaths in 1993.

¶35. While being held in a cell, Ballinger and Rubenstein started to talk about ways to fight extradition to Mississippi. Ballinger stated that Rubenstein told him that he was wanted for killing and "he shot his wife, his daughter, and his daughter's boyfriend, was his exact words." Ballinger alleged that Rubenstein told him that he shot his wife for being a "bitch" and having drinking problems, his daughter was running around with black men and "their drugs" and he gave no reason for killing the boyfriend.

¶36. Rubenstein told Ballinger that the crime happened five years ago. A few weeks later, Ballinger wrote to Sheriff Solly of Meridian and told him of Rubenstein's statements. A week and a half later a highway patrol man spoke to Ballinger about Rubenstein's statements. Later, on April 8, 1999, someone from the district attorney's office came to speak with him in Meridian.

¶37. Ballinger testified that he later realized that Rubenstein actually killed his daughter or step-daughter, his step-son or the girl's boyfriend, and a small child by reading a news article, however, he only testified to what Rubenstein told him. At one point Ballinger guessed that Rubenstein may not have told him the truth because people that hurt or molest children have a hard time in jail.

**James Stevens**

¶38.    James Stevens testified that while he was an inmate at the Pike County Jail he knew Rubenstein.    Stevens was incarcerated on a revocation.    He was housed in a block with Rubenstein.    He testified that they had various conversations.    Eventually, Rubenstein confessed to him what he had done.  Stevens testified:

> At that time he told me that he had planned to hire somebody to kill his stepson, daughter-in-law and the granddaughter.  He changed his mind.  He was coming to his camp in Summit about two weeks before Thanksgiving.  He went there, he killed his stepson, his daughter-in-law with a knife.  He did not specifically say how he killed his granddaughter, it was strangulation, choked, or suffocation.  And that after that he left, he went to the Jackson's house. These were neighbors of his.  He asked if they saw them.  They told him - - I forgot what he said they told him.  He left there, went back to New Orleans to wait.  Nobody ever found the bodies.
>
> Later on in December he went back.   The bodies were still there, same places.  His granddaughter was on the bed nude.  His stepson, the eyes were gone, there were maggots on him.  And his daughter-in-law was laying where she was at.  She had a hole in her stomach the size that you could put your fist in. And basically that was it.

¶39.    Stevens testified that Rubenstein told him that he killed them for money.  Rubenstein told him that at the time he had insurance policies out on both of his granddaughters.    Stevens testified that he recalled the insurance policy being for about $200,000.   According to Stevens, Rubenstein told him that he planned for it to look like a drug deal.    Stevens stated that Rubenstein told him he planted two kilos of cocaine around the scene of the camp, but the cocaine was never found.    Stevens testified that no one ever asked him to talk to Rubenstein or get him to talk.    He testified that he was not promised anything in exchange for his testimony.    He was ordered to pay his fine and serve his sentence.    Stevens testified that he

11

paid the fine and completed his sentence. At the time of trial, Stevens was no longer in incarcerated and working every day.

**George Hiene**

¶40. George Hiene, an insurance agent, who sells health and life insurance for New York Life in Metairie, Louisiana, testified. He met Rubenstein in the 1980's. Hiene's first business transaction with Rubenstein concerned a policy on the grandchildren.

¶41. As for Krystal Perry, Doris owned the policy on her. Doris was the first beneficiary, Rubenstein was the second beneficiary, and Evelyn and Darrell Perry were the third beneficiaries on the policy. Hiene thought that Rubenstein contacted him about setting up some funds for the girls. The first contact was sometime in December 1990.

¶42. Hiene also spoke to Rubenstein about bonds, mutual funds, annuity contracts in addition to life insurance. The first year of Krystal's insurance policy had a zero cash value accumulation. The first year cost $1,167 for the whole life policy and had zero value. The second year had a $358 cash value. The third year had $838 in value. The application date for Krystal's insurance policy was September 13, 1991. The fact that Doris was the grandmother of Krystal demonstrated a substantiated insurance interest. Rubenstein would have had no insurable interest on Krystal had he not been married to Doris. Doris signed the policy application on September 13, 1991. The first premium payment was by check from Rubenstein's account. Hiene first heard of Krystal's death through a news report.

¶43. Hiene ran a proposal for additional life insurance on Rubenstein's life on December 15, 1993. Hiene did not remember running this proposal at anyone's request. He did not

remember there being any contact with him by Rubenstein between November 16 and December 16, 1993, concerning location of Krystal.

¶44. Hiene was contacted between ten days to two weeks after Krystal's death concerning a claim. The earliest date a claim was made on the policy was January 26, 1994. Doris assigned $60,000 of the proceeds of the insurance policy to Attorney Wiley J. Beavers. Doris signed the death claim on January 26 and Rubenstein was with her. The insurance check was issued on April 13, 1994, to Doris.

¶45. However, on February 1, 1994, Hiene was notified of threatened litigation over the proceeds of the policy. Doris received disbursements of $200,275.85 on April 13. The other $60,000 was issued to Doris and Attorney Beavers. Hiene thought that he and New York Life knew that Rubenstein was a suspect in the murders at the time the proceeds were paid.

¶46. There were no insurance policies in effect for either Brittany, another granddaughter, or Doris on the date of trial. Doris requested that Brittany's policy be canceled on November 22, 1995. Doris took affirmative steps to cancel the policy, and it was not just a mere lapse in premium payments. Doris canceled her own policy in June 1995. A second policy on Brittany was affirmatively canceled by Doris earlier in the year in September 1995. Brittany was added to Rubenstein's own life insurance policy as a beneficiary five months after Krystal's death, but Krystal was never a beneficiary to Rubenstein's policy. In Hienes' twenty four years as an agent, he never had a New York Life policy for $250,000 taken out on a two-year-old child.

## STATEMENT OF ISSUES

13

**I.**　　　　Whether the trial court erred in admitting evidence concerning the defendant's relationship with one of the victims and other character evidence.

**II.**　　　Whether the trial court erred in allowing testimony concerning alleged prior bad acts.

**III.**　　Whether the trial court properly handled any matters regarding testimony of other alleged prior bad acts.

**IV.**　　Whether the trial court erred in allowing the prosecution to introduce evidence of Rubenstein's alleged bad character.

**V.**　　　Whether the trial court erred by allowing the admission of testimony in alleged and violation of the rules of evidence and Rubenstein's right to confrontation.

**VI.**　　Whether Rubenstein received a fair trial.

**VII.**　Whether the evidence regarding Rubenstein's pre-arrest actions was admissible.

**VIII.**　Whether proposed Instruction D-17 was properly denied.

**IX.**　　Whether there was reversible error in Earl Ballinger's unsolicited comment regarding his offer to take a polygraph.

**X.**　　　Whether the Appellant's accusation that the State knowingly presented false testimony is substantiated by the record and without legal merit.

**XI.**　　Whether the rebuttal evidence in this case was properly admitted and there was no discovery violation.

**XII.**　Whether there was no Brady violation in this case.

**XIII.**　Whether Instruction 15 (which defined "felonious child abuse") was constitutional and was supported by the evidence.

**XIV.**　Whether the jury was properly instructed on only definition of capital murder, and the verdict was clearly unanimous.

14

XV.         **Whether the indictment was constructively amended by Instruction 5.**

XVI.         **Whether Instruction 15 was supported by the evidence.**

XVII.         **Whether Instruction 15 was proper.**

XVIII.         **Whether the trial judge erred in refusing to strike the venire.**

XIX.         **Whether there were prosecutorial misstatements of the law during voir dire; whether the death-qualification process was skewed.**

XX.         **Whether the prosecutor's closing arguments at the guilt phase of the trial were proper.**

XXI.         **Whether the trial court erred in handling the State's objections to defense counsel's closing arguments at the guilt phase of the trial.**

XXII.         **Whether the trial court erred by denying Rubenstein's requests for exhumation of the victims' bodies and DNA tests.**

XXIII.         **Whether the trial court erred by refusing to allow Rubenstein's attorneys to withdraw before his second trial.**

XXIV.         **Whether the jury was properly instructed on the burden of proof at the guilt phase of the trial.**

XXV.         **Whether the trial court erred in excluding double hearsay during the testimony of Officer Donald Lindley.**

XXVI.         **Whether the State's cross-examination of defense witnesses at the sentencing phase of the trial was proper.**

XXVII.         **Whether the jury instructions on the sentencing options in this case were proper.**

XXVIII.         **Whether the limiting instruction on the "heinous, atrocious, or cruel" aggravator is proper and legally correct.**

**XXIX.**        **Whether the evidence was sufficient for the submission of the "heinous, atrocious, or cruel" aggravating circumstance.**

**XXX.**        **Whether the prosecution's closing arguments at the sentencing phase were proper.**

**XXXI.**        **Whether the jury was properly instructed with regard to sympathy.**

**XXXII.**        **Whether there is cumulative or otherwise.**

**XXXIII.**        **Whether the sentence was proportional to the crime.**

## DISCUSSION

### I.    Hearsay Statements

¶47.    Rubenstein argues that witnesses were allowed to present hearsay testimony based on statements made by Annie. Rubenstein's argument focused on the testimony of (1) Sidney Page, (2) Kay Kelly, (3) Sue Bellow and (4) Carla Denham.

**Sidney Page**

¶48.    Sidney Page (Page) testified that he first knew Annie when Krystal was approximately four or five months old. They were friends and spent time together, however, they lost touch until they ran into each other approximately a year and a half later. When he sold Darrell $100 worth of crack cocaine. After that occasion, Page testified that he and Annie began "hanging out" every now and then.

¶49.    Page testified that he was in jail from January 1990 to February 1991. At that time before going to jail, he and Annie were just friends with no sexual relationship. When he was released from jail, a party was held for him. At the party, he and Annie agreed that they wanted to have a relationship. He stated that he had decided that he would not sell drugs anymore, and

16

Annie was not using drugs anymore. They lived with a friend until they got their own apartment. They lived together for six to eight months. While they lived together, Krystal stayed with Rubenstein.

¶50. The State asked Page what Annie had told him. Page testified that Rubenstein did not like black people, and he did not like Page at all. He stated that Rubenstein told Annie that if she did not leave Page that she would never get her daughter back. No objection was made by the defense to the question.

¶51. The State asked Page what, if anything, Annie told him would have to occur in order for her to see Krystal. Page further testified[6]:

> She [Annie] would have to have sex with him [Rubenstein] sometimes. Whatever it was he said, she'll have to do. Whether it's me or sex. It would range. Whatever he wanted.

Again, there was no objection by the defense to the question.

¶52. No hearsay objection was made **until** later when the following exchange transpired:

| State: | And how do you know that? |
|---|---|
| Page: | She told me. Because it caused an argument. I could tell something was going on. For instance, there was this one occasion Mike - - Mike won't picked her up at the house. Mike picked her up around the corner, at a store, around the corner. |
| Defense: | Judge, I would like this witness to be instructed to testify what he knows of his own personal knowledge, not what somebody helped he knows. What he knows of his own personal knowledge, to this jury, not what somebody prompted him to say, or something like that. |
| Court: | Do you understand that, Mr. Page? |
| Page: | Yes, Sir. |
| Court: | You need to - - you can testify about what you have seen and observed. |

---

[6] On cross-examination, the defense questioned Page as to whether Annie had sex for money and asked regarding whether she had sex with various other men besides Rubenstein.

| | |
|---|---|
| State: | Your Honor, excuse me. May he also testify to the things that Annie told him? I believe that's an exception to the hearsay requirement because of her unavailability - - |
| Court: | Yes, Sir. |
| State: | Because of their close relationship. |
| Court: | Yes, Sir. |
| Defense: | And, Your Honor, if the jury could be instructed, respectfully I ask, what he's saying she told does not go to the truth of whether she told him that. That's only what he's saying today, that she said. That doesn't mean that she said that. As long as the jury understands that. |
| State: | Excuse me, Your Honor. I believe it is an exception to the Hearsay Rule. It may be accepted for the truth. |
| Court: | What are you - - what rule are you basing that on, Mr. Shields[Defense]? |
| Defense: | Judge, the victim can't be cross examined and it would be grossly unfair to allow someone to come into court and make up any story that they wanted to say that the victim said, knowing that we wouldn't have any opportunity, whatsoever, to impeach them. So a witness could come in here and say anything they wanted to say the victim said, and we would just be up the creek over here about challenging it. We wouldn't be able to go to the victim and see if she actually did say it or if this witness made it up. |
| Court: | Well, under Rule 804 the victim is obviously unavailable. Under Rule 804 (d) - - I'm sorry, 804 (b) (5), I'll make a more detailed statement, into the record, later, but the objection is overruled. |
| | But this testimony cannot go outside of what was disclosed to the defendant ahead of time, and must fall within the perimeters of that exception of the Hearsay Rule. |

**Kay Kelly**

¶53. Kay Kelly (Kelly), formerly Kay Slatten, testified that she had been friends with Annie for about five or six years. She knew she first met Annie while she was pregnant with Krystal and before she married Darrell. Kelly testified that she lived with Annie in an apartment for some time in "1992, 1993." Based on an argument over Annie's drug use, Kelly moved out and never saw Annie again. She testified that she rarely saw Darrell because he was always in jail.

18

¶54.   While they lived together, Annie was having a relationship with Page.   He would come spend the night, but he did not live there.   She testified that Annie, Page and Krystal seemed happy together.

¶55.   Kelly was questioned about Rubenstein's request that she make a statement regarding seeing Darrell and Annie between November and December 1993.   Kelly testified that she never saw them.  The following exchange transpired:

> State:      At any time during this period of time, and by this period of time I am referring to November 16, 1993, through, well, let's say Christmas of 1993, when if ever at that time had you been or were you contacted by the defendant Alan Michael Rubenstein?
>
> Kelly:      Yes, I was.
>
> State:      And tell the - - and do you recall when that was?
>
> Kelly:      Thanksgiving time to the beginning part of December.  It was in that time frame. . . .
>
> Kelly:      He had went to my mother's house and told my mother that he really needed to see me.  So I phoned him.  **And he wanted me to go somewhere on Fourth Street to sign a statement saying I had seen Annie and Darrell in the New Orleans area.**
>
> State:      And had you?
>
> Kelly:      No, I hadn't.
>
> State:      How many times did he call you to ask you to go make this false statement?
>
> Kelly:      Oh, at least **three or four**.  He went to my mother's house, you know, he went there at least **eight to ten times**. . . .
>
> State:      **Was this before or after the bodies had been found?**
>
> Kelly:      **Before.** . . .
>
> State:      How was he making you feel when he was asking you to give this false statement?
>
> Kelly:      Pressured into something that I didn't want to do.
>
> State:      Now, at this time did you know that Annie and Darrell were missing?
>
> Kelly:      No, I didn't.

(emphasis added).  There was no objection made by the defense to this line of questioning.

¶56.    Kelly was questioned as to Annie's relationship with Rubenstein.    Kelly testified that the relationship was not strictly father-in-law and daughter-in-law, it was a sexual relationship. Kelly testified:

> One time in particular, the baby had chicken box [pox], and she called and asked if he could bring her some money or some lotion to put on the baby.    And he said yeah.    And he came, and in order for her to get it, she had to leave with him and I watched the baby. . . .
> She left the house with him.    They went off.    And when she came back, she told me she had to have sex with him in order for him to give her the money to buy the lotion.

The defense made no objection.

### Sue Bellow

¶57.    Sue Bellow (Bellow)[7] testified that she knew Annie two years before she died.    She met Annie through Annie's sister, Carla Denham.    Bellow and Annie's sister, Carla, were good friends, and she got to know Annie when Annie and Krystal moved in with Annie's mom.    She also knew Krystal.    She only knew Darrell for a short time-approximately three weeks.    Annie lived across the street from Bellow.    Bellow testified that on the average she spent fifteen to twenty hours a day with Annie.    Annie did not work and supported herself on welfare.

¶58.    Bellow testified that she saw Annie on a regular basis.    Bellow stated that the last time she saw Annie was on the morning of November 5, 1993, before Annie left for Mississippi. Annie had come to Bellow's apartment and talked to her in her bedroom.

¶59.    According to Bellow, Krystal asked to stay.    Annie told Krystal she could stay because they would not be gone long.    However, Rubenstein told Annie, "well, if you are going to work

---

[7] The record has Bellow's name spelled Bellow and Bellows.  Some of the witnesses also call her Sue Bellub.

on your marriage, don't you think you need the whole family." Annie told Krystal she had to go. She gave Annie $65 in food stamps to take with her. Annie left in a car with Rubenstein and Krystal. There was no objection by the defense.

¶60. Bellow testified that Annie was to be back on November 16 because Darrell had to be back at work, and Bellow and Annie were going out on the 17th for Bellow's birthday. After Annie left, Annie called Bellow collect on November 11. Annie told her that she could not wait to get back home, and they would have fun on Bellow's birthday. Annie told her that she was bored at the cabin, and she did not have any cigarettes. Annie told her that she could not wait for Rubenstein to pick them up on the 16th. There was no objection by the defense.

¶61. Bellow testified that the reasons Annie told her for going to Mississippi were (1) so she and Darrell could work on their marriage, and (2) Rubenstein had proposed an offer to them on how to get some money, so they could get their own place by having a car accident in Mississippi. There was no objection raised by the defense.

¶62. There was no objection raised by the defense as to hearsay regarding Bellow's testimony that Annie had told her that she had sex with Rubenstein for money. However, the objection did not come until well into this line of questioning. The record reflects the following:

|  |  |
|---|---|
| State: | And when you say sometimes she would call the defendant, Alan Michael Rubenstein, how do you know that? |
| Bellow: | She'd do that from my house. |
| State: | Do you remember any particular occasions when Crystal or Annie needed something and she'd call the defendant? |
| Bellow: | I remember one, a couple of weeks before her birthday. And she told Mr. Mike that she didn't have the money to get Crystal anything. And she wanted to know if she could borrow $30 till she got her check and she'd pay him back. And Annie, and what I |

21

heard with her words was couldn't I just pay you back. And I can't say what he said to her.

State: You didn't hear what he said?

Bellow: No, sir, I just heard her part of the conversation.

State: And then what happened?

Bellow: She hung up and started crying and told me the conversation, which it was pretty evident what the conversation was.

State: What was that conversation?

Bellow: That Annie told me?

State: Yes, ma'am.

Bellow: Can I cuss?

State: No, ma'am, you cannot cuss, okay? You can, if you have to be accurate in your testimony, if you are repeating - - if I ask a question you don't like, I don't want you to cuss me, okay? But if you, in order to be accurate, if you have to repeat something, you can do that. But just make it clear what you're doing, okay?

Bellow: I am going to repeat what she said. She said that m****r - f****r. I guess Crystal won't get anything for her birthday, because I have to go spread my legs in order to get $30.

State: And do you know if anything like that occurred on other occasions?

Bellow: Just from what she told me. That any time she needed anything, she would say she'd pay him back and he would tell that, you know how to pay me back, you know how I want the money back.

Defense: Judge.

Court: What is your objection?

Defense: I don't know, I think that is hearsay unless she is hearing Mr. Mike say that. Not what somebody else told her. I think it's obvious. Like the conversation, she didn't hear the other end. I don't think she's hearing that.

State: Your Honor, I believe there are certain exceptions.

Court: Well, yes, sir. Are you through with that, Mr. Lampton?

State: Yes, sir.

Court: All right, overrule the objection.[8]

---

[8] As already discussed, the trial court previously overruled an objection as to Page's similar testimony as to Annie's statement regarding sex with Rubenstein finding that it was a hearsay exception under M.R.E. 804(b)(5). Therefore, the same reasoning applies here as to Bellow. Furthermore, the transcript from the first trial which resulted in a hung jury was made part of the record on appeal by the parties. The same judge and attorneys were involved in the first trial. In the first trial, the judge made a detailed finding that Bellow's testimony regarding statements made by Annie fell within hearsay exception M.R.E. 804 (b)(5) and cited to this Court's holding in *Parker v. State*, 606 So.2d 1132 (Miss. 1992).

¶63. Following the ruling on the objection, the State did move on to questioning Bellow regarding Annie having sex with Walter Stevens, a/k/a, Poonie, for money. The defense made no objection to this line of questions.

**Carla Denham**

¶64. Carla Denham (Denham) testified that she was close to her sister, Annie. Denham testified that the night before Annie left to go to Mississippi, she spoke to Annie on the telephone. At that time, Darrell, Annie and Krystal were living with Annie's mother. Annie told Denham that she was going to a little cabin in Mississippi. Denham testified that Annie told her that "they were coming to Mississippi to do an insurance scam." The State asked if that night was the first time this particular insurance scam was mentioned. Denham testified that was not the first time Annie had mentioned the insurance scam to her. The defense did not raise any objection until the State asked "[h]ow long before - - [that night did Annie mention the insurance scam.]."

¶65. The defense asked to approach the bench, and the trial court excused the jury to hear the defense's M.R.E. 403 objection. The trial court conducted a hearing on the objection. We find that the trial court made a thorough and proper balancing review on the record finding that the testimony was more probative than prejudicial. Judge Starrett ruled as follows:

> Insofar as this issue of the car insurance. The testimony has been that - - well, first of all, I think that there was a door blown wide open regarding insurance by the defendant in direct and cross-examination, I mean, in cross-examination of some witnesses.
>
> But and there has been a substantial amount of testimony, and some of it, like with the witness this morning, Mr. Perry [David Perry, Darrell's brother], without objection that Mr. Rubenstein had in his past perpetrated insurance scams.

23

The objection is made that it is a prior bad act and is not admissible for the purpose of proving character. And if that is what it is submitted for, then the objection is properly to be sustained.

**Under 404(b), the Court ruled previously that the knowledge of insurance was important, and allowed some of this testimony in under the exception to the general bar against proving prior bad acts. There was a balancing test gone through under 403, and this testimony regarding the reason why the victim went to Mississippi is probative and should be admitted because it is part of the body of the crime, that they were, the purpose or what the victims were told by the defendant.**

The State's theory of the case is that the victims were lured to Mississippi for the purpose of perpetrating an insurance fraud. This is proof of that. It is part of the web that has been woven in this case. And to try to separate it out would make it so sterile that it would not be understandable. All the facts and the pieces of the puzzle would not fit logically, and the jury would be left to grope, unreasonably grope for facts that are necessary and important to the adjudication of the ultimate issue, and that is as of guilt. The corroboration for this testimony is significant. And corroboration of the testimony regarding car insurance scams is significant. And is just not, the record is just not void of this testimony. Because it is, several witnesses have testified to this.

**Under Rule 403, I find that this is more probative than prejudicial. Especially in view of the light that the record is replete with bits and pieces regarding Mr. Rubenstein and these victims' involvement in them. So I don't think it's certainly not as prejudicial this time as it was the first time it was mentioned. That doesn't automatically create a cloak of admissibility. But when the prejudicial effect of this reintroduction of this testimony is weighed against the probative value. And under 403, I will allow the testimony to continue. And for other reasons that are obvious in the record regarding this line of testimony**.

(emphasis added). Therefore, Rubenstein's assignment of error that the trial court failed to properly conduct a balancing test and allowed testimony from Denham that was more prejudicial than probative is without merit.

¶66. When the jury returned, the State asked Denham how long before that night did Annie mention the scam. Denham testified that approximately two to three weeks before they left

24

for Mississippi, Annie first told her the reason they were going to Mississippi. Denham testified that "[it] was basically that they were going to do a [sic] insurance scam. It was supposed to be some kind of car accident." Denham testified that Annie, Darrell and Darrell's brother, David Perry, participated in the conversation.

¶67. Denham further testified that Annie never collected her November and December welfare payments.

¶68. First, the testimony discussed from each witness where the defense did not raise any contemporaneous objection the State properly submits that assignment of error is barred from appellate review. "If no contemporaneous objection is made, the error, if any, is waived." *Walker v. State,* 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State,* 639 So.2d 1263, 1270 (Miss. 1994)). Application of the contemporaneous rule is not diminished in a capital case. *Foster,* 639 So.2d at 1270.

¶69. Second, previously as discussed, the trial court reviewed and properly overruled the defense's objection as to Page's testimony under M.R.E. 804(b)(5) as to Annie's statements.[9]

¶70. M.R.E. 804(b)(5) provides:

**(b)** **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be

---

[9] In the second trial, there is no similar objection as to Annie's statements in Kelly's testimony.

admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

¶71. In *Parker v. State,* 606 So.2d at 1138, this Court analyzed the five requirements for admission of hearsay under M.R.E. 803(24). However, the Court in *Parker* also discussed that the same analysis applied to M.R.E. 803(b)(5). *Id*. at 1138. M.R.E. 803(24) provides a similar residual exception for admission of hearsay "regardless of whether the declarant is available to testify."[10]

¶72. The five requirements are "trustworthiness, materiality, probative value, interests of justice, and notice." *Parker,* 606 So.2d at 1138 (citing *Motorola Com. & Electronics v. Wilkerson,* 555 So.2d 713, 720 (Miss. 1989); *Leatherwood v. State,* 548 So.2d 389, 401 (Miss. 1989)).

¶73. We held in *Parker* as follows:

These five findings should be made on the record unless there is an explicit waiver or waiver by silence or if the basis for the ruling is obvious. *Leatherwood,* 548 So.2d at 401. **The trial judge has considerable discretion**

---

[10] M.R.E. 803(24) provides:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of declarant.

**in determining whether to admit hearsay evidence under this exception and his decision will not be overturned except for an abuse of discretion.** *Id*. Before evidence can be admitted under either residual exception to the hearsay rule, **803(24)** or **804(b)(5)**, certain findings must be made by the trial judge. *Cummins v. State,* 515 So.2d 869, 873-75 (Miss. 1987). First, the court must make a finding that the statement is sufficiently reliable. *Cummins,* 515 So.2d at 874. The need for the evidence must be weighed against its trustworthiness, considering such factors as whether the statement is oral or written, the character of the statement, the relationship of the parties, the motivation of the declarant, and the circumstances under which the statement was made. *Id.* Next, the hearsay evidence must meet the requirements of M.R.E. 401 and 402 concerning materiality and if the declarant is alive, the court must also find that reasonable efforts were made to obtain his live testimony. *Cummins,* 515 So.2d at 874. Purposes of the Mississippi Rules of Evidence must be met by admission of the hearsay; this is determined by looking to Rule 102. *Cummins,* 515 So.2d at 875. Finally, notice must be given by the proponent of the evidence sufficiently in advance of trial to provide the opponent with a fair opportunity to meet it. Sufficient notice will depend on the facts and circumstances of the case. *Cummins,* 515 So.2d at 873-74.

*Parker,* 606 So.2d at 1138 (emphasis added).

¶74. Here, the trial court applied the testimony to the five requirements for admissibility of Annie's statements stating its findings on each requirement. There is no evidence to support that the trial court abused its discretion in allowing the testimony. The trial court held:

The issue, that was brought before the Court, was regarding the admissibility of hearsay testimony, or testimony about what Annie Perry had told Mr. Page. Under Rule 804, the - 804(a) the declarant, Annie Perry, is unavailable. She's dead. She falls within subsection 4 of the unavailability portion. Under Hearsay Exceptions, Part B, Subsection 5, the statement is not covered in any of the foregoing exceptions but have certain guarantees of **trustworthiness** if the Court determines that the statements offered as **evidence of a material fact,** and it is. The statement is **more probative of the point,** of which it is offered, than any over [sic] evidence which the proponent can procure through reasonable efforts, and it is. The general purposes for which these rules and interest and the **interest of justice** will be best served by the admission of the statement into evidence. And the defendant has been sufficiently put on **notice** of this statement.

> In fact, I think that these statements were testified extensively to in the last trial, which was six months ago. And the defendant's investigator has had access to the witness, interviewed him, and the discovery had been furnished regarding this witness. The statement by Annie- the two statements, that I understand were objected to, one about the statements about Mr. Rubenstein and the statements about the sexual relationship between Annie and the witness. The only persons who would have known about these things would have been the defendant and the witness, so there is no other testimony available that I can reasonable see that would be probative of these two issues. And I find that under Rule 804(d)(5) [sic] that the testimony of Sidney Page regarding what Annie told him, on those two subjects, would be admissible as an exception to the hearsay rule. Certainly, this is subject to full-bore cross examination. And these statements come as no surprise to the defendant.

(emphasis added).

¶75. We now look at the Confrontation Clause of the Sixth Amendment of the United States Constitution which provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI. Article 3, Section 26 of the Mississippi Constitution provides an almost identical provision. In *Lanier v. State,* 533 So.2d 473 (Miss. 1988), this Court stated the purpose of the confrontation clause is fulfillment of the " 'mission . . . to advance the accuracy of the truth determining process. . . by assuring that the trier of fact has a satisfactory basis for evaluating the trust of a prior statement.'" *Lanier,* 533 So.2d at 488 (quoting LaFave and Israel Criminal procedure § 23.3(d) at 877-78 (1985) (quoting *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

¶76. The United States Supreme Court abrogated its holding in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, (1980) "where testimonial statements are involved." *Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The court focused its review on out-of-court statements and testimony that would reasonably be

28

expected to be used "prosecutorally," such as confessions, affidavits, custodial police examinations, and depositions. *Id.* at 51-52. In *Crawford,* the Court addressed whether the Confrontation Clause was violated by using a tape-recorded statement at trial taken by the police during a police interrogation of Crawford's wife. *Id.* at 38. The wife did not testify at trial because Crawford invoked the marital privilege against such testimony. *Id.* at 40. At trial, the State played the wife's tape-recorded statement made during the police interrogation that described the stabbing as evidence that the stabbing was not done in self-defense. *Id.* at 38, 40.

¶77. The Court held that out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless the witnesses are unavailable and the defendant had the opportunity to cross-examine the witnesses. *Id.* at 53-54. The Court determined that statements taken by police officers in the course of interrogations are testimonial in nature. *Id.* at 52.

¶78. In this case, the statements that Rubenstein argues violated his Sixth Amendment right to confrontation do not constitute testimonial hearsay. In *Crawford,* the Court acknowledged the distinction, stating:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Crawford,* 541 U.S. at 68.

¶79. Here, Rubenstein's right to confrontation was not compromised. Rubenstein made no objection at trial that the Confrontation Clause was violated. However, the trial court determined that the declarant, Annie, was unavailable and made an on-the-record examination that the evidence possessed adequate indicia of reliability and particularized guarantees of trustworthiness.

¶80. This Court finds that this assignment of error is without merit.

## II.    Prior Bad Acts

¶81. Rubenstein argues that the trial court committed reversible error by allowing the prosecution to introduce evidence of alleged prior bad acts. He requests a new trial based upon this asserted error.

¶82. We find that of the sixteen statements that Rubenstein complains, many were without objection at trial, or the objections were sustained. This Court has held that the contemporaneous objection rules still applies in death penalty cases. *Scott v. State,* 878 So.2d at 988; *Williams,* 684 So.2d at 1203; *Moawad v. State,* 531 So.2d 632, 634 (Miss. 1988). Therefore, any issue to which Rubenstein failed to object is procedurally barred. *Howard v. State,* 507 So.2d 58, 63 (Miss. 1987).

¶83. The following is a list of statements, Rubenstein claims showed evidence of alleged prior bad acts for which a new trial should be granted.

**Statement 1**:

¶84. Officer Applewhite stated:

> From the information that we had received, after talking with those witnesses [David Perry], we knew that Mr. Rubenstein had come to Mississippi on the date [November 16]. We also had information of insurance scams that had been done.

This objection was sustained by the trial court. Defense counsel even asked for a motion to strike the statement and asked that the jury be told to disregard the statement. Then before the judge could finish and tell the jury to disregard the statement, defense counsel stated "I'll pass over it, Judge. That's fine." The statement was sustained by the trial court and the trial court's attempt to satisfy the defenses' request to ask the jury to disregard the statement was cut-off by defense counsel informing the judge that it was not needed. Therefore, the trial court did not err, and Rubenstein's complaint about this statement is without merit.

**Statement 2**:

¶85. The State asked Officer Applewhite: "Are you aware of any other life insurance policies, that Mr. Rubenstein had, on anyone who was not his grandchildren?" to which the officer replied, yes. No objection was made by Rubenstein. The contemporaneous objections rule applies to death penalty cases. *Scott,* 878 So.2d at 988. Therefore, Rubenstein's complaint about this statement is procedurally barred on appellate review.

**Statement 3:**

¶86. Officer Applewhite was questioned on cross-examination by defense counsel. He was asked what David Perry told him when he visited David Perry in the hospital. The exchange between the defense and Officer Applewhite was as follows:

| Defense: | What information did you get from this brain-dead person this time? Tell the jury that. |
| Applewhite: | David went more into - - - and you - - - its hard for me to - - - |
| State: | He's asked the question . . . |

31

Defense: Let him answer - - -
Applewhite: He told us of his involvement in insurance fraud. Mr. Rubenstein's knowledge of insurance and other insurance fraud schemes that he and Mr. Rubenstein's family had been in.

Clearly, Rubenstein asked the questions that elicited this answer. Indeed, prior to Officer Applewhite answering, the State tried to intercede but defense counsel insisted that Applewhite be allowed to speak. Defense counsel then objected, although there was no articulated reason for the objection, only the words "No, Judge stop him." Rubenstein opened the door and elicited the response from Officer Applewhite. Therefore, Rubenstein cannot now complain on appeal about this statement.

**Statement 4:**

¶87. When the testimony continued Rubenstein questioned whether Applewhite's information was from notes taken on the interview with David. Applewhite stated:

> From the notes, that they have a copy of, David told us about the night of the 16th or 17th that Mr. Rubenstein was aggravated when he left. Mike - - told Mike to tell Darrell [sic] that - -

At this point the testimony was stopped and the jury was excused from the courtroom. Rubenstein objected to Applewhite's discussion concerning insurance and asked for a mistrial. The objection and motion for mistrial were overruled and denied. However, the trial court made an extensive on-the-record finding on this issue and stated:

> Court: Mr. Shields, the Motion in Limine was made regarding insurance scams under Rule 403 or other bad acts. There was an objection made in a Motion in Limine. The Motion was sustained, by the Court, out of an abundance of caution.
>
> This issue was extensively testified to in front of the jury by the last - - at the last trial.

The Court sustained the objection to the Motion in Limine, because I thought that there needed to be some predicate laid before and some probative value shown before that would be gone into. And I forbid the State from going into that line of questioning in it's case in chief, or asking questions about that.

The defendant has been furnished a copy of the report of interview of David Perry. That if - - the witness was pressed to answer the question regarding what came from the interview of David Perry.

The witness expressed some reluctance and then the attorney instructed him to answer the question in a very direct and forceful manner. That may not read on the record, if it goes further than this, but it was a - - almost a demand to answer the question. The witness answered the question. Now the defendant was clearly on notice of what was contained in the interview with David Perry.

I don't know the trial strategy of the defendant's counsel, but to get it to that point, with the specific directions to answer the question, and almost demand, and then not allow the question to be answered would be - - would be wrong. And there was adequate - - more than adequate notice. And even the stopping and the reluctance of the witness to answer and then another demand to answer the question.

The objection to this line of testimony is overruled. The door has been, not just cracked, but it has been thrown wide open to this answer.

Now, y'all ready for the jury again?

Defense: Judge, one other thing respectfully.

The reports that I offered to put into evidence and question him on, you stopped me from going there, because they were hearsay, you said.

All right. Now, when I asked a witness a question, that does not leave open the door for the witness to roll a snowball down a mountain in hearsay. He's still got to follow the rules in his answer. And what I ask you to stop is him doing a hearsay document.

33

| | |
|---|---|
| Court: | Mr. Shields, what could he have gotten from the interview, other than hearsay? It was statements from David Perry that he wrote the report on. I don't know where you - - I don't know what you expected. |
| Defense: | He could have gave the same answers he's been giving Mr. Goodwin, nothing. What his investigation found, not what David Perry said. He didn't have to say what David Perry said, Judge to give the information. He did that on purpose. |
| Court: | Well, that would have been a misstatement, because I think the investigation did yield something. Apparently, because that's what the witness testified to. |
| Defense: | So, in other words, every time I ask a question, from now on, they can say what somebody said? That's what he did. |
| Court: | If you ask a question and it calls for hearsay answer, and there is no objection, yes, sir, the witness can answer it. |
| Defense: | If that's the ground rules, we'll go that way. |
| Court: | That's why you make objections to hearsay. |
| Defense: | My motion for a mistrial stands. |
| Court: | It's overruled. |
| Defense: | Thank you, Judge. |

The trial judge did all that was necessary for this statement. The trial court made an on the record ruling, and nothing more is needed in this case. Accordingly, Rubenstein's complaint about this statement is without merit.

**Statement 5:**

¶88. Rubenstein also contends that Officer Applewhite continued to reference his involvement in insurance scams while on cross-examination.

¶89. The trial judge determined that Officer Applewhite was not allowed to finish his answer to defense counsel's question concerning the information David told Officer Applewhite at the hospital. The trial court made an on-the-record finding quoted in statement four above. This was based on the trial court's previous ruling allowing Officer Applewhite the opportunity to complete his answer. Rubenstein again objected to this testimony coming before the jury. He

34

further objected pursuant to M.R.E. 403. The trial court then limited the testimony to automobile insurance scams only.

¶90. Once testimony resumed in front of the jury, Officer Applewhite testified that Rubenstein was involved in automobile insurance scams in Texas and Louisiana with other family members. Officer Applewhite later referred to information concerning "previous insurance scams that was done [sic] with Mr. Rubenstein and other members of the Perry family." When questioned further, Officer Applewhite also stated:

> We knew from other family members, telling us the involvement of car insurance scams and other insurance scams. David related to us incidents that happen ten, twelve, fifteen years ago of Mr. Rubenstein's involvement in insurance, his knowledge of insurance. And every insurance scam that they had performed other than car insurance.

¶91. Again, this information was elicited during cross-examination testimony by the defense. After Officer Applewhite was allowed to finish his original question, Rubenstein continued to ask more and more questions concerning the alleged insurance scams. Rubenstein did not object to these three statements from Officer Applewhite. Clearly, the statements are barred for failure to object, *Scott,* 878 So.2d at 988. In addition, Rubenstein opened the door by asking about the scams and continuing to ask this line of questions. We find that Rubenstein's complaints about these statements are without merit.

**Statement 6:**

¶92. Officer Applewhite testified on cross-examination by defense counsel about other life insurance policies in the 1970's and that "other life insurance policies were considered that changed the focus of the investigation on January the 12th, from knowledge - information."

35

¶93.    The record reflects that Rubenstein made no objections to these statements.    The trial

judge stopped Officer Applewhite, himself, before the officer finished some of his statements

and some discussions ensued by counsel.

¶94.    Rubenstein did not object to the officer's first statement that "we were informed of

another life insurance policy that happened in 1970."    Rubenstein continued questioning

Officer Applewhite concerning why the investigator focused on Rubenstein on January 12

implying that knowledge of an insurance policy on Krystal was the key factor.    The defense

questions and the officer's testimony were as follows:

| | |
|---|---|
| Defense: | I'm talking about your investigation, sir.  You said you went out and started really investigating this man on January the 12th.  And that policy was the turn that made you do it.  What notes, do you have, indicated that you ever investigated the policy? |
| Applewhite: | Sir, I have - - |
| Defense: | Tell the jury. |
| Applewhite: | Sir, I investigated two policies.  One being the one on Crystal Perry and another policy that was taken out in the year of 19 - - |
| Court: | Just a minute. |
| Defense: | Judge, can we - - |
| Court: | Ladies and gentlemen of the jury, go with your bailiffs, please. |

(JURY   EXCUSED   FROM   COURTROOM,   AND   FOLLOWING
PROCEEDINGS HAD IN ABSENCE OF THE JURY.)

The officer was trying to explain that the authorities relied upon more than just   Krystal's

policy for suspecting Rubenstein.    After the jury was excused, the trial court cautioned

Rubenstein that his questioning may open the door to testimony that he might not want.    A

discussion followed concerning where defense counsel was going with his questions and to be

sure the questions were asked to limited the answer.    Prior to the jury's return, the trial court

also warned Officer Applewhite that before he stated anything about the 1979 insurance policy,

that he was to stop and make sure that the judge understood where he was going to go with his answer.

¶95. Rubenstein claims that the trial court did not caution the officer about references to "another policy" but clearly the record reflects above that the trial court warned the officer to stop prior to stating anything about the 1979 policy.

¶96. As for the officer's later references that the focus of the investigation shifted to Rubenstein because of other insurance policies, Rubenstein made no objection, therefore, the issue is waived and procedurally barred. *Scott,* 878 So.2d at 988; *Howard,* 507 So.2d at 63. Further, there was no actual mentioning of Harold Conner by the officer. Rubenstein's complaint about this statement is without merit.

**Statement 7:**

¶97. Officer Applewhite testified on cross-examination by the defense that, "Sir, if you are asking me if the investigation was not completed, there are a lot of things that this jury doesn't know about the investigation." This answer was given in response to the defense question of whether Officer Applewhite thought the identity of the owner of the hairs found near Krystal's body was irrelevant to the Officer. Rubenstein claims that Officer Applewhite's response was "yet another reminder of the prior life insurance policy." Rubenstein never objected to this statement, therefore, this statement is procedurally barred upon appellate review. *Scott,* 878 So.2d at 988.

¶98. Secondly, Rubenstein is disingenuous by claiming that the response was another reminder about the life insurance policy. The response does not mention life insurance, it is a vague answer to the question. Further, the proceeding testimony concerned physical evidence

of blood on Darrell's shoes, and hair samples found near Krystal's body. There had been no discussion of insurance policies for pages prior to this response. We find that there is no error.

**Statement 8**:

¶99. Officer Applewhite responded to defense questions on cross-examination concerning life insurance policies for his wife and granddaughters. The prosecution intended on asking questions about insurance, because it argued that Rubenstein opened the door to this type of redirect examination questions. Officer Applewhite's testimony was proffered out of the presence of the jury.

¶100. Rubenstein and the State eventually both agreed to a stipulation concerning the insurance policies. The stipulation was:

> That the Defendant had knowledge of the contestability clause of insurance policies.

> That the Defendant was familiar with the insurable interest clause in life insurance policies.

> That the Defendant was aware of the way insurance companies process claims.

> And that the Defendant had policies of insurance on persons who were not related to him in the past.

¶101. Both Rubenstein and the State agreed to the stipulation. Rubenstein appears to suggest that the trial court's ruling that the State could conduct a redirect examination of Officer Applewhite concerning his alleged prior bad acts involving life insurance forced him to agree to this stipulation.

¶102. First, other than reaching an agreement as to the terms of the stipulation, Rubenstein made no formal objections to this issue. Second, the trial judge determined that Rubenstein opened the door to questions involving insurance policies he had taken out on other family members. Indeed, Rubenstein asked Officer Applewhite on cross-examination about insurance policies for his wife and granddaughters with the implication that the policies on the girls were for educational purposes. The State wanted to ask further questions concerning insurance policies other than automobile policies. The State proffered Officer Applewhite's testimony in which he stated the authorities considered other life insurance policies other than those of his wife and granddaughters. The State further questioned Officer Applewhite about whether it was ascertained that Rubenstein had knowledge of insurance policies. Officer Applewhite then related his information that Rubenstein attempted to collect on a business insurance policy on a former partner, Harold J. Conner.

¶103. Prior to ruling on whether this testimony could go before the jury, Rubenstein suggested a stipulation about his knowledge of the workings of insurance. A discussion ensued over the agreed language of the stipulation. The trial judge also conducted a M.R.E. 403 balancing test and determined while the information was prejudicial because it showed Rubenstein had knowledge of the working of insurance policies, contestability periods, insurable interest clauses and requirements in insurance policies, it was probative to rebut the attempted claim that Rubenstein purchased policies on his wife and grandchildren for philanthropic purposes.

¶104. Further, the trial court found that the door was opened to the testimony and that to leave them out would imply that they were the only policies upon which the authorities relied.

However, the trial court found the probative value outweighed any prejudicial effect. However, the trial court restricted testimony on any allegations that Rubenstein had anything to do with Conner's death.

¶105. Rubenstein requested that the trial court reconsider its ruling on the life insurance policies. The trial judge denied the request. The prosecution only asked Officer Applewhite (1) whether he was aware that Rubenstein had life insurance policies on non-family members, and (2) whether he could confirm alleged automobile scams described by David Perry. We find that the trial court did not err. Rubenstein opened the door to questioning by the State on his cross-examination of Officer Applewhite. Further, Rubenstein suggested a stipulation to go before the jury in place of questioning by the State on redirect examination of Officer Applewhite. Rubenstein negotiated the language presented in the stipulation, and the State only asked for a yes or no answer concerning whether the authorities knew that Rubenstein had insurance policies on non-family members and whether any auto insurance scams could be confirmed based upon David's statement. This Court finds that Rubenstein's complaint about this statement is without merit.

**Statement 9:**

¶106. Rubenstein argues that the trial court erred by allowing the prosecution to question Officer Applewhite concerning whether the authorities were able to confirm David's statements.

¶107. Rubenstein made no contemporaneous objection to this question therefore, the statement is barred. *Scott,* 878 So.2d at 988. The record reflects the following dialogue:

| | |
|---|---|
| State: | . . . You had testified that when you were interviewing David Perry, the victim Daryl Perry's brothers, at East Mississippi State Hospital - - |
| State: | That he had given you information concerning automobile insurance scams, was that correct? |
| Applewhite: | Yes, it was. |
| State: | Were you able to confirm what he told you? |
| Applewhite: | By talking to his - - yes. |

Therefore, the trial court did not err by admitting this statement.

¶108. Rubenstein argues that "Mr. Shields objected to no avail and went forward with the stipulation." The record clearly reflects that there was no objection. To the extent that this statement could be interpreted to relate back to the trial court's denial of Rubenstein's request to reconsider in statement 8 above, the statement is still without merit for the reasons given in the previous statement. We find that Rubenstein's complaint about this statement is without merit.

**Statement 10**:

¶109. The prosecution questioned Sheriff Glynnis and asked, "and what, if anything, did [Rubenstein] tell you concerning an insurance scam, or anything of that nature?" Rubenstein claims that the State knew nothing was said to the sheriff about any scam and that even though the objection was sustained the prejudicial information went before the jury. Rubenstein did not object to this statement on the grounds that it was prejudicial. Defense counsel only claimed the statement was leading at trial. The trial court did not believe the statement was leading and questioned whether it was a proper question at all, but sustained the objection.

¶110. Rubenstein argued that the question was leading. The trial court sustained the objection, for apparently being an improper statement and not a leading question. Notwithstanding this,

the sheriff never answered the question.  Further, Rubenstein on appeal argues a reason for objecting to the question that was not presented to the trial court for a ruling; therefore, Rubenstein waived the objection.  We find that Rubenstein's complaint about the statement is without error.

**Statement 11**:

¶111.  Rubenstein argues that the prosecution elicited inflammatory and irrelevant testimony about insurance scams from Sidney Page.  When questioned on direct examination by the State about why Annie went to Mississippi, Page stated that she went "to do something for Mr. Mike" and that Page "just figured it was another scam, you know, insurance scam for pills or something like that."

¶112.  The record reflects that Rubenstein did not object; and therefore, this issue is waived. *Scott,* 878 So.2d at 988.  Further, the trial court was not presented with an objection in order to make a ruling.  Accordingly, we find that Rubenstein's complaint about this statement is without merit.

**Statement 12**:

¶113.  On cross-examination Page stated that he heard from Annie, Darrell and David Perry that they committed scams involving car accidents and pills for Rubenstein.

¶114.  The record reveals that Rubenstein made no objections to these statements; and therefore, the issue is waived. *Scott,* 878 So.2d at 988.

¶115.  Prior to the first statement that Annie, Darrell and David told Page about insurance scams, the trial court made a ruling that the defense opened the door for Page's opinion concerning why he pointed his finger to Rubenstein in regards to the murder.  The trial court

42

also stated that under M.R.E. 804(b)(5) Page's statements would guarantee trustworthiness because he had a relationship with Annie and they lived together for several months. The trial court also acknowledged that while it is hearsay "the question was asked why, and I think this witness should be allowed to answer the question. He had an opinion. And he was asked why. And he'll be allowed to give it." Therefore, Page's response concerning the insurance scam was a continuation of his opinion why he pointed the finger at Rubenstein. A question to which, Rubenstein opened the door. We find that the trial court made thorough on-the-record findings on this issue.

¶116. The continued statement that Annie, Darrell and David told Page of insurance scams was not objected to by defense counsel following this ruling. This opinion addresses these issues in further detail concerning the hearsay analysis in Issue I and bad character evidence in Issue VI. We find that Rubenstein's complaint about this statement is without merit.

**Statement 13**:

¶117. Michael Perry, the brother of David and Darrell, was asked what he knew about insurance scams involving Rubenstein. Michael began to testify that he was involved in scams, but was cut off by defense counsel. Defense counsel interrupted and insisted that Michael only testify to what he knows of his personal knowledge. The prosecution and trial court was in agreement with the defense. Thereafter, Michael testified about his participation in insurance scams in 1981 and 1983. His answers were in conformity with the defense's request that Michael only testify as to his personal knowledge. Accordingly, we find that there is no error as to these statements.

¶118. Rubenstein also argues that he objected to the relevance of testimony concerning the purpose of an airline tickets in the 1983 scam at the airport. The State argued that the testimony concerned the modus operandi and the complexity of the scams. The trial court overruled the objection. Rubenstein now argues that the trial court failed to perform a M.R.E. 403 analysis. This Court finds that both sides presented arguments from which the trial court made a ruling. Rubenstein did not ask the trial court to make a probative versus prejudicial finding, but merely objected to the tickets' relevance. This Court finds that Rubenstein's complaints about these statements are without merit.

**Statement 14:**

¶119. Carla Denham, Annie's sister, testified on direct examination by the State that Annie told her, she was going "to do an insurance scam." Rubenstein objected arguing that the case was a murder trial and not an insurance fraud case. Further, Rubenstein argued that "This has no place in this trial. Under 403 and 404, 402, under any imagination."

¶120. The trial court made an extensive on-the-record finding pursuant to M.R.E. 404 and M.R.E. 403, and determined the questioning to be admissible. The trial court stated its reasoning which is quoted in Issue I, under Carla Denham. Subsequently, Carla testified that the reason for going to Mississippi was for an insurance scam involving a car accident. We find that the trial court did not err by admitting this testimony. The State's theory of the case was that Annie and Darrell believed that an insurance scam was to be performed by Annie, Darrell and Rubenstein in Mississippi. However, this scam was merely a way for Rubenstein to lure them to Mississippi. The trial court made a Rule 404(b) analysis and performed a Rule 403 balancing test. The trial court found the testimony admissible to supply a logical piece

44

of the puzzle for the jury to comprehend the case. We find that the trial court did not err by allowing the testimony; Rubenstein's complaint about this statement is without merit.

**Statement 15:**

¶121. Sue Bellows testified that Annie told her that "they were going to Mississippi and have a car accident for Mike to collect some money so they could get their own place and get away from her mom's." The record reflects that there were no objections to the prosecutors' questions; therefore, the issue is procedurally barred. *Scott,* 878 So.2d at 988.

**Statement 16:**

¶122. Donald Landrew, another inmate in jail at the same time as Rubenstein, testified at the defense's request. Rubenstein claims that the prosecution initiated more testimony about insurance scams and an attempted escape by Rubenstein.

¶123. A review of the record reveals that no objections were made to the questions or answers on Landrew's cross-examination. Rubenstein waived this issue and consequently is procedurally barred. *Scott,* 878 So.2d at 988. Therefore, Rubenstein's complaint about this statement is without merit.

### III.    Other Prior Bad Acts and Failure To Give Appropriate Instructions

¶124. Rubenstein argues that the trial court erred by allowing prejudicial testimony concerning alleged prior bad acts and failing to give a limiting instruction. In specific, Rubenstein complains that testimony from Page, Kelly and Bellows concerning Annie's alleged sex with Rubenstein for money, as also argued in Issue I, was inadmissible hearsay, and inadmissible as prior bad acts. As stated in Issue I, Rubenstein used this same testimony to his advantage by implying that Annie slept around for money. He also contends that the trial court

45

failed to conduct a balancing test pursuant to M.R.E. 404(b) and 403 and failed to give a limiting instruction on this testimony.

¶125. Issue I addressed testimony from Page that Annie told him that she was forced to have sex with Rubenstein and Rubenstein did not like black people. Kelly testified that Annie stated that she had to have sex with Rubenstein in order to get baby supplies for her daughter. Bellows testified that Annie stated that Rubenstein forced her to repay a loan with sex. Denham testified that Annie was going to Mississippi for an insurance scam.

¶126. Issue I fully addressed the hearsay issue and Rubenstein's alleged dislike for black people. Rubenstein also claims that these statements were inadmissible prior bad acts. However, Rubenstein never objected to any of these statements on the basis of prior bad act. As Issue I already noted, Rubenstein failed to object to some of these statements altogether, including the sex for money statement and Rubenstein allegedly disliking black people. Therefore, Rubenstein failed to properly object to these statements on the basis of 404(b), and he therefore failed to make any objection on the grounds of prior bad acts and is procedurally barred from asserting these alleged issues of error on appeal. *Walker v. State,* 823 So.2d at 557; *Moawad v. State,* 531 So.2d at 634.

¶127. As for Landrew's statement concerning Rubenstein's plan to attempt an escape from jail, no objections were made by Rubenstein. This issue was addressed in statement 16 of Issue II. Since no objection was made, Rubenstein cannot claim error on appeal. *Walker v. State,* 823 So.2d at 557. This issue is procedurally barred.

46

¶128. Denham's testimony that Annie went to Mississippi to perform an insurance scam is also extensively discussed in Issue I. The trial court made a lengthy analysis pursuant to M.R.E. 404(b) and a 403 balancing test and found the testimony admissible.

¶129. We find that Rubenstein's assertion that the trial court failed to conduct a M.R.E. 404(b) analysis and M.R.E. 403 balancing test is disingenuous given the fact that Rubenstein made no objections based upon M.R.E. 404(b) grounds. Likewise, Rubenstein's argument that the trial court failed to issue a limiting instruction is without merit because he never requested such an instruction from the trial court. This Court in **Brown v. State,** 890 So.2d 901, 913 (Miss. 2004), held that the trial court is not obligated to give a sua sponte limiting instruction on evidence pursuant to M.R.E. 404(b).

¶130. This Court finds that this issue is procedurally barred and without merit.

### IV.    Evidence of Rubenstein's alleged bad character, M.R.E. 404(a)

¶131. Rubenstein argues that the trial court erred by allowing evidence of his alleged bad character in the prosecution's case in chief. He claims that the use of bad character is prohibited under M.R.E. 404(a) and is reversible error, entitling him to a new trial. He also claims that the character evidence denied his right to a fair trial.[11]

¶132. M.R.E. 404(a) states: "[E]vidence of a person's character or trait of his character is not admissible for the purposes of proving that he acted in conformity therewith on a particular occasion."

---

[11] The jury was instructed in instruction 9 that "no person may be convicted upon his reputation or character" and that Rubenstein can only be convicted if he is proven "guilty beyond a reasonable doubt and must not be based upon speculation, conjecture, or prejudice."

¶133. Rubenstein indicates specific example from the trial testimony of Officer Applewhite and Page, where he argues that his alleged bad character was placed before the jury. As discussed in Issues I, II and III, Rubenstein either failed to object or failed to object for the reasons now argued pursuant to Rule 404(a). We adopt by reference all previous discussions as they relate to this issue when asked where David lived on January 12.

**Statement 1:**

¶134. Officer Applewhite testified that David "stated that he was uncomfortable, afraid" when the officer approached him about the case. The record reflects that defense counsel objected, albeit with no specificity and without a 404(a) argument. However, the trial court sustained the objection. The record is unclear as to what made David feel afraid because the officer did not finish his statement. In any case, the objection to this statement was sustained, therefore, the issue is without merit.

**Statement 2:**

¶135. When transporting Rubenstein to Mississippi, Officer Applewhite stated "I told [Rubenstein] I thought he was a sorry sack of human s--t." Later, when asked if Officer Applewhite disliked Rubenstein, the officer stated, "anybody who hurts a child, I have dislike for." As to the statement that the officer thought Rubenstein was a "sorry sack of human s - - t," no objections were made by Rubenstein. Therefore, Rubenstein's complaint about this statement is procedurally barred for a lack of a contemporaneous objection. *Scott,* 878 So.2d at 988.

¶136. As for the second question whether the officer disliked Rubenstein and the response that the officer disliked anyone that hurt a child, Rubenstein requested the statement be

48

stricken and the jury disregard the statement. The trial judge told the jury that they were "the triers of fact and the ultimate issue of guilt is theirs to decide. No witnesses' testimony can take that job away from them." This Court finds that the trial court adequately addressed Rubenstein's concerns. In addition, the defense later questioned the officer on cross-examination about the name calling and the officer's dislike of Rubenstein. Therefore, despite Rubenstein's claim of wrongdoing the defense also used the testimony to its advantage by portraying the officer as having a bias against Rubenstein. Rubenstein's complaints about these statements are without merit.

**Statement 3:**

¶137. The defense asked Officer Applewhite at "what point did [he] decide that [Rubenstein] was a sack of s - - t?" Officer Applewhite responded in part that "To the best of my knowledge, the Pike County victims rights fund paid for the burial of Krystal Perry." Rubenstein also points to a second statement that Zula Loque, Annie's mother, made a similar comment that Rubenstein failed to pay his share of funeral expenses.

¶138. Rubenstein made no objection upon which the trial court could make a ruling for Officer Applewhite's response about the victims rights fund. Instead, the defense simply requested that the officer be more responsive to his questions and not go into a narrative. However, the officer's answer in response to the questions posed by the defense of what time did the officer form his opinion of Rubenstein. As to Loque's statement, she responded that Rubenstein and Doris failed to pay their share of funeral expenses and had no money with him at that time. The record reflects that Rubenstein made no objection. If no contemporaneous objection is made, the trial court cannot err for an alleged issue not presented. *Moawad,* 531

So.2d at 634.  Further, this issue is procedurally barred on appellate review.  *Walker,* 823 So.2d at 557.  We find that this issue is without merit.

**Statement 4:**

¶139.  On cross-examination Rubenstein asked about specific dates that Doris contacted Officer Applewhite.  He stated that Doris contacted him after "Mike Rubenstein left her penniless."  The record reflects that Rubenstein made no objection to this statement.  No contemporaneous objection was made so the issue is procedurally barred on appellate review. *Scott,* 878 So.2d at 988; *Walker,* 823 So.2d at 557.

**Statement 5:**

¶140.   Page testified that Rubenstein disapproved of Annie's interracial relationship with him. Rubenstein claims that it attempted to paint him as a racist.   Again, the record reflects that Rubenstein made no objection, let alone an objection based upon M.R.E. 404(a) as to testimony that Rubenstein disapproved of the relationship.   Therefore, the issue is without merit. *See Walker,* 823 So.2d at 557; *Moawad,* 531 So.2d at 634.

**Statement 6:**

¶141.  Page testified on redirect examination that he told police after the murders that he thought Rubenstein would have committed this type of crime and described Rubenstein as "not a good person."  The record reflects that no objection was made by Rubenstein for either of these statements.  Therefore, the issues are waived and procedurally barred on appellate review. *Scott,* 878 So.2d at 988.

**Statement 7:**

¶142. On cross-examination, Page remarked that being a drug dealer, he had connections and Rubenstein was "known" in those circles and "[a]ll you got to do is ask." Page's answer was in response to the defense's question asking why did Page "point the finger" at Rubenstein. Rubenstein objected, and the trial court allowed the statements on the basis that Rubenstein opened the door to this type of response concerning Rubenstein's character based upon his request that Page give his opinion. This issue is addressed in Issue II and III above; and therefore, this Court need not address it further. This issue is without merit.

### Statement 8:

¶143. Rubenstein generally argues that bad character evidence in the form of his alleged participation in insurance scams, Annie having forced sex with him, and any other incidents involving life insurance were inadmissible. These issues were addressed in detail in Issues I, II and III. What is more, there were no objections made let alone an objection based upon M.R.E. 404(a). As such, the issue is procedurally barred and this Court need not revisit this repetitious argument.

### Statement 9:

¶144. In his supplemental brief, Rubenstein complains of the alleged improper introduction of racial remarks made to Sheriff Glynnis. Rubenstein allegedly made some racial remarks to the sheriff which were not recorded or mentioned until shortly before the trial.

¶145. Rubenstein spoke to the sheriff after the discovery of the three bodies. The sheriff typed his interview notes after speaking with Rubenstein. On the way back to the cabin and before the sheriff typed Rubenstein's interview, Rubenstein allegedly hit the top of the car and said that he thought "that niger [sic] Sydney" sexually assaulted Krystal. However, the sheriff

did not immediately write down Rubenstein's remarks. The sheriff wrote the statement after discussing the matter with the district attorney five years later. Rubenstein argues that admission of this statement was prejudicial and would inflame the jury and cites the argument pursuant to Rule 404 in this issue.

¶146. Rubenstein made no contemporaneous objection to this statement; therefore, it is procedurally barred. *Scott,* 878 So.2d at 988. Notwithstanding the bar, we will address the merits of the statement.

¶147. The trial court made a ruling to admit Sheriff Glynnis's testimony but not the actual document. The following exchange occurred:

> Court: I've ruled. And I don't have - - I don't know that it's an option.
>
> All right. Yesterday, I needed to put this on the record. The witness C. V. Glennis testified about a statement given by Mr. Rubenstein to him, in the car, on the way back to the crime scene. There was a Motion to Suppress, or a Motion in Limine that was ruled on.
>
> There was no objection made yesterday, but what I had - - after I heard the testimony, what I intended to do was reverse myself and allow that in. **To modify that statement, would have been to take it out of context and to detract from, modify the evidence in a way that was - - that I don't think is proper.**
>
> **Under Rule 403, I find that it was more probative than prejudicial. And of the probative of the alleged intent of the defendant to weave a web of deception to head the State's investigators in a direction away from himself.** So the rule that was previously made would have been reversed had objection been made, but I will - - I just wanted to state that.
>
> State: And, Your Honor, the only thing I thought you took under advisement, was going to think about, was whether or not to admit the document that Sheriff Glennis testified from.

Court: Yes, sir. I'm going - - I'm not going to allow that to come in, the document itself. I sustain the objection to that.

> All right. Anything - - certainly, if you can - - it can be talked about. It can be
> read from, to the jury. But it can not - - it will not go into - - the actual document will not go into evidence.
>
> I don't think that - - it was a document made from notes. That particular document, in the form that it is in, was not acknowledged by the defendant and adopted as his own statement. There is a danger of - - well, I just think it's proper to exclude the document without going into any more detail.

(emphasis added).

¶148. The specially concurring opinion acknowledges that Rubenstein failed to object to this testimony and is procedurally barred. However, the specially concurring opinion argues that Rubenstein's comments had no bearing on his guilt or innocence. The opinion cites ***Gaston v. State***, 239 Miss. 420, 123 So.2d 546 (1960), arguing that this Court found reversible error when a sheriff used the word "Negro" because it was irrelevant and inflammatory.

¶149. In ***Gaston,*** Ella Gaston, a black woman, was convicted for attempting to obstruct an officer in the performance of his duties. ***Gaston***, 123 So.2d at 548. The officer was attempting to arrest Gaston's husband for driving a car while under the influence of intoxicating liquor. ***Id***. At trial, the sheriff was asked when he first saw Nelse Gaston, the defendant's husband, on the day of the arrest. ***Id***. The sheriff stated, "We were investigating and trying to find a Negro by the name of Frank Ed Hill, that had committed an assault upon the marshall down there (Shuqualak)." ***Id***. The trial court overruled Gaston's objection that the comment was irrelevant and inflammatory. ***Id***. This Court held:

This was reversible error. **What happened in Shuqualak the night before, when appellant and her husband were in Hattiesburg, was wholly irrelevant to any issue pertaining to her guilt or innocence.** It unnecessarily raised in the trial the element of racial prejudice, which has no place in the administration of justice. *Hardaway v. State*, 1911, 99 Miss. 223, 54 So. 833; *Reed v. State*, 1958, 232 Miss. 432, 99 So.2d 455.

*Gatson,* 123 So.2d at 548 (emphasis added).

¶150. Clearly, the fact that the sheriff was looking for suspect in an assault that occurred in Shuqualak on a different date had no bearing on Gaston's charge. This is not the situation in the case at hand, as will be discussed more fully below.

¶151. More recently in *Whitten v. Cox*, 799 So.2d 1, (Miss. 2000), this Court distinguished *Gaston* and *GMAC v. Baymon*, 732 So.2d 262 (Miss. 1999), from the facts in *Whitten* and upheld the admission of offensive language.[12]  In *Whitten*, a municipal judge allegedly stated something to the effect that a n----- judge in Sumner would be unable help the plaintiffs. *Whitten*, 799 So.2d at 14.  This Court found that *Gaston* and *GMAC* were distinguishable from *Whitten* because the issue of race was irrelevant to the alleged crime or claims. This Court held:

The threshold for admissibility of relevant evidence is not great. Evidence is relevant if it has any tendency to prove a consequential fact. **In both of the cases cited by Whitten, the issue of race was wholly irrelevant to the claims asserted or to the damages claimed. The comment in the current case is relevant to a full understanding of all the facts. In this case the purpose of the evidence offered by the plaintiffs was to show their sense of helplessness, which is relevant to whether they felt free to leave and therefore relevant to their claim for false imprisonment. The evidence was also relevant to the plaintiffs' contention that Whitten sought to convince them that they would have no potential remedies available to them to redress his actions that afternoon.** The admission of the evidence

---

[12] The specially concurring opinion also cites to *GMAC*.

54

therefore meets the threshold requirement of relevance, unlike the cases relied on by Whitten.

*Id*. at 15 (emphasis added).

¶152. We find that the trial court did not err by admitting this testimony. The context of the offensive language in this case is analogous to the language in *Whitten* and, like *Whitten*, is distinguishable from *Gaston* and *GMAC*. The context of the remarks also are relevant to a full understanding of the facts. While the testimony contained a racial comment, the context of the statement would have been altered with the deletion of the comment. The trial court found that the testimony was more probative than prejudicial after reviewing the comment under M.R.E. 403. As the trial court determined, the testimony demonstrated Rubenstein's alleged ploy to redirect police attention away from himself and to cast suspicion on another person, Page. The State contends that the comment was made by Rubenstein to deflect suspicion from himself. The record does not reflect that the racial comment was offered to incite any racial animosity in the jury or as a racial indictment against Rubenstein. In fact, we do not know the racial make-up of the jury. Here, as the trial judge found, the deletion of the racial comment would amount to modification of the evidence. While this issue is procedurally barred due to Rubenstein's failure to object to the racial comment, this issue is also without merit.

## V. Whether the trial court erred by allowing testimony even though the actual declarants were available and Rubenstein's right to confrontation was violated.

¶153. Rubenstein argues that the trial court erred by admitting numerous hearsay statements when there were available declarants. In addition, Rubenstein claims that the statements violated his constitutional right of confrontation.

55

¶154. As a preliminary matter, the record reflects that the trial court made a ruling concerning hearsay. The trial court gave general instructions to the jury about hearsay. The trial court stated:

Court:   Ladies and gentlemen, the objection is, with that qualification, is overruled.

Hearsay is a statement made, outside of court, submitted, in court, for the truth of what was said. Such as I would tell someone - - that person would take the witness stand and say that Mr. Starrett said the sun was shinning. That would be hearsay, if it is submitted for the truth of what was said, to prove that the sun was shining.

There are times when statements, that normally would be hearsay - - hearsay is not normally accepted, or not usually accepted in court to prove the truth of a matter asserted unless it falls within one of the exceptions to the hearsay rule.

And I'm not going to go into a lot of explanation of that, right now. You may not need it.

But if there are statements that normally would be hearsay, that are admitted only to explain this officer's actions and not submitted for the truth of what was said, on they are allowed. Such as what Officer Applewhite just related that Ms. Belub said. That is hearsay. And it is not allowed to be presented for the truth of what was said. It can be presented to explain what the officer did. And it may or may not be true. You're not to consider whether or not it's true. you're to consider what the officer did when he was given that statement. Does everyone understand that. This is submitted not for the truth of what was said, but merely for the fact that it was said, to explain this officer's actions. And his actions would be - - just wouldn't make any sense unless he had some basis to do that. That's why this is allowed.

¶155. Therefore, the trial court gave general instructions to the jury that hearsay is admissible if it meets an exception or when the statement is not admitted to prove the truth of a matter asserted, but merely to explain the officer's actions.

¶156. Rubenstein also claims his right to confront witnesses was violated because witnesses such as David and Doris were available to testify, but not called as witnesses by the State. Rubenstein acknowledges that both David and Doris were available to testify. The fact that the State did not call these witnesses is of no consequence, as either side could have called these witnesses. The trial court even noted that either side could have called these witnesses. As such, we find that Rubenstein's claim is without merit.

¶157. Turning to the statements at issue, Rubenstein failed to object to a number of these statements at trial that he now lists as an issue on appeal. As previously discussed in Issue I - IV, this Court has held that the trial court cannot err if it has not been presented with an issue at trial. *Moawad v. State*, 531 So.2d at 634. *See also* **Howard v. State**, 507 So.2d at 63 (procedural bar).

### Statement 1:

¶158. Officer Applewhite stated that David told him that Rubenstein went to Mississippi on November 16 to bring home Darrell and Annie. Further, David told him Darrell called that day. The record reflects that Rubenstein made no objections to this statement. The State argues that this statement is not hearsay, and admitted to explain the officer's actions. In addition, the information was cumulative of the phone records. We find that Rubenstein's complaint about this statement is procedurally barred.

### Statement 2:

¶159. When asked whether Officer Applewhite had "any evidence to support that Mike Rubenstein didn't go pick his wife up in Texas on [November] the 17th" the officer stated that he never knew that Rubenstein went to Texas. David Perry indicated to the officer that

57

Rubenstein went to Mississippi to pick up Darrell, Annie and Krystal. David called Mississippi Highway Patrol and the Louisiana State Police, not the Texas Highway Patrol, to see if Rubenstein had been in a wreck.

¶160. The trial court sustained the objection to Officer Applewhite's testimony. The testimony in question was therefore not admitted and not an issue before this Court.

**Statement 3:**

¶161. Officer Applewhite stated that what he remembered from the file was "that I was told that it was on the 18th or 19th [of November] that Doris returned from Texas with Mike Rubenstein."

¶162. Again, Rubenstein failed to object to this statement. This Court therefore finds that the issue is waived and procedurally barred from appellate review.

**Statement 4:**

¶163. When asked on direct examination who Officer Applewhite spoke to when ascertaining that Rubenstein was insolvent in 1993, the officer stated David and one of Doris's sisters. Rubenstein failed to make an objection to this statement. As such, the statement at issue is waived and procedurally barred on appellate review. Further, the prosecution directed Officer Applewhite to not state what anyone told him. The officer only provided David's name and the name of Doris's sister.

**Statement 5:**

¶164. On cross-examination, Officer Applewhite testified that Annie was tough and could take care of herself in a fight. When asked if the officer thought that Darrell or Annie could have tried to get some of the killer's tissue under their fingernails, the officer replied that he

thought of that possibility. However, David mentioned that Rubenstein bought a hypodermic needle and asked about "what type of hot-shot mix" could make someone go unconscious. Further, the officer stated that another witness mentioned that Rubenstein bought hypodermic needles and threw them out on the road on the way to the home of Michael's wife. Rubenstein asked the question that elicited the officer's response, and this opened the door to this type of answer. In addition, Rubenstein made no objection to these answers. Thus, Rubenstein's complaints about the statements at issue were waived and are procedurally barred.

**Statement 6:**

¶165. When asked on cross-examination by defense counsel if Officer Applewhite gained any information from David when the officer visited him, Officer Applewhite stated that David was involved in insurance scams, along with Rubenstein and other family members, in Texas and Louisiana. Rubenstein would stage accidents in order to collect money. Later, the officer stated that David's statements were confirmed by other family members.

¶166. The defense went into extensive questioning on the issue of insurance, insurance scams, and the types of insurance policies involved in the scams. Therefore, Rubenstein cannot now complain about the responses to his own questioning. In addition, Rubenstein failed to object to any of these responses, therefore, there is no error and the statements at issue are waived and procedurally barred on appellate review. Furthermore, Rubenstein pushed Officer Applewhite to continue answering numerous questions on this issue, despite his answers.

**Statement 7:**

¶167. On re-direct examination the prosecution asked Officer Applewhite what reason Bellows gave for Annie going to the cabin. Officer Applewhite responded that "Annie had told

Sue that they were coming." At this point, Rubenstein objected on hearsay grounds. The trial court sustained the objection. The officer never gave a reason for Annie going to Mississippi, as such there was no error in this partial statement, sustained by the trial court.

**Statement 8:**

¶168. Following statement 7 above, Rubenstein argues that Officer Applewhite again attempted to suggest the motives for Annie going to Mississippi with Darrell. The record reflects Officer Applewhite never made another response on redirect examination after his response in statement 7 above. Therefore, it was impossible for Officer Applewhite to attempt to suggest anything to the jury as Rubenstein contends in his brief. The prosecution asked Officer Applewhite if it would "be accurate to say that the Perry's getting their marriage back together was the only reason they were in Summit?" Rubenstein immediately objected to the question as leading. The trial court sustained the objection. There was no objection based upon hearsay by Rubenstein. Thereafter, the prosecution tendered the witness without any further questions.

¶169. We find that the officer never answered any question. Therefore, he never attempted to suggest anything to the jury, the defense objected to the question posed by the prosecution as a leading statement only, which the trial court sustained. Accordingly, we find that there is no error.

**Statement 9:**

¶170. Rubenstein contends that the prosecution used Officer Applewhite to insinuate that Doris indicated Rubenstein was responsible for the crimes.

60

¶171. Rubenstein failed to object to any of the testimony in question. As such, Rubenstein waived any argument on appeal and is procedurally barred. Further, defense counsel initially brought up most of this information on cross-examination.

¶172. The prosecution asked Officer Applewhite whether during conversations with Doris "had she ever given you any indication that she was - - held the position that those murders were not related to these insurance policies?" To which the Officer responded "No she didn't." The actual question and answer does not insinuate that Doris found Rubenstein responsible for the murders.

**Statement 10:**

¶173. Sheriff Glynnis testified as to the time of death. He stated that Dr. Ward told him that the time of death was "Approximately four weeks from the time we sent the bodies to Jackson." The defense did not object to this specific question. The trial judge eventually ruled that this information was not in evidence. However, the record reveals that further closely related testimony was sustained by the trial court. The record reflects the following:

| | |
|---|---|
| State: | And what did Dr. Ward tell you the time of death was? |
| Sheriff: | Approximately four weeks from the time we sent the bodies to Jackson. |
| State: | And your initial report, that's in evidence, listed the time of death as, approximately, how long on the 17th? |
| Sheriff: | It says unknown. Well, are you talking about the - - I put unknown. |
| State: | Let's see. There was, at the bottom, I believe, you talked about a time of death. |
| Sheriff: | Yeah. Yeah. Autopsy to be held in Jackson on 12/17/93. The coroner stated to me that death most likely occurred two to three weeks ago. That was the information - - |
| Defense: | Judge, I'm going to ask that that be stricken. |
| Court: | All right. That's - - |
| Defense: | They said the medical examiner, now they have corner. |

61

| | |
|---|---|
| Court: | Just a minute. |
| Defense: | Now they have - - |
| Court: | Mr. Shields, when I start talking, lawyers be quite. Does everybody understand that? Y'all have been trying cases a long time. It is sustained. To the last objection, it is sustained. Proceed with your Redirect Examination. |
| Defense: | Your Honor, in all due respect, I ask that that be stricken from the record, and the jury be advised not to regard that. |
| Court: | All right. |
| State: | That's a part of a document that's in evidence, Your Honor. |
| Defense: | Let's approach the bench. |
| Court: | Well - - |
| State: | I mean, that's in evidence. |
| Court: | Well, you can argue that. Ladies and gentlemen, the objection has been sustained. You have been instructed before that you would disregard the statement, that is the objection is sustained. Does everyone understand that? All right. |
| State: | At the bottom. |
| Defense: | Judge, I would like the jury to be instructed that a medical examiner did not make an opinion. |
| Court: | Just a minute, Mr. Shields. |
| Defense: | Respectfully, they indicated - - |
| Court: | That is not in evidence. And don't make any more statements like that until it comes into evidence. |

¶174. The trial court found Dr. Ward's information that the deaths occurred four weeks prior to the death was not in evidence. The trial court gave an instruction to not make any further statements about that topic until it came into evidence. As for the sheriff's statements concerning the coroner's statement that the deaths occurred two to three weeks prior to December 17, the trial court sustained the objection, agreed to strike it from the record, and instructed the jury to disregard the statement.

¶175. Rubenstein failed to object to the testimony that the death occurred four weeks prior to December 17, nevertheless, the trial court found the information to not be in evidence. As

for the coroner's timing of two - three weeks, the trial court did not err because it sustained the objection and instructed the jury to disregard the statement. This issue is without merit.

## VI.    Fair Trial

¶176. Rubenstein alleges that Officer Applewhite's testimony deprived him of a fair trial. Officer Applewhite testified that he had dislike for anybody who hurts a child.

¶177. The defense objected and asked the trial court to instruct the jury to disregard the statement. The trial court immediately admonished the jury to disregard. The record reflects the following exchange:

| | |
|---|---|
| Defense: | Your Honor - - Your Honor, that's judge and jury. That's what these people are for. I ask that be stricken from this record and ask the jury to disregard that. |
| Court: | Ladies and gentlemen, - - |
| Defense: | We don't - - |
| Court: | Just a minute. |
| | Ladies and gentlemen, you are the triers of the fact. No one else can take the job away from you, no matter what the witnesses say, the ultimate issue is guilt or innocence, and that is your prerogative. Do all of you understand that? |
| | All right. Nothing else that any witnesses says can take that away from you. You are to be the ultimate - - you are the ultimate fact finders in this case. |
| | Proceed. |

There was no further objection by the defense.

¶178. In *Cavett v. State,* 717 So.2d 722, 725 (Miss. 1998), this Court held:

"Our criminal justice system necessarily proceeds on the premise that jurors take their responsibilities quite seriously," and this Court "presume[s] as a matter of institutional imperative that our jurors respect the law as they are instructed by the court." *Alexander v. State,* 602 So.2d 1180, 1183 (Miss. 1992) (quoting *Middlebrook v. State,* 555 So.2d 1009, 1013 (Miss.1990)).

63

¶179. We find that the trial court did not err. The trial court instructed the jury to disregard the statement as requested by the defense. Rubenstein also takes issue with Page giving his personal opinion as to why he suspected Rubenstein. However, the record reflects that the defense asked the question on cross-examination that opened the door for Page's response. The State did not ask Page to give an opinion as to Rubenstein's guilt. The following transpired:

| Defense: | Why did you point the finger at Mike Rubenstein when the police brought you in, if you had never seen Mike Rubenstein one time? |
| --- | --- |
| Page: | He was - - because of the type of person that he is, that's why. |
| Defense: | Thank you. But you don't know what type - - |
| State: | May he be allowed to finish his answer? |
| Court: | I thought - - did you finish your answer? |
| Page: | No. |
| Court: | Finish your answer, please. |
| Page: | Mike Rubenstein, is a known - - okay. As a dope dealer, you have connections. you have all kind of connections. All right. You know anything and everybody. All you got to do is ask. Somebody is going - - |
| Defense: | Judge, he's got to go through his own personal knowledge. He never me the man one time . . . |
| State: | Your Honor, the question was: "Why did you say that?" That calls for an opinion from this witness. He has a right to answer the question and give his opinion and the basis for it. **He just opened the door for that**. And he is bound by that. |

(emphasis added).

¶180. Clearly, as the State contends, the defense opened the door on cross-examination for Page's response. *See **Florence v. State,*** 755 So.2d 1065, 1071 (Miss. 2000) (Defense "opened the door", and therefore, put the question of Florence's potential homosexuality before the jury.) *See also **Tate v. State,*** 912 So.2d 919 (Miss. 2005); ***Bergeron v. State,*** 2005 WL 757264 (Miss. Ct. App. 2005).

## VII. Pre-Arrest Silence

¶181. On appeal, Rubenstein argues that his constitutional right to counsel and right to remain silent were violated. Rubenstein made no objection at trial to a constitutional violation of the Fourteenth Amendment through the Fifth or Sixth Amendment. Rubenstein's argues that the error occurred when Officer Applewhite mentioned that in **January 14, 1994,** when he interviewed Rubenstein, Rubenstein stated he needed an attorney and questioning was stopped. At this time, Rubenstein was not arrested as he was not arrested until years later in 1998.

¶182. In *Jenkins v. Anderson,* 447 U.S. 231, 231, 238-39, 100 S.Ct. 2124, 2126, 2130, 65 L. Ed.2d 86 (1980), the United States Supreme Court held that use of a defendant's pre-arrest silence does violate the Fifth Amendment applied to the States through the Fourteenth Amendment to impeach a criminal defendant's credibility. *See McGrone v. State,* 807 So.2d 1232, 1234 (Miss. 2002). This Court has held that "[i]t is improper and, ordinarily, reversible error to comment on the accused's post-Miranda silence." *Quick v. State,* 569 So.2d 1197, 1199 (Miss. 1990).

¶183. In *Riddley v. State,* 777 So.2d 31, 34 (Miss. 2000), the defendant argued that the State's commenting on his right to counsel was constitutionally improper. The Court stated that it was problematic "to accept a proposition that a criminal defendant has a constitutionally protected right to counsel before any criminal proceedings against him have begun." *Id.* The Court held: "While Riddley's actions in contacting and counseling with an attorney were probably wise, they were not constitutionally protected at the time." *Id. Riddley* addressed whether the prosecutor's questions on cross-examination reflected negatively on the defendant's right to counsel. This is not the case at hand.

¶184. Here, the prosecutor did not make any comment on Rubenstein's decision to seek an attorney. There was no negative connotation attached by the prosecutor. The State's questioning focused solely on the murder investigation by Office Applewhite.

¶185. On appeal, Rubenstein also contends that his "invocation of his right to seek legal assistance should have been barred by Rule 403" even if its not prohibited by the Fifth or Sixth Amendments as discussed. The State counters that no testimony was elicited concerning Rubenstein's use of counsel or his right to remain silent. The State argues that the questioning was designed solely to elicit a chronological version of events involved in the investigation of the murders not the fact that Rubenstein requested an attorney during the State's investigation. On appeal, the State stresses that Rubenstein was a relative of the victims and the one who discovered the bodies. Therefore, Rubenstein was a relevant part of the investigation.

¶186. The record reflects the following:

| | |
|---|---|
| State: | Officer Applewhite, I was asking you what the **purpose of the January 14th meting** with Mr. Rubenstein was. |
| Applewhite: | **To find his whereabouts on the 16th through 18th or 19th of November.** |
| State: | Did Mr. Rubenstein give you that information? |
| Applewhite: | No, sir. |
| State: | Well, exactly, what happened? |
| Applewhite: | When he came to the sheriff's office and he had - - first thing was he had heard that he had become a suspect in the investigation. And when he asked us that question, I said, **all I need to know is your whereabouts on the 16th through the 18th and 19th of November.** And, at that point, he told me that he needed an attorney. And there were no further questions asked from him at that time. |
| State: | Did you ever have further contact with either Mr. Rubenstein or a representative of Mr. Rubenstein? |
| Applewhite: | I did. On February the 3rd, somebody, I think Don Lynlee had contacted the - - by this time, it was aware that Wiley J. Beevers - - |

| Defense: | Your Honor, if he's testifying from his knowledge, fine. But if he's testifying to he thinks about what Don Lynlee, that's hearsay. |
| Court: | Lay your foundation for that, Mr. Goodwin. |

DIRECT EXAMINATION CONTINUED BY MR. GOODWIN:

| State: | Mr. Applewhite, was there an effort - - or let me ask this question. When, if ever, was there an appointment set up to talk to Mr. Rubenstein again, after the 14th of January of 1994? |
| Applewhite: | February the 3rd. |
| State: | And what happened at that time? |
| Applewhite: | We were to report to the law firm of Wiley J. Beevers, myself, Don Lynlee and Margaret Lang, the victim's rights coordinator, drove - - |
| State: | And did you do that? |
| Applewhite: | Yes. We drove to the law firm. We were met and told that - - we were furnished the - - we had requested a statement from Mr. Rubenstein of his whereabouts on those days in question, also his phone records. When we got there, we were furnished a copy of the phone records and we were told that Mr. Rubenstein had given a statement on the 16th day of November and he - - that was the only one that he was going to give. |

¶187. The State citing *Foster v. State,* 508 So.2d 1111, 1117 (Miss. 1987), argues that Rubenstein fails to demonstrate that "any prejudice from this evidence does not outweigh the necessary probative value of this evidence . . ." See *id.*, (M.R.E. 403 factors must "substantially outweigh" the probative value before the evidence must be excluded).

¶188. This assignment of error is without merit. Here, there is no constitutional violation and no evidence to support Rubenstein's assertions.

## VIII. Jury Instruction D-17

¶189. Rubenstein alleges that the trial court erred in denying proposed jury instruction D-17.

Proposed jury instruction D-17 states:[13]

> The testimony of incarcerated individuals can be looked at with some question. You have the right to accept or disregard testimony of an inmate and give it any weight you choose.

¶190. This issue concerns the testimony of Stevens and Ballinger. On appeal, Rubenstein

cites this Court's holding in *Moore v. State,* 787 So.2d 1282 (Miss. 2001). However, this case

was not handed down by this Court until June 21, 2001, months after Rubenstein's trial which

commenced January 25, 2000, and concluded February 5, 2000.

¶191. Therefore, Rubenstein asks this Court to retroactively apply its holding in *Moore* to find

that Judge Starrett erred. The State argues that *Moore* is inapplicable, and it is also

distinguishable from this case.

¶192. The State contends that *Manning v. State,* 735 So.2d 323 (Miss. 1999) is dispositive

of the case. In *Manning,* this Court affirmed the denial of a cautionary instruction, stating:

> Manning was allowed to question fully both Lucious and Ashford about any potential preferential treatment which they might be receiving in exchange for their testimony. Neither witness made any deals with law enforcement or prosecutors regarding their testimony at the Manning trial . . . This questioning satisfied the dictates of *Foster* [*v. State,* 508 So.2d 1111, 1115 (Miss. 1987)].

*Manning,* 735 So.2d at 335.

¶193. In *Moore v. State,* this Court reversed the trial court's denial of a cautionary instruction.

*Moore,* 787 So.2d at 1292. The Court discussed the unreliability of a jail house informant or

---

[13] Jury instruction D-17 was actually submitted at Rubenstein's first trial. On retrial, Judge Starrett announced that the instructions were considered resubmitted and stated that the same rulings applied. The trial court requested that authority be submitted to support the instruction, but the defense did not submit any authority.

"snitch," testimony. *Id.* at 1287. However, the Court still based its decision on the facts of that case, stating: "[T]his Court finds that the trial court erred in refusing jury instruction D-24 and that it was an abuse of discretion to deny Moore a cautionary instruction **in the face of evidence that Bully may have received favorable treatment in exchange for his testimony.**" *Moore,* 787 So.2d at 1287-88 (emphasis added).

¶194. Here, Stevens testified that he did not receive nor was he promised any favorable treatment in exchange for his testimony. In fact, Stevens was incarcerated on a revocation at the time he spoke with Rubenstein. Stevens testified that after he was revoked, he paid his fine and served his sentence. He testified that he was no longer incarcerated and was working. There is nothing to support that he received any favorable treatment.

¶195. Landon Phelps, then jail administrator for the Pike County Sheriff's Department during Rubenstein's first trial, testified. During Rubenstein's first trial Phelps spoke with Rubenstein during one of the breaks. Rubenstein had requested to go the bathroom. Phelps testified that when Rubenstein came out of the bathroom, the following conversation transpired:

> And when he came out, he asked me, said, Mr. Phelps, would you give me your honest opinion. And I said, Mr. Rubenstein, opinions are kind of like rectums, everybody has one and everybody should have one. He said, no, I mean just tell me something honestly. I said, well, I don't know whether I can legally do that or not. And he, without any further hesitation, said, well, said, do you think Stevenson's [Stevens's] testimony hurt my case. And I said, Mr. Rubenstein, if Stevenson [Stevens] was coached to say what he said, he didn't miss a lick of all the testimony I have heard while I have been in the courtroom.
>
> And he said, well, I told him what went on up there at Summit, but I didn't know he was going turn it into a confession. And that ended that conversation. I thought then it was my duty to try to get that, let the prosecution know.

¶196. The State argues that Phelps's testimony provides reliability that Stevens and Rubenstein did have a conversation while incarcerated, and they discussed what occurred in Summit.

¶197. Ballinger also testified that he did not receive any favorable treatment nor any promises in exchange for testimony. Ballinger first met Rubenstein while they both were opposing extradition from Louisiana to Mississippi confined together in a holding cell. Furthermore, Ballinger testified as what Rubenstein actually told him which he later discovered through the media was not the correct story. Rubenstein told him he killed three people. However, Rubenstein told Ballinger that he killed his wife, daughter and either the daughter's boyfriend or husband. Ballinger testified he did not change his story to make it fit the actual victims, and he would not change his account of the conversation with Rubenstein to suit anybody.

¶198. Based on the record and facts of this case, we find that the trial court did not err denying proposed jury instruction D-17.

### IX. Ballinger's Testimony

¶199. Rubenstein alleges that he is entitled to a new trial because Ballinger inadvertently stated that he offered to take a polygraph test. The defense argues that a witness's statement concerning his willingness to take a polygraph is inadmissible. However, the record reveals that Rubenstein's assignment of error is procedurally barred and without merit.

¶200. In *Weatherspoon v. State,* 732 So.2d 158, 163 (Miss. 1999), this Court held that the inadvertent admission of evidence pertaining to a witness's offer to take a polygraph test or the mention of a witness's refusal to take a polygraph test does not automatically require reversal. The Court stated that the nature of the admission and the circumstances attendant to its

disclosure must be considered. *Id.* Here, Ballinger's testimony regarding the polygraph was unsolicited by either the State or the defense. Furthermore, there was no objection by either the State or the defense to the testimony *See **Williams**,* 684 So.2d at 1203 (contemporaneous objection rule applies in death penalty cases).

¶201. In fact, the unsolicited response came during the defense's cross-examination of Ballinger. Unlike the facts in ***Weatherspoon,*** neither the State or the defense was trying to introduce or solicit the witness's testimony regarding the polygraph test. In fact, there was no question asked regarding any polygraph test or willingness to take a lie detector test. The record reflects:

> Defense: Are you telling the jury that today you don't know whether it happened another way or not? You never gave any information -
>
> Ballinger: Oh, I have heard the information, sir, and I know you're killing my credibility. **You yourself declined my offer to take the polygraph test back in May 21.** I can only tell you what this man told me. I was not given any promises or leniencies of benefits from Mr. Lampton. No one offered me anything. I didn't ask for nothing.
> I told Mr. Lampton and I told you yourself, I will come testify, **I will not lie for Mr. Rubenstein, I will not lie for Mr. Dunn Lampton. And I an just stating what I was told by Mr. Rubenstein.** And that's what I have done.
>
> Defense: Today, what do you know about how these crimes were allegedly committed?
>
> Ballinger: Well, today I know that his stepson was killed. It was either his wife or his daughter or his boy friend, or whatever, or the stepson's girl friend or whatever, and the young girl was brutally murdered. Two of them were stabbed to death and the young girl was strangled and found naked on the bed . . .
>
> Defense: Who told that [sic] you?
>
> Ballinger: That was in the paper.
>
> Defense: In the paper.
>
> Defense: **That's all I have, Judge**.

(emphasis added)

71

¶202. Reviewing the circumstances of the disclosure, the issue is without merit.

## X. False Expert Testimony

¶203. Rubenstein argues on appeal that the State knowingly presented false expert testimony or allowed a false impression of the evidence to be presented to the jury. Rubenstein takes issue with the testimony of the State's expert, Dr. William Bass, a forensic anthropologist. The expert testimony was for purposes of establishing a date of death.

¶204. In *Manning v. State,* 884 So.2d 717, 726 (Miss. 2004), this Court held:

> "A new trial is required if the false testimony could have . . . in any reasonable likelihood affected the judgment of the jury." *Barrientes v. Johnson,* 221 F.3d 741, 756 (5th Cir.2000) (citing *Napue v. Illinois,* 360 U.S. at 271, 79 S.Ct. 1173); *see also United States v. MMR Corp.,* 954 F.2d 1040 (5th Cir.1992) ("[I]f the government used false testimony and knew or should have known of its falsity, a new trial must be held if there was any reasonable likelihood that the false testimony affected the judgment of the jury.")

¶205. During the State's case-in-chief, Dr. Bass testified that he estimated that it took blowflies a week to ten days to realize that dead people were in the house and get to the bodies. On the State's direct questioning, he stated that this is not an exact science in giving his estimate. On cross-examination, Dr. Bass testified that the flies would have gotten to the bodies in eight to ten days. Dr. Bass testified that he had not been to the crime scene (cabin) to examine the ease of access to the interior. He testified that he did not see any pupal cases (which would indicate that the maggots had left the bodies). Dr. Bass based that observation on the photographs and reports he had reviewed at that point. He testified that in the crime scene pictures it is difficult to see the maggot masses because maggots are attracted to blood and moist areas of the body, i.e., eyes, nose, mouth, ears, vagina, anus or any wound on the body.

¶206. After Dr. Bass testified, the defense called a number of experts to testify. Dr. Mark Krouse[14], a forensic pathologist, estimated that there "would be around ten to twenty days from the time they died to the time they were discovered." Dr. Lamar Meeks, an entomologist, testified that they had been dead about ten days to two weeks before they were discovered. Dr. Meeks had inspected the premises for the flies access to the interior. Dr. Neil Haskell, another entomologist, estimated that the flies began their life cycle no earlier than December 2, 1993, if there was no heat in the cabin, and December 9, 1993, if there was heat in the cabin. Dr. Haskell testified that he saw no pupal casings, i.e., evidence of multi-generations. Dr. Emily Ward, a forensic pathologist, testified that due to the state of decomposition of the bodies, it would be impossible to render an opinion to pinpoint a precise date of death. She further stated that she had no specific knowledge of the life cycle of maggots. She testified that she saw maggots of varying sizes. Dr. Ward estimated that the victims had not been dead for more than two weeks before they were discovered.

¶207. The State recalled Dr. Bass on rebuttal. Dr. Bass testified that the flies' infiltration of the cabin would have taken "a few days to more than a few days." On rebuttal, Dr. Bass stated that in Dr. Ward's autopsy photographs pupa casings could be seen. Dr. Bass also referenced Dr. Ward's testimony that she observed multi-generation maggots. Therefore, Dr. Bass incorporated the testimony of Dr. Ward and her autopsy photographs into his testimony. The defense made no objection, and the defense did not question Dr. Bass on cross-examination

---

[14] In the record, the Dr. Krouse's name is spelled two ways, "Krause," and "Krouse" For consistency, we will use "Krouse" unless taken as a quote from the record.

as to any correction of his earlier testimony. The defense never asked Dr. Bass why he changed his mind regarding the presence of pupa casings.

¶208. The State argues that the substance of Dr. Bass's testimony remained virtually the same on both occasions to the time line involved. On appeal, the State asserts:

> In the State's case-in-chief, Dr. Bass testified that the decomposition of the bodies (i.e.: putrification, bloating, hair and skin slippage, leaching of fatty acids, and mummification), indicated that "there was decay there before the maggots got there." Dr. Bass stated that the entomologists' reports did not take into account that the bodies were "decaying and then the insects" arrived. According to Dr. Bass: "The anthropologist[s] are looking at the decay of the body. The entomologist is looking at the age of the insects."

¶209. Similarly, in rebuttal, Dr. Bass testified as follows:

> I have two problems with it, with the entomologists, that none of them consider that the body is decaying before the maggots get there. And in this case there is a barrier between these decaying bodies and when the flies get there. The entomologists are giving you a minimum time of from the time that the insects attack the body until the body is found.

¶210. Furthermore, the State asserts that Dr. Bass's testimony regarding seeing pupa casing was not the only evidence of the existence of pupa casings in the record. The State provided in its brief:

> [A]ccording to Officer Applewhite, there were "the remains of maggots where they had hatched. Sounded like Rice [C]rispies when we were walking through the house." In addition, the Coroner (Percy H. Pittman, Jr.) testified that there was a crackling sound as they walked through the crime scene, like "Rice Crispies or something to that effect." Dr. [William] [, a forensic pathologist,] also testified to the existence of pupa casings. He further stated that the lay remarks about "rice crispies" were a very common observation by law enforcement, where pupa casing are present. Moreover, the State submits that certain photographs in composite Exhibit 47 indicate - even to the untrained eye - that there were pupa casings in Krystal's hair.

74

¶211. The jury heard the testimony from all the experts. None of the experts pinpointed the same exact time of estimated death. Rubenstein asks this Court to find that the State knowingly had Dr. Bass put on false testimony on rebuttal to salvage its case. The record does not reflect that occurred. The defense never asked Dr. Bass to explain his change in opinion as to the pupa casing or to clarify what pictures he looked at before when he testified in the State's case-in -chief and now on rebuttal.

¶212. This Court has repeatedly held that "the jury is the final arbiter of a witness's credibility." *See **Williams v. State**,* 794 So.2d 1019, 1028 (Miss. 2001); ***Morgan v. State**,* 681 So.2d 82, 93 (Miss. 1996). The jury alone determines the weight and worth of any conflicting testimony. ***Hicks v. State**,* 812 So.2d 179, 194 (Miss. 2002). Dr. Bass's credibility as a witness at trial rests with the jury.

¶213. Nothing in the record supports Rubenstein's assertion on appeal that the State intentionally presented false testimony in this case. In fact, the defense has not demonstrated that Dr. Bass's testimony was false. Dr. Bass's opinion testimony was provided as an expert and open to cross-examination. This Court finds that this assignment of error is without merit. Here Rubenstein only makes assertions that Dr. Bass's testimony was false and the State knowingly submitted false testimony. Such assertions are not sufficient to warrant a new trial.

### XI.  Rebuttal Testimony[15]

---

[15] This issue is a continuation of Issue X. Dr. Bass's rebuttal testimony was discussed in great detail in Issue X. However, Dr. Bass is briefly mentioned in Issue XI by the defense making a similar argument as to Dr. Rodriguez that the rebuttal was improper and constituted a discovery violation. Therefore, Dr. Rodriguez will be the focus of this issue.

¶214. On appeal, Rubenstein argues that the State violated its discovery obligations by failing to disclose Dr. William Rodriguez as a prosecution witness before trial. Dr. Rodriguez, a forensic anthropologist, testified as a rebuttal witness for the State.

¶215. The record reflects that the State listed Dr. Rodriguez as a potential witness on the State's witness list. The potential witness list was filed in the circuit clerk's office on December 29, 1999. Dr. Rodriguez's name and telephone numbers were provided. The witness list also provided that Dr. Rodriguez would be called to testify as a M.R.E. 702 expert. Furthermore, the trial court conducted a pre-trial hearing on January 7, 2000. At that pre-trial hearing, the State informed the trial court that Dr. Rodriguez would testify. The following transpired:

| Court: | Well, I don't know if they have or not, but the State is obligated and is hereby instructed to furnish additional discovery, if you have any, to the defendant. The reciprocal discovery is also ordered. |
|---|---|

<div align="center">***</div>

| State: | **One thing in particular is Dr. Bill Rodriguez will be called as an expert at some point in the case, and Dr. Rodriguez is a world-renowned expert in - I really don't know what you call the field- but a forensic anthropologist.** His name came up in the last trial from both the defense witnesses and from the State's witnesses, and Dr. Rodriguez will testify and set the approximate date of death at November 16, 1993; and, just so the Court doesn't think I have just sat back and not provided that, **Dr. Rodriguez has just given me his report over the telephone at 10:0[sic] o'clock last night. I haven't seen the written report, but he told me what his findings were.** |
|---|---|
| Court: | All right. That will be furnished, Mr. Goodwin? |
| State: | Yes |

<div align="center">76</div>

¶216. Clearly, the defense was informed that Dr. Rodriguez would be a witness. On January 14, 2000, the State furnished a letter to the defense setting forth Dr. Rodriguez's findings in compliance with the trial court's instructions. The letter provided:

Dear [Defense Counsel]:

As per the court's instruction I hereby submit to you a synopsis of what I anticipate Dr. Bill Rodriguez' testimony to be. This is the first time I have ever been required to reveal the testimony of a rebuttal witness, but, here it is. **First, Dr. Rodriguez will be called as a rebuttal witness to Dr. Meeks or any other State witness who testifies at trial**. His opinions are as follows:

1. The date of death of Perry family is consistent to a reasonable degree of scientific certainty to November 16, 1993 than any date post December 2, 1993.

2. He bases this opinion on a review of the relevant evidence shown in the photographs, the tapes of the crime scene, the circumstances surrounding their last known time that they were alive, all of the witness' statements, and so forth.

Dr. Rodriguez has been informed that one witness claims to have seen them alive on December 2, 2000 [sic]. He was also informed that another witness testified similarly to this at the last trial but has since recanted this testimony.

3. He will testify that Dr. Lamar Meeks - or anyone else's - reliance on the swine/automobile experiments is faulty for several reasons:

   A. The swine body is in a closed environment where the temperatures are reasonably expected to rise at a faster rate due to the heat being generated by the decaying process.

   B. When the swine body is in the trunk of the automobile the odor is intensified which increases the process in which the flies infest the body as opposed to the case at hand where the temperatures are not expected to significantly rise and where the odors are defused over a larger area of space which, based on his experiments and training have shown to slow fly infestation.

77

C. Based on the temperatures, humidity and other relevant information it is his opinion that the inside temperatures of the home w[ere] four to five de[g]rees lower inside than outside. This would further slow infestation. He will cite the reasons as to why he thinks this is true.

4. He will testify that the bodies of the adults show a slower decomposition rate than the child and the reasons for this is that the adults were on a floor which on numerous days during this time period were at or below freezing temperatures. It is his opinion that all three people were killed on or about the same date.

5. He will testify that swine experiments are not clearly as reliable as experiments based on human beings and are a poor substitute for the human experiments conducted by Dr. Bass and others in the field.

6. **He will testify that although useful, it would be wrong to rely solely on insect infestation rates and larvae cycles to establish the time of remote death. Rather, he views the insect issue as only one piece of many in the "puzzle."**

7. Dr. Rodriguez is expected to quote [f]rom Dr. Meeks['] academic writings and articles during the course of his testimony.

Respectfully,

/s/ William E. Goodwin
[Assistant District Attorney]

(emphasis added).

¶217. Therefore, Rubenstein's argument that the State did not satisfy its obligation to provide discovery is meritless.

¶218. Rubenstein argues that the rebuttal testimony of Dr. Bass and Dr. Rodriguez was not proper rebuttal. Specifically, Rubenstein contends that rebuttal testimony cannot be used to

avoid the obligation to disclose evidence about its case-in-chief. The record does not reflect that this is the case at hand.[16]

¶219. Dr. Rodriguez testified that decomposition is " a complex subject. Nobody has an easy answer." He stated that entomology cannot be looked at alone. There are many factors to be considered. He estimated that the bodies had been there three to four weeks before they were discovered on December 16, 1993.

¶220. Dr. Rodriguez testified that "the insects are only one part of the puzzle." He testified the bodies being indoors rather than outdoors makes estimating less accurate because how long it would have taken the insects to reach the bodies affects the time involved. He even stated that insects may have been there for the time that Dr. Haskell and Dr. Meeks estimated.

¶221. Dr. Rodriguez testified that the pictures of Krystal's body showed pupa casings in her hair, on the sheet she was wrapped in, and along her neck. However, he stated that the existence of pupa casings was not the dispositive factor in formulating his "opinion on the decompositional process, which is a more gross visualization." He testified that he based it "on the environmental conditions and corporal evidence that we use in a combined manner to get the estimate that combines all of those aspects."

¶222. The State asserts that during Dr. Rodriguez's testimony regarding pupa casings, the defense never objected that it was improper rebuttal or a discovery violation. The State contends that Rubenstein failed to raise a specific objection to the evidence. The State argues that the defense therefore failed to comply with Rule 9.04 of the UCCR. and ***Box v. State,*** 437

---

[16] Dr. Bass's testimony on rebuttal is fully discussed in Issue X. In order to avoid repetition, it will not be restated here.

79

So.2d 19 (Miss. 1983) and its progeny. That aside, based on the discussion in Issue X, the defense's experts, Dr. Haskell, Dr. Meeks and Dr. Ward, all testified regarding whether or not maggots, blowflies, multi-generation maggots and pupa casings were observed. Rubenstein is wrong in claiming on appeal that this was not a proper rebuttal. The State informed the defense that Dr. Rodriguez would be called and the substance of his expected testimony.

¶223.   In *Powell v. State,* 662 So.2d 1095, 1098-99 (Miss. 1995), this Court stated:

> This Court has encouraged liberal application of the rebuttal evidence rule. *See Meeks v. State,* 604 So.2d 748, 755 (Miss. 1992). . . . The determination of whether evidence is properly admitted as rebuttal evidence is within the trial court's discretion. *Wakefield v. Puckett,* 584 So.2d 1266, 1268 (Miss. 1991).

¶224.   Likewise, in a capital murder case, *McGaughy v. State,* 742 So.2d 1091, 1094-95 (Miss. 1999), this Court held:

> This Court has advocated a liberal application of the rebuttal evidence rule. *See Powell v. State,* 662 So.2d 1095, 1099 (Miss. 1995) (citing *Meeks v. State,* 604 So.2d 748, 755 (Miss. 1992)). The time and manner of introducing evidence is committed to the sound discretion of the trial judge. *Deas v. Andrews,* 411 So.2d 1286, 1291 (Miss. 1982) (citing *Winterton v. Illinois Cent. R.R.,* 73 Miss. 831, 836, 20 So. 157, 158 (1896)). This Court will not reverse unless the exercise of discretion appears arbitrary, capricious or unjust. *Id.*

¶225.   While *McGaughy* involved the rebuttal testimony of a witness listed by the State, *McGaughy* differs from the case at hand in that it addressed the denial of the defendant's request to present surrebuttal. Here, Rubenstein did not present an issue of being denied surrebuttal. Therefore, the analysis of surrebuttal in *McGaughy* is not relevant in this case.

¶226.   There is no evidence that supports Rubenstein's claim that the trial court abused its discretion in allowing Dr. Rodriguez's rebuttal testimony.

## XII. *Brady* Claim

¶227. Rubenstein briefly asserts that the State failed to discharge its duty pursuant to ***Brady v. Maryland,*** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). ***Brady*** applies to the State's failure to disclose exculpatory information. Rubenstein again takes issue with Dr. Rodriguez's testimony.

¶228. Specifically, Rubenstein argues that Dr. Rodriguez testified that he saw pupa casings. Rubenstein claims that since that testimony differed from that of Dr. Bass it amounted to exculpatory evidence that must have been disclosed. As previously discussed in Issue XI, Dr. Rodriguez's testimony did not constitute a discovery violation or improper rebuttal. Furthermore, Dr. Rodriguez testified as a rebuttal witness, not as a witness in the State's case-in-chief.

¶229. Rubenstein's specific assertion does not tell the complete story. Dr. Rodriguez only testified as a rebuttal witness. Dr. Bass had already testified on rebuttal. In his rebuttal testimony, Dr. Bass testified that he reviewed the autopsy photographs and heard Dr. Ward's testimony regarding the autopsy she performed. Based on that information, Dr. Bass corrected his earlier testimony stating that pupa casings could be seen in the autopsy photographs.

¶230. Dr. Rodriguez's testimony similarly provided that pupa casings could be observed in the photographs. Dr. Rodriguez's testimony was presented to rebut the testimony of the defense's experts. As to the pupa casings, Dr. Rodriguez testified in viewing the autopsy photographs he observed the presence of puparium. There is no indication that the defense did not have access to the photographs. The defense clearly had experts to testify as to whether they observed pupa casings. Rubenstein's argument centers on this alleged inconsistency between Dr. Bass and

Dr. Rodriguez's testimony. The defense took no action to preserve this issue on appeal. The defense did not cross-examine Dr. Bass to correct his testimony. Furthermore, there was no objection to Dr. Bass's testimony regarding pupa casings.

¶231. This Court finds that Rubenstein's argument is without merit. As discussed in Issue XI, Dr. Rodriguez's testimony did not constitute a discovery violation or improper rebuttal testimony and support a new trial. Rubenstein does not demonstrate the factors necessary to support a **Brady** claim or a new trial. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97. Rubenstein's assignment of error does not constitute a **Brady** violation or merit a new trial.

### XIII. Jury Instruction 15: Felonious Child Abuse

¶232. On appeal, Rubenstein argues that the instruction on the elements of felonious child abuse was improper as being vague and not supported by the evidence. The State correctly asserts that Rubenstein did not raise any objection regarding the felonious abuse instruction at trial. Therefore, based on the lack of a contemporaneous objection, this issue is procedurally barred on appellate review. *See Williams v. State,* 684 So.2d at 1203.

¶233. Alternatively, without waiving the procedural bar, Rubenstein's assertion challenging the instruction on appeal will be briefly addressed. Rubenstein contends that the instruction was inadequate and not supported by the evidence. The instruction stated: "Under the laws of the State of Mississippi, felonious child abuse is defined as intentional torture in such a manner as to cause serious bodily injury or the death of any child."

¶234. Miss. Code Ann. § 97-5-39 (2) provides:

> Any person who shall intentionally (a) burn any child, (b) torture any child or,
> (c) except in self-defense or in order to prevent bodily harm to a third party,
> whip, strike or otherwise abuse or mutilate any child in such a manner as to

cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child . . .

Here, the jury instruction accurately tracked the language of in the felonious child abuse statute, Miss. Code Ann. § 97-5-39 (2). "[T]his Court has 'consistently held that instructions in a criminal case which follow the language of a pertinent statute are sufficient.'" *Byrom v. State,* 863 So.2d 836, 880 (Miss. 2003). Furthermore, the language of Miss. Code Ann. § 97-5-39 (2) is not vague. The statute provides "a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited." *Faraga v. State,* 514 So.2d 295, 303 (Miss. 1987).

¶235. Moreover, this Court has held that "'the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder under Miss. Code Ann. § 97-3-19 (2).'" *Brawner v. State,* 872 So.2d 1, 16 (Miss. 2004) (quoting *Stevens v. State,* 806 So.2d 1031, 1044 (Miss. 2001)).

¶236. In *Stevens,* this Court held:

> In *Faraga* [*v. State,* 514 So.2d 295, 302-03 (Miss. 1987)], the defendant contended that since the facts demonstrated that only one act caused the death of the child, namely throwing a baby onto the pavement, then no one independent act constituted felonious abuse and/or battery of a child. *Id.* This Court stated that Miss. Code Ann. § 97-5-39 (2) "does not require that the abuse be dispensed over a period of time before a charge for felonious abuse will arise." *Id.* This Court further stated that "[t]he intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died." *Id.* at 302. We find that it was the intent of the Mississippi legislature under Miss. Code Ann. § 97-5-39 (2) that the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder under Miss. Code Ann. § 97-3-19(2). The murder of a child constitutes serious child abuse, and the murder may be elevated to capital murder under the reasoning in *Faraga.*

*Stevens,* 806 So.2d at 1044. *See Brawner,* 872 So.2d at 16 (the Court similarly applied its holdings in *Stevens* and *Faraga).*

¶237. According to Dr. Hayne's testimony, four-year-old Krystal would have experienced panic and terror from being strangled. Dr. Hayne testified that she would have experienced "pain and suffering from compression of those structures of the neck, not only light[-]headedness, but certainly air starving and the like."

¶238. Furthermore, Krystal was discovered nude on a bed with her legs spread open. Due to the major maggot masses in Krystal's vagina, it was impossible to determine if Krystal had been sexually assaulted.

¶239. However, the State submits that Krystal's state of undress and location can not be totally disregarded. *See Brown v. State,* 690 So.2d 276, 291 (Miss. 1996). In *Brown,* Dr. Hayne, the forensic pathologist, found no evidence of sexual assault. *Id.* at 281. However, he determined her wounds indicated that the girl had been abused. Furthermore, the thirteen-year-old was found nude with her bra pulled behind her head. The Court stated:

> Although it was not necessary to prove sexual battery or rape, evidence supporting **the State's theory that Brown went to the Boyd house to have sex with Evangela is not totally irrelevant.** While Dr. Hayne, the forensic pathologist, found no evidence of sexual assault, the girl's body was discovered nude with her bra pulled behind her head. Her wounds indicate that she had been abused, struck and mutilated consistent with the definition of felonious abuse and/or battery of a child provided in § 97-5-39.

*Brown,* 690 So.2d at 291 (emphasis added).

¶240. The State also asserts that based on expert testimony it is a reasonable inference that the little girl, may have witnessed the murder of her parents before her death. Both Darrell and

Annie had multiple stab wounds. Dr. Hayne testified that '[t]hey died, at or about the same time, based on the decomposition." Dr. Bass testified:

> If you look at all three, the pictures, you'll notice that the child is a little more advanced in the decay than are the two adults. I think the reason for this is that the adults are lying on the floor of the house, they're cooler. The child is lying up on the bed, lying on the bed, and it's up in a little warmer zone and, therefore, the decay is a little further advanced. Although, I think all three of these were killed at, roughly, the same time.

¶241. Therefore, this Court finds that this assignment of error is without merit.

### XIV. Instructions 5 and 15

¶242. Before discussing issue XIV through XVIII, we note that Rubenstein's theory of the case was that he could not have possibly killed three people at once. This theory, however, forced the State to request alternate instructions for the jury. These theories will be discussed as necessary in issues XIV through XVIII.

¶243. Rubenstein argues that the instructions allowed the jury to convict him without making an unanimous finding. He also contends that the jury instructions supported different theories of capital murder, those being murder during the commission of the crime of felonious child abuse, murder for hire, or as an accomplice, aider or abetter.[17] Instructions 5[18] and 15 are at issue. Rubenstein claims that both these instructions deprived him of his right to an unanimous verdict and his due process rights and he requests a new trial.

---

[17] In Issue XIII, we addressed the felonious child abuse issue. Issues XVI and XVII go into more detail on aiding in abetting. However, this Court has held that "one that aids and abets another in the commission of an offense is guilty as a principal." *King v. State,* 857 So.2d 702, 739 (Miss. 2003).

[18] Instruction 5 was originally labeled as C-2 in the record.

¶244.   Instructions 5 stated:[19]

The Court instructs the Jury that under the law, the State of Mississippi is not required to prove that a defendant committed the entire crime with his own hand.

Therefore, the Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that Krystal Ryan Perry, Evelyn Anne Perry and Darryl Perry were murdered as defined in other instructions from the Court, and further believe beyond a reasonable doubt that the defendant, Alan Michael Rubenstein, arranged for, counseled, assisted or commanded another to commit the murders, if any, then you may find the defendant, Alan Michael Rubenstein, guilty as charged.

¶245.   Instruction 15 stated in part:

The Court further instructs the Jury that murder occurs when one wilfully, unlawfully, and feloniously and with malice aforethought kills and murders another without the authority of law and not in necessary self defense.  While malice aforethought is a necessary ingredient to the crime of murder, still "malice aforethought" means the same thing as killing a human being with the deliberate design to effect the death of the person killed; and that malice aforethought and deliberate design do not necessarily mean hatred or ill will, and need not exist in the mind of the defendant for any definite period of time.

Capital murder is the murder of a child during the commission of the crime of felonious child abuse.  Under the laws of the State of Mississippi, felonious child abuse is defined as intentional torture in such a manner as to cause serious bodily injury or the death of any child.  Under the law, a child is any person under the age of eighteen years.

---

[19] The trial court refused an alternate jury instruction which contained specific aiding and abetting language.  This instruction was also labeled as instruction S-5 also known as S-4.  The refused instruction provided:

The Court instructs the Jury that every person who assists, aid or abets, arranges for , counsels or commands another in the commission of a crime is equally as guilty as if he had committed entire crime by himself.  Therefore, if you the jury find beyond a reasonable doubt that Alan Michael Rubenstein participated by aiding, abetting arranging counseling or commanding another in the murders as alleged in counts one, two and three, you may find him guilty even though you may suspect that some other person also participated in the murders.

The Court instructs the jury that Alan Michael Rubenstein has been charged in Count One of the indictment with the capital murder of Krystal Ryan Perry on or about the 16th day of November, 1993. Therefore, if you find from the evidence in this case beyond a reasonable doubt that on or about the 16th day of November, 1993, in Pike County, Mississippi, the defendant, Alan Michael Rubenstein, did wilfully, unlawfully, feloniously and of his malice aforethought, either alone or in cooperation with another kill and murder Krystal Ryan Perry, a child, by intentionally committing acts which resulted in the torture of the said Krystal Ryan Perry, then you should find the defendant guilty of capital murder.

Should you find that the State of Mississippi has failed to prove beyond a reasonable doubt the underlying crime of felonious child abuse then you the jury may consider whether or not the defendant, Alan Michael Rubenstein is guilty of the crime of murder in the death of Krystal Ryan Perry.

Therefore, in this case, if you believe from the evidence, beyond a reasonable doubt, that on or about the November 16, 1993 in Pike County, Mississippi, the defendant, Alan Michael Rubenstein, did wilfully, unlawfully, feloniously and of his malice aforethought, either alone or in cooperation with another kill and murder one Krystal Ryan Perry, a human being, then you should find the said Alan Michael Rubenstein guilty of murder as to count one.

Should you the jury find that the State has failed to prove the defendant guilty beyond a reasonable doubt of either capital murder or murder in count one of the indictment, then you should find the defendant, Alan Michael Rubenstein not guilty as to count one.

Should you the jury find that the State has failed to prove the defendant guilty beyond a reasonable doubt of either capital murder or murder in count one of the indictment, then you should find the defendant, Alan Michael Rubenstein not guilty as to count one.

¶246. The record reflects Rubenstein failed to object to instructions 5 and 15 on the basis that the jury would be able to convict him without a unanimous verdict and his due process rights. Indeed, the record reflects that Rubenstein only objected to the record based on the aiding and abetting language, not a murder for hire basis.

¶247. Accordingly, this issue is procedurally barred on appellate review. Even in a death penalty case, counsel is not relieved of the contemporaneous object rule. ***Williams v. State,***

684 So.2d at 1203. Despite the procedural bar, this Court will briefly address this issue on the merits.

¶248. There were a number of instructions which do require the jury to reach a unanimous verdict. Instruction 17 states in part: "The Court instructs the Jury that before you can reach a verdict in this case, all twelve of you must agree upon the same verdict. This means that any verdict of the Jury must be unanimous." Instruction 16 reads in part: "The verdict of the jury must represent the considered judgment of each juror. In order to return a verdict, it will be necessary that each juror agree. In other words, all twelve jurors must agree before returning a verdict in this case."

¶249. Instruction 17 makes it clear that the twelve jury members have to agree upon the same verdict, meaning reaching a unanimous verdict. Likewise, instruction 16 requires that the jury agree before reaching a verdict. Looking at other instructions, such as D-7, the jury was instructed that Rubenstein is presumed innocent unless the jury is "satisfied from the evidence, beyond a reasonable doubt, that [Rubenstein] is guilty. . . may [the jury] return a verdict of guilty." Further, instruction D-8 stated that the jury could only convict Rubenstein if convinced by the evidence alone that Rubenstein was guilty beyond all reasonable doubt and not by "mere suspicion." Instruction D-11 also permitted the jury to convict Rubenstein only if the State met its burden of proving Rubenstein guilty beyond a reasonable doubt by way of proving "each and every essential element of the offense charged."

¶250. The record reflects that the jury returned a unanimous verdict as evidenced by their statement finding Rubenstein guilty of the crime of capital murder for Krystal (Count I) and

88

guilty of the crime of murder against Annie and Darrell (Counts II and III). The trial court also polled the jury and it was reflected in the record that the verdict was unanimous.

¶251. Furthermore, instruction 5 contains no language indicative of a murder for hire instruction. The applicable part of the capital murder statement states "that capital murder includes a murder that is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals." Miss. Code Ann. § 97-3-19(2)(d). The instruction contains no language similar to the statute; therefore, the claim that the instruction is potentially a murder for hire theory is without merit. Reviewing all the statutes given to the jury in totality, none of them contain murder for hire language.

¶252. Instruction 5, as the State admits, is an aiding and abetting instruction. Indeed, this Court reviewed similar language contained in instruction 5 which stated in part that instruction 5 provided Rubenstein "arranged for, counseled, assisted or commanded others to commit the murders" to be an aiding and abetting instruction. *King v. State,* 857 So.2d at 727-28. In *King* the language "arranged for, counseled, or commanded another" was provided as an aiding and abetting instruction.

¶253. Therefore, for all these reasons, this assignment of error is without merit.

### XV. Instruction 5

¶254. Rubenstein argues that instruction 5 constructively amended the indictment by allowing the jury the opportunity to convict him for murder for hire pursuant to Miss. Code Ann. § 97-3-19(2)(d). The grand jury indicted Rubenstein for capital murder while engaged in the

89

commission of the crime of felonious child abuse of Krystal in violation of Miss. Code Ann. § 97-3-19(2)(f).

¶255. Rubenstein makes his argument in the context of instruction 5. He claims that the language in instruction 5 which states "arranged for, counseled, assisted or commanded another to commit the murders" in essence gave the jury the opportunity to convict him on a murder for hire theory.

¶256. As explained in Issue XIV the record reveals that Rubenstein never objected to instruction 5 on the basis of it being a murder for hire instruction. He objected to the language as allowing the jury to convict him as an aider and abetter.

¶257. Rubenstein, likewise never objected to the instruction as constructively amending the indictment either. This issue is therefore procedurally barred.

¶258. Even considering the merits of this issue, Rubenstein's argument is wholly without merit. As previously addressed in Issue XIV, the language of Miss Code Ann. § 97-3-19(2)(d) concerning murder for hire, is not contained in any of the instructions given to the jury. Indeed, there is no language which contains wording to the effect that a person offered or received "anything of value for committing the murder." Miss. Code Ann. § 97-3-19(2)(d).

¶259. Accordingly, this Court finds that Rubenstein is procedurally barred, and alternatively the issue is without merit.

### XVI. and XVII.        Instruction 15

¶260. Rubenstein argues that there was no evidence to support jury instruction 15. The pertinent language of instruction 15, originally C-20, in issue, as stated to each of the three victims, Annie, Darrell and Krystal, is as follows:

90

> Therefore, if you find from the evidence in this case beyond a reasonable doubt that on or about the 16th day of November, 1993, in Pike County, Mississippi, the defendant, Alan Michael Rubenstein, did wilfully, unlawfully, feloniously and of his malice aforethought, *either alone or in cooperation with another.* . . .

(emphasis added).

¶261. The proposed instruction 15, originally S-1, had provided "either alone or in cooperation with another *with whom he was then and there aiding and abetting."* Defense counsel objected that the evidence did not support the instruction. The trial court stated:

> I am going to take out the language in each of the three cases with whom he was then and there aiding and abetting. . . the instruction will read Alan Michael Rubenstein did willfully, unlawfully, and feloniously, and of malice aforethought either alone or in cooperation with another kill and murder one Crystal Perry and that will be done in all three counts of the indictment.

The trial court found that the instructions had "to comply or comport with the proof and the reasonable inferences therefrom." "Inferences and presumptions are a staple of our adversary system of fact finding. It is often necessary for the trier of fact to determine the existence of an element of the crime-that is, an 'ultimate' or 'elemental' fact-from the existence of one or more 'evidentiary' or 'basic' facts." *Edwards v. State,* 469 So.2d 68, 69 (Miss. 1985).

¶262. Rubenstein's argument on appeal that the "alone or in cooperation with another" language in the instruction was unsupported and improperly submitted to the jury is without merit. While the trial court found no testimony of another's involvement, the defense's theory of the case was that no one could have murdered the three people alone and that someone killed Annie, Darrell and Krystal.

¶263. In its opening statement to the jury, defense counsel stated:

91

> **How does one person murder three people?** You can imagine the mother of a child, while Daryl is being stabbed and his throat cut from the front to the back of his neck, she would be grabbing her child, fighting for her life and her child's life, and getting out of the cabin, screaming, yelling breaking open windows, breaking doors trying to get out, yet she has not one defensive stab wound. It is impossible for it to have happened that the way the State claims. **It raises the reasonable question that these victims may not have been murdered in this cabin.**

(emphasis added).

¶264. Furthermore, the defense questioned Lisa French, on direct, regarding observing a forest green or dark green mini-van in front of the cabin. French testified that the first time she saw anyone at that cabin was on November 12, 1993, when she saw a young man and a little girl walking through the yard to the cabin. She saw the same young man and a little girl outside playing on the front porch three or four days later. French did not know who owned the green van. French stated that she saw the man and the little girl on the porch somewhere between the 13th and 16th. It was a day or two after that she saw the van. On cross-examination by the State, French testified that she could not be exact about when she saw the green van, but it was less than a week.

¶265. Likewise, on cross-examination of Dr. Bass, the defense asked if flies could have attached themselves to the bodies while the bodies were being unloaded from a van. The defense further, questioned whether that would affect the life cycle of the maggots.

¶266. Moreover, Stevens testified that Rubenstein told him that he had planned to have someone else commit the crimes, but he later changed his mind.

¶267. On appeal, the defense also argues that the language in instruction 15, originally C-2, allowed the jury to convict Rubenstein based on nothing more than some sort of "cooperation"

with another. Here, as discussed in Issue XIV, the trial court gave instruction 5, originally C-2, which provided:

> The Court instructs the Jury that under the law, the State of Mississippi is not required to prove that a defendant committed the entire crime with his own hand.
>
> Therefore, the Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that Krystal Ryan Perry, Evelyn Anne Perry and Darryl Perry were murdered as defined in other instructions from the Court, and further believe beyond a reasonable doubt that the *defendant, Alan Michael Rubenstein, committed the murders, if any, himself or that the defendant, Alan Michael Rubenstein, arranged for, counseled, assisted or commanded another to commit the murders, if nay, then you may find the defendant, Alan Michael Rubenstein, guilty as charged.*

(emphasis added).

¶268. As previously stated in Issue XIV, the instruction provided the jury with an aiding and abetting instruction. *See King v. State,* 857 So.2d at 727-28. Therefore, when the instructions are read together, the jury was properly instructed. In *Humphrey v. State,* 759 So.2d 368, 380 (Miss. 2000), this Court stated: "[j]ury instructions are to be read together and taken as a whole with no one jury instruction taken out of context." (citing *Heidel v. State,* 587 So.2d 835, 842 (Miss. 1991)). *See Austin v. State,* 784 So.2d 186, 193 (Miss. 2001). Here, "[t]he instructions, when read in conjunction with all others, had no tendency to mislead or confuse the jury." *King,* 857 So.2d at 728. Furthermore, the evidence presented at trial adequately support the instruction given by the trial court.

¶269. This assignment of error is without merit.

### XVIII. Refusal to Strike Venire

93

¶270. Rubenstein argues that the trial court erred by refusing to strike the venire denying him a right to a fair trial and seeking a reversal of his conviction and sentence. He raises two arguments in this issue.

### A. Argument 1

¶271. Juror Woodward informed the trial court that she had overheard a juror tell another juror about a conversation in the clerk's office. Juror Woodward told the trial court outside the hearing of the jury:

> Juror Woodward: One of them, when we came back in from the break, we were sitting down in our seats, the lady in front of me began to talk about how she was called in this morning to fill out a form and she overheard conversation in the clerk's office, I think it was, that the case had been overturned before and that the man had committed heinous crimes and that they were trying to get a big jury pool so the lack of jury - - jurors could not be used again to overturn the case.

Juror Woodward told the judge that she could disregard a conversation that she heard that day concerning the trial. Juror Woodward stated that the juror that actually went to the clerk's office had already been excused. This unknown juror told the second juror, identified as Juror Saucier, about the conversation in the clerk's office. Rubenstein was concerned that the jurors heard information that the case was "overturned on a technicality." The trial court correctly stated that Woodward did not state that Rubenstein's case was overturned on a technicality. Rubenstein asked for a mistrial based on this information which was denied. Rubenstein was also concerned that the jurors heard the crime described as "heinous" and that an indeterminate number of jurors heard the description of the crime as heinous.

94

¶272. Before proceeding further, it was not determined that any other juror had knowledge of the facts of the case.[20] The only evidence in the record was that these three jurors heard what took place in the clerk's office. Most significant here, the original juror relating the conversation was excused and Jurors Woodward and Saucier, also did not serve on the jury. Moreover, every juror stated that they could be fair and impartial.

¶273. Therefore, we find that Rubenstein was not harmed or prejudiced by the information as none of these three potential jurors sat in judgment of his case. Accordingly, this issue is without merit.

### B.    Argument 2

¶274. Rubenstein raises a second argument in this issue. He contends that when the trial court addressed the jurors and told them the first trial resulted in a mistrial, the judge allegedly told the jurors one of the murders "involv[ed] child abuse." Rubenstein claims the trial judge's comments compounded the prejudice against him and "amount[ed] to a judicial finding that the murder involved child abuse."

> The entire statement made by the trial court was as follows:

> Ladies and gentlemen, it will come out later in this proceeding that this case was tried one timer earlier and it ended in a mistrial. Now, that should not matter to you at all. It will come  - - that will be something that will be evident before we conclude the trial of this case. That has nothing to do with your decision. You are to base your verdict on the evidence, and the evidence alone. **Now, evidence is what comes from the witness stand. What you may have speculated, first of all it is a serious case. You've just heard, it involves alleged three deaths, alleged to be three murders. One involving child abuse. That is, in and of itself, very serious matters.**

---

[20] Juror McQueen thought she had heard of the case in the newspaper. The trial court did not believe there was an article in the newspaper. Nevertheless, Juror McQueen stated she would "certainly, try to base [the verdict] on the evidence."

(emphasis added).

¶275. It is clear from the context of the trial court's comment to the jury that he meant that one of the alleged three murders involved child abuse, not that the trial court found child abuse. It is true that the indictment alleged murder in the cause of felonious child abuse. Accordingly, we find that Rubenstein has mischaracterized the trial judge's comments and taken the comment out of context. As such, this issue is without merit.

### XIX. Prosecutorial comments during voir dire death-qualification process

¶276. Rubenstein contends that the prosecution made misstatements of law in voir dire which resulted in three potential jurors being excused from the jury. In addition, Rubenstein claims that the prosecutorial misstatements of law made it more likely that the jurors in Rubenstein's case were predisposed to vote for death. The main problem posed by Rubenstein is that "the prosecutor informed the jury that they should be able to vote for the death penalty even for a defendant who did not commit the murder but who was simply 'aware of what was going on.'" Rubenstein contends this alleged misstatement would result in a potential vote for death even if Miss. Code Ann. § 99-19-101(7) was not met and result in a "super death-qualified jury."

¶277. Mississippi's capital sentencing statute Miss. Code Ann. § 99-19-101(7) provides:

> In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> (a)    The defendant actually killed;
> (b)    The defendant attempted to kill;
> (c)    The defendant intended that a killing take place;
> (d)    The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7). *See also* **Enmund v. Florida,** 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed. 2d 1140 (1982).

¶278. Rubenstein appears to suggest that the prosecutor's comments left the jury with the impression that the death penalty would be appropriate even if the prerequisites of Miss. Code Ann. § 99-19-101(7) were not met. Before addressing further arguments, the jury voted unanimously and in conformity with Miss. Code Ann. § 99-19-101(7) when the actual sentencing verdict was delivered. The jury verdict found:

> "We, the Jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of Capital Murder."
>
> (1)   That the defendant actually killed Krystal Ryan Perry.
> (2)   That the defendant intended the killing of Krystal Ryan Perry.
> (3)   That the defendant contemplated that lethal force would be employed.
>
> "Next, we the jury, unanimously find beyond a reasonable doubt that the aggravating circumstances of:
>
> (1)   The Capital Murder of Krystal Ryan Perry was committed while Alan Michael Rubenstein was engaged in the commission of felonious child abuse.
> (2)   The Capital Murder of Krystal Ryan Perry was especially heinous, atrocious, and cruel.
> (3)   The Capital Murder was committed for pecuniary gain.
>
> Are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we unanimously find that the defendant should suffer death."

¶279. We find that the sentencing verdict clearly follows the statute. A unanimous jury found no reasonable doubt that Rubenstein actually killed Krystal, intended the killing of Krystal, contemplated that lethal force would be employed, and should suffer death. Therefore, the jury verdict was in conformity with the Mississippi statute.

¶280. Rubenstein also argues that the State informed the venire that it could vote for death merely because he was "aware of what was going on" even when he did not commit the murder. The specific comments at issue are as follows:[21]

| | |
|---|---|
| State: | And once again, I'm talking - - I don't know for sure what the Judge, what instructions he will give. I just know that under some circumstances Judge sometimes give instructions to tell juries that under certain facts, they have the option, the possibility of convicting someone of a crime even if that person didn't commit the entire crime himself. But that's a possibility. |
| | A bank robbery, somebody in a car, goes to the bank, comes out - - the person in the car, under some circumstances, can be found guilty. So this is hypothetical. |
| | All I want to know is , just like we talked about, could you consider a death penalty, whether you are in favor or opposed to it, could you consider imposing the death penalty if the law authorized you to do that, even though he did not commit the entire crime with his own hands? Or unless the State proved to you that the defendant, if it was a shooting, that the defendant fired the gun rather than telling someone to fire the gun. What I'm saying is would you have to find that the defendant committed that crime with his own hand, if the law said that that's not necessary? I'm talking about principals and accessories. If the law authorized that, could you at least consider it? |
| Johnson: | Consider the death penalty? |
| State: | Yes, ma'am. |
| Johnson: | For an accessory? |
| State: | Yes, ma'am. |
| Johnson: | I don't think so on that one. |
| State: | Okay. That's what I'm asking you. Because that may be under some circumstances - - |
| Johnson: | They didn't have to do it they just were aware of what was going on. |
| State: | That's right. |
| Johnson: | They shouldn't get the death penalty in my opinion. |
| Smith: | Oh, okay. |
| Court: | Just a minute. It's more than just being aware of the crime. |

---

[21] Jurors Johnson and Smith will be identified by their last names only.

| | |
|---|---|
| Johnson: | What would accessory mean, just like being present but you didn't actually do the killing, is that what you're saying? |
| Court: | The best example I can give you is a bank robbery and you have a getaway driver. The person that goes to the bank is charged and so is the getaway driver. And those are - - that's what can be a good example of an accessory. |
| Johnson: | I guess they're just as guilty. |
| Court: | Well, the - - the question is. And this case has nothing to do with a bank robbery, it's only give to you as an example. |
| | The question is, could you consider the death penalty if it's not proven by the State that the defendant committed the crime with his own hands? Could you at least consider it? |
| Johnson: | No. |
| Court: | All right. You may continue Mr. Lampton. |
| State: | That's all I'm asking, if the State failed to prove with a bank robbery that the driver of the car knew that they were doing a bank robbery and he knew what was fixing to take place and helped the man do it, and knew he was going to come out with the money rather than if he just got a taxi cab, rented a taxi cab, hold it out there on the street, comes out and he says I'm ready to leave, the taxi cab driver wouldn't be guilty of anything, because he didn't know. |
| | I'm just saying that if the law authorized that, you wouldn't be able to consider it? |
| Smith: | No. |

¶281. Because of the prosecution's alleged misstatement of law, Rubenstein claims that the jurors were predisposed to vote for death and three jurors were excused for cause. Those three jurors were Johnson, Smith and Brumfield.

¶282. Upon review of the record, Rubenstein failed to object to striking any of these three jurors, and even indicated that he wanted those jurors struck.

¶283. The record is clear that no objection was made for striking any of these three potential jurors. This issue was waived and is procedurally barred on appellate review. *Scott v. State,* 878 So.2d at 953; *Williams v. State,* 684 So.2d at 1203.

¶284. Regardless of the procedural bar, the three potential jurors were properly struck based upon various responses during voir dire. When questioned on voir dire by the defense, Jurors Johnson and Smith both stood up and indicated that they could not keep an open mind until they heard the entire case. When questioned further by the trial court on this matter, both jurors stated that they could not be sure that they could keep an open mind.

¶285. In addition, Johnson and Smith both stated they could not examine the evidence if it was gruesome. As evidenced by the quoted passage above, during the challenges for cause the defense acknowledged and told the trial court that they had noted that these two jurors could not keep an open mind in the case. Therefore, Rubenstein's main concern centered on the two jurors lack of open mindedness, not whether Rubenstein "was only aware of what was going on."

¶286. As for Brumfield, the defense stated that they had "no objection" to him. As for creating a super death qualified jury, the record shows that the prosecutor's question was merely a hypothetical example. Even the defense appeared to want Jurors Johnson and Smith struck for cause for lack of open mindedness not because of their response to the hypothetical. As for Brumfield, the statement by the State was not incorrect. An accomplice or accessory can be found guilty as a principal in a death penalty case. *See Scott v. State,* 878 So.2d 933 (Miss. 2004); *Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

¶287. The jury followed the mandates of Miss. Code Ann. § 99-19-101(7) as evidenced by the sentencing verdict. Rubenstein failed to object to any of the three jurors from being struck for cause. Nevertheless, the jurors were properly struck. This issue is without merit.

### XX.     Closing Argument - Guilt Phase - State

¶288. Rubenstein argues on appeal that the State improperly commented on Rubenstein's exercise of his right not to testify and assistance of counsel; misstated the applicable law; expressed a personal opinion as to the credibility of witnesses; and referred to facts not in evidence.

¶289. The record shows the following transpired during the State's closing argument during the guilt phase:

| | | |
|---|---|---|
| State: | There was all these questions during the trial - - Did Mr. Rubenstein ever acknowledge this statement as being his?  Well, sure he did, ladies and gentlemen.  Remember what happened, what Officer Applewhite and Don Lindley testified happened at Wally Beaver's office in New Orleans.  They went there, to Wally Beaver's office, expecting to get a statement.  And they were told that Mr. Rubenstein had given his statement on the 16th of December - - | |
| Defense: | Objection, Judge. | |
| State: | - - and that's - - | |
| Defense: | Objection.  We went over this.  Mr. Rubenstein never gave a statement. That has been mis[-]characterized through nine days of this trial, and he is up there doing it again. And I would like that clarified now.  That was an interview. | |
| Court: | Overruled. | |

¶290. At trial, the defense objected claiming that the interview with Rubenstein was being mischaracterized as a statement.  Rubenstein's "statement" on December 16 is fully addressed in Issue VII.

¶291. On appeal Rubenstein, however, objects that the State in its remarks commented on Rubenstein's exercise of his right to testify and seek assistance of counsel.  As the record reflects, that was not the defense's objection at trial.  Furthermore, the State's remarks did not comment on Rubenstein's failure to testify.   The comment provided that his attorney provided

that Rubenstein stood on the statement he made on December 16. The State's remarks conformed to the evidence admitted at trial.

¶292. Rubenstein further argues that the State commented on his exercise of his right not to testify when the State, on close, remarked "[t]here is absolutely no evidence to the contrary but that Mr. Rubenstein got that money in cash." Again, the State's remark was based on the evidence admitted at trial, not that Rubenstein chose not to testify.

¶293. The insurance agent, Hiene, testified that Rubenstein and his wife Doris came to his office after Krystal was discovered murdered to collect on Krystal's life insurance money. A claim on the policy was made by January 26, 1994. An assignment of $60,000 of the insurance proceeds was made to Attorney Beavers. The balance of the proceeds was disbursed to Doris. The check was deposited. Officer Applewhite subpoenaed the Hibernia National Bank. The bank records showed that there was a withdrawal of $63,100 in cash and $57,500 in cash. The withdrawals occurred on May 16, 1994 and May 20, 1994. Officer Applewhite also obtained cash transaction reports from the Federal Reserve System. Officer Applewhite explained that the report contained information regarding any time a person deposits, transfers or buys anything over $10,000 in cash. Officer Applewhite testified that from his investigation he was able to ascertain that Rubenstein ultimately received the bulk of the proceeds from the insurance policy on Krystal. Officer Applewhite investigated Rubenstein's financial condition as it existed on November 1993 and discovered he was not solvent in November 1993.

¶294. The evidence introduced supports the State's statement in closing argument. Therefore, the evidence supports that State's comments on closing argument, the remarks were proper.

Davis v. State, 660 So.2d 1228 (Miss. 1996) (prosecutor may comment upon any facts introduced into evidence and draw whatever deductions seem proper from those facts).

¶295. On appeal, Rubenstein also argues that the State's referring to him as "manipulative" in its closing remarks was improper. First, the defense failed to make a contemporaneous objection at trial. Therefore, this assignment of error is procedurally barred. In *Foster v. State,* 639 So.2d 1263, 1288-89 (Miss. 1994), this Court held that "[i]t is incumbent on defense counsel to raise proper objection when offensive language is uttered or waive appellate review of issue." Failure to contemporaneously object to a prosecutorial remark bars this Court's consideration of alleged misconduct on appeal. *Simmons v. State,* 805 So.2d 452, 489 (Miss. 2001) (citing *Davis,* 660 So.2d at 1255). *See Evans v. State,* 725 So.2d 613, 670 (Miss. 1997) (contemporaneous objection rule applicable to death penalty cases).

¶296. Second, without waiving the procedural bar, the State's remarks occurred in its rebuttal closing argument. The State's comments were as follows:

> I have to be fair. My oath doesn't allow me to do anything less. My oath would require me to frankly sack Mr. Goodwin if I thought he was manipulating a witness. And I can't get carried away with the tragedy of the situation. Neither can I be manipulated by the defendant, and allow him to put the State in the position that we cannot ask the jury for justice. And so that's what this trial is about. It's about whether or not the defendant has manipulated the system to the point that you cannot find under your oaths that he is guilty beyond a reasonable doubt.

> * * *

> You listened to me cross-examine [Tonya Rubenstein], you listened to her answers, you saw her demeanor. You know that the statement that was given at first was given where? Where was she when she gave her first statement that she had seen Annie at Gatsby's, where was she? She was at Uncle Mike's house. Am I right? The second time she gave a statement, to the lawyer, how did she get there? Do you remember? Sure you do. Uncle Mike took her there. Now, has

103

Uncle Mike ever been manipulative before, has he ever called upon his family members to go to a lawyer's office and lie? Obviously. Numerous occasions.

¶297. The State contends that the remarks were made in response to numerous comments by the defense in its closing argument accusing the State of manipulation of the jury. "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Simmons v. State,* 805 So.2d at 490. In *Davis,* this Court held it was proper for the prosecution to rebut the defense's argument. *Davis,* 660 So.2d at 1255. The Court found that defense counsel had invited the State's response. *Id.* Some of the defense's comments in its closing remarks are as follows:

> You're an educated jury . . . You know when someone is trying to pull the wool over your head. You know when somebody is trying to twist the facts. I'm not deliberately going to do that. I'm not saying the State didn't do it, but I'm telling you I'm not going to do it.
>
> * * *
>
> And I don't mean that these witnesses are dishonest. God forbid, I don't believe they are. I'm just saying they have another agenda. And you cannot be judge, jury and executioner in this court. And Mr. Goodwin [Assistant District Attorney] can't be judge, jury and executioner.
>
> * * *
>
> But I have a duty to point this out to you. I'm not saying they did something wrong, that's what they all do. They put the picture up there so you can look at it so that you will not look at the evidence[...]. And here is somebody trying to twist the evidence around. Please do not let your emotions rule.
> * * *
>
> For every little thing that happens, [Assistant District Attorney] Goodwin becomes judge, jury and executioner.
>
> * * *

104

This is all sinister stuff that's cooked up by the judge and the jury and the executioner.

\* \* \*

[Co-counsel Janous] told you that the State was desperate, and in their desperation they've stooped to the lowest level of going to jails and dealing with convicted felons.

\* \* \*

You see how some things can be manipulated? Ms. Janous [Defense] told you their case was about manipulation of the facts, in her opening statement, if you recall it. She was right on the money. They manipulate every date. And it worked on these people's hearts and souls out here who've lost their children. And God bless them all. God bless everybody in it, because I couldn't imagine a family being like this. But they've played on these poor people's heart and soul and manipulated the facts. These people don't know it.

\* \* \*

But I do care if a man [Officer Applewhite] is biases when he's closing a case. You'd care too. Because when they're biased, they start to manipulate things. Not because they're bad people.

\* \* \*

Not with Mr. Goodwin [State] questioning somebody and trying to lead them with leading questions, if you get what I'm saying. Strong, hard facts, backed up medically and scientifically, each and everything that we put there. Not talking, but producing. That's what this lady [Janous] said when she got her opening statement. She said we will produce hard facts for you, not a bunch of bologna to try to get you prejudiced.

\* \* \*

Now, I need to show you another example of what I consider manipulation . . . they somehow or another maneuver Ms. Louque [Zula] to come up here on the stand and say that she called Doris Rubenstein on November 16th. . . . Take the witness in the room and explain the dates-give this date. And then they bring them out here and the dates are messed up.

\* \* \*

105

Now, let's talk about the manipulation. He [Goodwin] came up here and tries to throw stuff on the wall in his total presentation and Mr. Lampton [District Attorney], will come up here and I would ask that he get some facts out for you rather than just talking.

\* \* \*

Well, Mr. Goodwin [State], manipulative as he is - and I make no apologies for that I just said . . .

\* \* \*

And the State has manipulated Zula Louque, they've manipulated that poor lady with her calendar, for goodness sakes.

\* \* \*

But they [the State] can't have it both ways, they can't manipulate everything [...] In this particular case, you can't have it any way, because these people are complete adulterated liars, unadulterated liars.

\* \* \*

The State is in bed, literally in bed, with criminals.

\* \* \*

Maybe I'm getting like Mr. Goodwin [State] and I want you to believe something that's not based in fact, I don't know. But I hope I haven't insulted you, because I don't practice law that way.

\* \* \*

Professional people put hard, real evidence on. They don't out stuff and just throw it on the wall to try to see what you can get . . . You're a professional, act professional. Do your job professionally.

¶298. Here, the defense clearly made an issue of the State allegedly manipulating the case against Rubenstein, the evidence, and the witnesses in its closing argument. Therefore, we find that the State's rebuttal closing remarks in response were not improper.

106

¶299. The defense also argues that District Attorney Lampton expressed personal opinions regarding witnesses for the State and defense citing to excerpts from the State's rebuttal closing argument. The record reflects that of the excerpts cited by Rubenstein on appeal, there were no contemporaneous objection made by the defense. In *United States v. Young,* 470 U.S. 1, 20, 105 S.Ct. 1038, 1049, 84 L.Ed. 2d 1 (1985), the United States Supreme Court stated that bolstering statements made by the prosecution does not amount to plain error as to require reversal despite an objection. As the defense did not raise any objection to preserve this assignment of error for appellate review, it is procedurally barred.

¶300. However, without waiving the procedural bar, as previously discussed, the defense invited the State's response in its rebuttal close by its repeated attack on the State for being manipulative and for the credibility of the State's witnesses. *See Young,* 470 U.S. at 17-18, 105 S.Ct. at 1047 (any potential harm was mitigated because the jury understood "the prosecutor was countering the defense counsel's repeated attacks on the prosecutors integrity."). *See also Simmons,* 805 So.2d at 490; *Davis,* 660 So.2d at 1255.

¶301. Lastly, Rubenstein argues that the State referenced matters not in evidence citing to the following excerpt from the State's closing argument:

> Now, we have spent a great deal of time on bugs in this case. The only thing that I can really tell you about that is the two foremost experts in the world - - Dr. Bass and Dr. Rodriguez, the people who pioneered the study of decaying bodies, decaying human bodies - - that these two men are absolutely, just had no question that these bodies had been there for several weeks. And while I'm on December the 2nd, let's talk about Tonya for a moment.
>
> Tonya Rubenstein stated and testified to you that the very first time that she told anyone about having seen Annie at Gatsby's on December 2nd, was at the funeral home when the death certificates had come out placing them at November, placing the deaths at November. And she said, oh, that can't be true, because I

107

saw her at Gatsby's. And she said that was the first time she had mentioned to anyone that fact.

Well, ladies and gentlemen, the funerals, I think that we can assume, were after the bodies were found. The bodies were found on December 16, 1993. And yet, in Mr. Rubenstein's interview or statement or whatever you want to call it, he said that Tonya had seen them at Gatsby's. I think the name on the statement is Taylor, but you can draw your own conclusions as to whether or not that is the same person. I mean, someone is just not telling the truth at that point.

¶302. Again, there was no objection raised by the defense at trial. Therefore, we find that this assignment of error is procedurally barred. Additionally, without waiving the procedural bar, the State's remarks were related to the evidence introduced. The testimony of Dr. Rodriguez included questioning by the defense on rebuttal cross-examination and by the State on redirect as to an eyewitness seeing Annie alive on December 2nd and whether another eyewitness had recanted the testimony.

¶303. Tonya Rubenstein testified at Rubenstein's first and second trial. On cross-examination, the State questioned Tonya as to the discrepancies in testimony in the two trials concerning seeing Annie on December 2, 1993.

¶304. While the assignment of error is procedurally barred, we alternatively find that the State's closing argument also conformed to the evidence and reasonable inferences drawn therefrom. Therefore, this assignment of error is without merit.

## XXI. Closing Arguments - Guilt Phase - Defense

¶305. Rubenstein agrees that the trial court erred in sustaining three of the State's objections to the defense's closing argument. The first assignment of error arises from the following exchange:

| | |
|---|---|
| Defense: | Now, Doris and David Rubenstein were State witnesses in the last trial. They are not here today because - - |
| State: | Excuse me, Your Honor, that is not in evidence and they are equally available to both sides and it is improper to comment on that. They are equally available. |
| Court: | Yes, sir. Proceed, Mr. Shields. |

CLOSING ARGUMENT BY MR. SHIELDS [DEFENSE] CONTINUED:

| | |
|---|---|
| | Doris and David Rubenstein could have testified by the State. They don't want them here. |
| Court: | Just a minute, Mr. Shields, that objection is sustained. That is a misstatement. |
| Defense: | I'm talking about witnesses that could have been called, Judge. |
| **Court:** | **Yes, sir, they were equally available to both sides.** |
| Defense: | I hear that, and that is what I'm going into. |
| Court: | All right. |

CLOSING ARGUMENT BY MR. SHIELDS CONTINUED:

**And I could have called them, too. But then we go back to the presumption of innocence. He doesn't have to take the stand and we don't have to put a case on. I chose not to, because I don't have to do anything. But they should have if they want to get up here like Mr. Goodwin [Assistant Attorney] did and start telling you what Doris Rubenstein said. Call her, put her under oath, and let you hear it. Don't come up here like Mr. Goodwin did and try to tell you what Doris Rubenstein said. That's not admissible evidence.** That's nothing in evidence. And you've got to wonder why they just keep saying that.

(emphasis added). On appeal, Rubenstein argues that the trial court's comment "amounted to an improper comment on the defendant's burden at trial." Rubenstein cites no authority for this proposition. The State contends that "this argument is procedurally barred for failure to cite relevant authority." The State cites *Bell v. State,* 879 So.2d 423, 434 (Miss. 2004). In *Bell,* this Court held "[f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *See Byrom v. State,* 863 So.2d 836, 853 (Miss. 2003);

109

*Howell v. State,* 860 So.2d 704, 760 (Miss. 2003); *Simmons,* 805 So.2d at 487; *Mitchell v. State,* 792 So.2d 192, 202 (Miss. 2001).

¶306. We find that this assignment of error is procedurally barred. However, without waiving the procedural bar, this assignment of error is also without merit. Here, the record reflects that Rubenstein was allowed to make his point to the jury. Rubenstein was not barred from arguing to the jury that the State did not call Doris and David to testify. The defense stated that they were available to the defense to be called as witnesses. Rubenstein then argued to the jury that the defense had no burden to call any witness to the stand or to put on a case. Therefore, Rubenstein made his argument to the jury despite the State's objection that the State had not called Doris and David as witnesses.

¶307. Moreover, here the defense opened the door for the State's objection and the trial court's ruling. In *Griffin v. State,* 533 So.2d 444, 449 (Miss. 1988), this Court stated "the failure of either party to examine a witness equally accessible to both is not a proper subject for comment before a jury by either of the parties.'" *Griffin,* 533 So.2d at 449 (quoting *Phillips v. State,* 183 So.2d 908, 911 (Miss.1966)). However, in *Randall v. State,* 806 So.2d 185, 211 (Miss. 2001), this Court has held that before there is substantial evidence presented the "prosecutor's comment about a potential witness's absence is not reversible error in and of itself." *Randall,* 806 So.2d at 211 (citing *Brock v. State,* 530 So.2d 146, 154-55 (Miss. 1988)).

¶308. Here, the defense, not the State, opened the door during the defense's closing argument by stating the State did not call Doris and David in the second trial. The defense was using this to its benefit. This issue is without merit.

110

¶309. Rubenstein's second assignment of error arises from the trial court sustaining the State's objection to the following comment by the defense on close, "[n]ow the State's case is totally based upon and they are permitted and they are mandated to prove November 16, 1993."

¶310. We find that this assignment of error is without merit. The defense's assertion is factually incorrect. In *Dennis v. State,* 555 So.2d 679, 684 (Miss. 1989), this Court held that "it is the duty of the trial counsel to promptly make objections and to insist on a ruling by a trial judge if he deems opposing counsel to be overstepping . . . ."

¶311. Here, the indictment provided that the crimes charged against Rubenstein occurred "on or about the 16th day of November, 1993 . . ." Furthermore, the State's expert testimony did not provide a specific date. As previously addressed, Dr. Rodriguez testified that he could not provide an exact date. The State's expert, Dr. Bass, also did not provide an exact date or time due to the decomposition. In fact, the defense's experts also did not provide a specific date or time. Therefore, we find that the record does not reflect that the trial court erred in sustaining the State's objection.

¶312. Lastly, Rubenstein argues that the trial court erred by sustaining the State's objection to the defense's closing remarks regarding the hairs discovered. Rubenstein also takes issue with the trial court's alleged improper comments regarding the relevancy of the tests. The record reflects that the defense was arguing what test the State did or did not do in the first trial versus the second trial regarding testing the hairs. The trial court stated: "[w]ell, I sustain the objection to that. That is outside the scope of the proof."

¶313. Despite, the trial court's ruling, the defense continued:

**And this time they finally do something**.   They finally do something.   August 19th, after December 17th.   On August 19th, they sent the hairs over, but guess what?   They don't want to know but one thing.   **They don't have any other tests run on purpose.** Now - -

State:       Excuse me, Your Honor.  I would object to that.

Defense:    This is opening, closing arguments, Judge.   This is my version of the case.

Court:       I understand, but both sides had the right to request tests, request the Court for tests.

Defense:    Judge, are we going to get into that?  **I requested tests and this Court wouldn't let us have it.**  They refused to pay for it, and I requested three times, if we're going to get into that.

Court:       **Well, they we re requested and it was ruled that they were irrelevant.**  There was no justification for the tests.

Defense:    And it became relevant, Judge there's the relevancy.

Court:       I sustain the objection, Mr. Shields.  Move along.

Defense:    Okay.

CLOSING ARGUMENT BY Mr. SHIELDS CONTINUED:

**The test was done.  They asked for one thing.  This is after the last trial.  They asked was it Caucasian or Negroid.  That's it.  We've got a copy of that.  The second test.  January 31, 2000.  Do you know when y'all were empaneled on this jury? January 25.**  Well, actually, you was empaneled, yeah, the 25th or 26th you were empaneled.   We got this in the middle of the trial.   And it's been setting over there since November 17, 1993. **Wasn't made available for the first trial.**  But we got it this time.   What did it say?   The hairs don't belong to Michael Rubenstein.   And there is your stipulation by the State.  **Wish I'd have had it last time at the last trial.  But I didn't.**

**The State of Mississippi hereby stipulates that the hairs found** on and under the body of the victim Crystal Perry are not those of Alan Michael Rubenstein.    And that the State of Mississippi does not know who the hairs belong to.

(emphasis added).[22]

---

[22] Issue XXII addresses the testing requested and available to either side.

¶314. Rubenstein fails to demonstrate how the defense was hindered or the trial "infected" by the trial court's ruling. While the trial court sustained the State's objection, the defense continued with its closing argument pointing to each of the tests done by the State with regards to the hairs discovered. The defense clearly continued its reference to the first trial, the availability of the testing done on the hairs and the stipulation that the hairs were not Rubenstein's. Rubenstein does not establish that the jury was prejudiced by the trial court's ruling. We find that the trial court did not err in its ruling that the defense's closing argument was outside the scope of the evidence introduced. Moreover, any error in the trial court's ruling is harmless based on the defense's closing argument regarding the hairs made to the jury as discussed. This assignment of error is without merit.

## XXII. Additional Forensic Evidence: Exhumation of the bodies and DNA testing

¶315. Before his first and second trials, Rubenstein requested that the bodies of the victims be exhumed. He wanted the exhumations to collect fingernail scrapings for DNA testing. Rubenstein also requested that hairs found at the scene of the crime near Krystal's body be tested for DNA. The trial court refused to provide the funds for the exhumations and testing. Rubenstein claims that the exhumation and DNA testing would provide critical evidence for his case and assist in providing a complete defense to the allegations that he faced. Therefore, Rubenstein requests that his conviction be reversed.

¶316. This Court in *Coleman v. State,* 697 So.2d 777, 782 (Miss. 1997) addressed when a defendant should receive an expert to analyze DNA evidence. This Court held:

> This Court has applied [*Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985)] to criminal prosecutions involving DNA evidence, requiring that the defendant be provided with an independent expert to analyze

113

DNA evidence presented against him by the State. ***Polk v. State,*** 612 So.2d 381, 393-94 (Miss. 1992). Determination of whether the State must pay for an expert witness for an indigent defendant must be made on a case by case basis. ***Davis v. State,*** 374 So.2d 1293, 1297 (Miss. 1979). This Court has previously held that DNA evidence is not always valuable enough to warrant a trial delay. *See* ***Rhymes v. State,*** 638 So.2d 1270, 1274 (Miss. 1994) (holding that trial delay for DNA testing was attributable to the State, but was mere negligence). Tennessee and North Carolina have held that a criminal defendant must show a "particularized necessity" to justify funds for independent DNA experts or analysis. ***State v. Edwards,*** 868 S.W.2d 682, 697-98 (Tenn. Crim.App.1993) (citations omitted); ***State v. Mills,*** 332 N.C. 392, 420 S.E.2d 114, 117-19 (1992) (citations omitted). Considering the expense and time required to conduct DNA testing, we will not require the State to pay for DNA testing where there is no showing that it would significantly aid the defense.

***Coleman,*** 697 So.2d at 782. Therefore, in order for the State to pay for DNA testing it must be shown that DNA testing would "significantly aid" the defense. ***Id.***

¶317. We find that on both issues, the exhumation of the bodies and the hair sampling, DNA sampling would not be beneficial based on the facts of this case. In addition, the trial court conducted extensive hearings on these matters before denying Rubenstein's requests.

### A. Exhumation of the bodies

¶318. Rubenstein wanted the bodies exhumed to collect fingernail scrapings for DNA tests. Part of his reasoning was that at least one of the victims had defensive wounds and a DNA analysis of fingernail scrapings may have provided DNA which would exclude Rubenstein as the assailant. Prior to the second trial, the motion indicated that part of the reason why the trial court denied the exhumation was that it would delay the trial. Therefore, in his second motion, prior to the second trial, Rubenstein waived his constitutional right to a speedy trial.

¶319. However, as the record reflects, the trial court addressed this issue numerous times prior to both trials. Indeed, prior to the first trial the trial judge made a ruling that the bodies

114

should not be exhumed.  While the trial court cites delay of the trial as part of his reasoning, it is not the main focus for denying the exhumations as Rubenstein suggests in his brief.  The trial court relied more on the lack of probability of success of the DNA testing.  The trial court held:

Court:    Now, the issue of the DNA, there was a Motion made to exhume the bodies.  This Motion was made approximately two to four weeks prior to the trial.  **It would have caused a delay of the trial.  That is not as much the issue as the probability of success.**  There was a telephonic hearing, the forensic scientist, Mr. Warren, the pathologist Dr. Hayne, and the pathologist Dr. Krause, and Debbie Haller, the forensic scientist from the Crime lab, they were all on the phone together late one Friday afternoon. I heard the evidence and nobody could give me any kind of probability as to what the success of even locating viable DNA - - these bodies were in a significant state of decay - - the testimony is from two to six weeks, the time that they had been decaying prior to being discovered.  They were in a significant state of decay, significant insect infestation and damage.  The bodies were buried in a low lying cemetery, probably were water logged, had been there in the ground for approximately six years.  **The testimony from Ms. Haller and the testimony from Dr. Hayne was that there would be, the probability of finding recoverable DNA would just not be there**.  The only part that would be relevant to this defendant would be if there just happened to be some scrapings under the fingernails of some recoverable DNA, and I found that it had not been shown that it would be any - - there's always a possibility - - it's a possibility that DNA can be on the moon, but that is just not something that I can authorize the county's money to be spent to go look for. **The proof justified to me that it would not be there, that recoverable DNA would not be there, that recoverable DNA would not be there**.  It would have caused a delay in the trial, and it just was not shown that this would be something that would be reasonable or something that should be pursued.  Mr. Warren here, the witness, was on the conference call, and Mr. Warren, I'll ask you now, you can't tell me that there's DNA under the fingernails?

Warren:   That's correct.

Court:      And you can't tell me even if there was at one time fingernail scraping or some skin or - - that it would even produce any viable DNA, can you?

Warren:    No, sir.

Court:      Taking all of these things into consideration, I didn't make this decision lightly, I realize that this is a very serious trial, and I ruled that the bodies could not be, should not be exhumed and the trial delayed. My feeling were that this was - - I'd better not say that. I think I need to put it on the record since I started. I think it was something that was primarily intended to delay the trial, but overriding that, I didn't think that it was a viable option and I declined the request to exhume the bodies and search for DNA evidence.

(emphasis added).

¶320. The trial court obviously relied upon the opinions of four experts in order to reach his decision to deny the exhumations. The information before the trial judge led him to find that there was a lack of proof that DNA was recoverable from the bodies. Part of the information included the fact that the bodies were in a state of decomposition, were buried in a Louisiana cemetery which typically has moisture, and the bodies were buried for over six years.

¶321. Prior to the second trial, Rubenstein again filed a motion to exhume the bodies. The trial court denied this motion as well. Judge Starrett referenced his prior ruling, and his belief that Rubenstein wanted to delay the trial.

¶322. Also, during the second trial, the trial court made yet another ruling, explaining why the motion to exhume the bodies was denied. The trial court stated that based on the scientific evidence, he found that the probability of having DNA was remote. Also, the motion was

116

overruled due to the tardiness of filing the motion and the other reasons given at the first trial.[23]

¶323. We find that the trial court clearly denied the exhumations based upon the lack of probability of DNA and to a lesser extent the delay in requesting the motion and delay in the trial. The findings in the first trial concerning the probability of finding DNA was sufficient to determine that it was not valuable enough to delay the trial. Further, Rubenstein failed to show that the exhumations would significantly aid his defense since it was determined that adequate DNA would not be found due to the time lapse since the deaths, the decomposition of the bodies prior to the burial and the burial of the bodies in a moist cemetery in Louisiana. *Coleman,* 697 So.2d at 782. Therefore, issue is without merit.

### B. Hair Follicles Near Krystal's Body

¶324. Rubenstein also argues that the trial court erred by denying the testing of hairs found near Krystal's body. Rubenstein argues that the hairs could be compared to the victim and if the DNA did not match his hair or Krystal's then it would prove that someone else was in the cabin, which might influence the jury.

¶325. The State goes into great detail on this issue. As for the first trial, the State cites to the trial court's statement that the crime lab services were offered but no requests were made for the testing prior to the trial. Some testing was performed on the hairs prior to the second trial. The limited results revealed that of the twenty-three hairs, thirteen were Caucasian head hairs, the other hairs were also Caucasian but from an unknown part of the body. Of the thirteen head

---

[23] Rubenstein notes that his counsel was attempting to withdraw prior to the second trial and did not file anything for a period of time pending the outcome.

hairs, all the hairs, except one and one fragment, had the same microscopic characteristics of Krystal's hair. The hair that was not determined to have the characteristics of Krystal's hair were determined to be chemically tinted as a reddish brown color.

¶326. However, critical to this issue, which Rubenstein fails to mention in his brief, is the fact that there was an agreed stipulation read to the jury concerning the hairs. The stipulation read to the jury by the trial judge, was as follows:

> I'm about to read to you a stipulation regarding the hair fibers that were found.
>
> State of Mississippi hereby stipulates, and the defendant hereby stipulates, that the hairs found on or under the body of the victim, Crystal Perry, are not those of Alan Michael Rubenstein. And that the State of Mississippi does not know who the hairs belong to.
> That's the stipulation. You can accept that as being conclusively proved.

¶327. The defense also used this information in its opening statement wherein, it stated that there was no physical evidence linking Rubenstein to the murders. Also, the defense gave a preview of the stipulation in opening argument by stating:

> that the State agreed and admitted that these hairs do not belong to Alan Michael Rubenstein and that they do not know who they belong to, **proving Mike Rubenstein's innocence.**

(emphasis added). Later, the trial court basically stated that the stipulation stated that the hairs did not belong to Rubenstein and that is all the DNA testing could have proved in any case, therefore, it would be a waste of time and money to perform the testing.

¶328. We find that this issue is without merit. The State stipulated to the fact that the hairs found near Krystal's body were not Rubenstein's and the State did not know who the hairs belonged to. Further, Rubenstein used the stipulation to his advantage in opening statements claiming that the stipulation proved his innocense. Rubenstein is being disingenuous by

118

claiming that the lack of testing was critical to his defense yet using the stipulation to his advantage expressing that it proved his innocence. Further, the trial court found that the stipulation accomplished the same as a DNA test, that being that the hairs do not belong to Rubenstein. Under the facts of this case, Rubenstein failed to show a substantial need for the DNA testing he requested at trial.

### XXIII.        Counsel Withdrawal

¶329. Rubenstein argues that the trial court erred in refusing to allow his attorneys to withdraw before the second trial. Rubenstein retained Louisiana attorney, James Shields, Sr., to represent him following his extradition from Louisiana to Mississippi. Shields appeared on a pro hac vice basis and associated local counsel Leigh Triche Janous, a member of Shield's law firm, licensed in Mississippi.

¶330. Following the eleven-day trial that resulted in a mistrial, Shields moved to withdraw from the case because he had not been paid. Shields made his announcement to the trial court when the 11-1 vote to convict was revealed. Shields was instructed by the trial court to make a written motion. The State asserts that during the first trial, Shields and Janous represented to the trial court that they were handling the case pro bono. The State's response to defense counsel contained in the record provides that the defendant furnished an affidavit that he entered into a contingency contract to pay Shields $75,000 if he obtained an acquittal.[24] Rubenstein informed the trial court that he was satisfied with his attorneys and asked the court not to appoint anyone else.

---

[24] The affidavit is not in the court record nor is the defense's written motion to withdraw.

¶331. On December 23, 1999, Shields and Janous filed a motion for court appointed attorney, stating:

> The Court has previously declared defendant an indigent. Defendant had no funds for an attorney in his previous trial and James E. Shields, Sr. and Leigh Triche Janous represented him as an indigent at the previous trial.
>
> Defendant, Alan Michael Rubenstein, again moves this Court to maintain, appoint and/or re-appoint James E. Shields, Sr. and Leigh Triche Janous as his attorney and moves this Court to arrange for monetary renumeration for their services.

¶332. Defense counsel made a motion for reimbursement of necessary expenses. On November 4, 1999, the trial court executed an order to reimburse the out-of-pocket expenses, including $7,650.02 to Shields & Shields Attorneys for reimbursement of travel, witness expenses, exhibit preparation expenses, meals and lodging.

¶333. An order setting the second trial for January 25, 2000, was executed on December 30, 1999. On January 7, 2000, Janous filed a motion to withdraw as counsel. Janous had accepted new employment with the State of Mississippi. Janous represented to the trial court that she would be responsible for prosecution and/or quasi prosecution of cases and that Rubenstein was fearful of a conflict and the possibility of threats and undue influences on Janous by the State. Janous's new employment with the State was with the Department of Human Services handling child support cases. Shields also on January 7, 2000, filed a motion on behalf of Rubenstein to have Janous recused.

¶334. The trial court heard the motions to withdraw and denied the request to have Janous withdraw or recuse finding no evidence of a conflict. The trial court further determined that

it was merely an attempt to delay the second trial that was set for January 25, 2000. The trial

court held:

> All right. First, Ms. Janous was attorney of record for Mr. Rubenstein a long time ago, it goes back, I don't know how long, eight or nine months, if not longer. She participated in the trial of Mr. Rubenstein back in June in Pike County. She is a licensed attorney in Mississippi. Subsequent to a hung jury and a mis-trial she requested to be released, as did Mr. Shields from representation. The Court declined to allow them to withdraw, stating numerous reasons then and in a Bench Opinion that was rendered at the hearing, I think on September 10th. The defendant cannot state anything that leads, of any substance, about any conflict. Ms. Janous works for the Department of Human Services up in the Delta, a long way from Pike County. The alternatives would be a public defender who would be employed by Pike County. **Mr. Rubenstein expressed his desire to maintain his attorneys and filed an Affidavit at a prior time, or letter to that effect, requesting that the attorneys be retained and that the Court not appoint anyone else. He stated that on the record.** The Court has to look at attorneys' ethics and integrity, and I can't imagine this young woman being overreached in any way by the State- first of all, I can't imagine the State trying. Second of all, I can't imagine her allowing it. Now, the fact that Mr. Rubenstein is fearful. **I think that this Motion is a- is pretextual. It think it is, that there is no substance to any of the concerns expressed on the witness stand today, and, finding absolutely no basis for the Motion to Withdraw, it is overruled, and finding no conflict. I can't imagine the representation of welfare receiving clients in the Delta in Chancery court conflicting with the representation of Mr. Rubenstein in the Circuit Court of Pike County.** It's no different from anybody else being overreached. There is nothing in this circumstance that causes me to have any suspicion that there is a conflict, and the Motion is overruled. Anything further?

> \* \* \*

> No one has given me specifics as far as any conflicts. . . If you choose an attorney- if the defendant chooses an attorney shows up to represent him, that's fine. He can choose him, and he did choose Ms. Janous and Mr. Shields. **Now, we come up, and the Appellate Court needs to understand that we are 18 days from trial. The subpoenas are probably prepared, witnesses are on notice of the trial, the courtroom is available. This Court has looked at the calendar and the schedule and this Judge does not have another time try this case this year, or it would be the latter part of the year. November or December before trial time would be available, because of prior commitments, because of other schedulings, and this Court has an**

121

**obligation to move its' [sic] docket, not so fast that it interferes with peoples' [sic] rights, but I have an obligation as Judge to expeditiously conclude cases that are before the Court.** Now, this crime. . . occurred in . . .1993. We are seven years past that. The Indictment was brought in June of '98, or by the June '98 Grand Jury. We are at least 18 months post-indictment. The defendant has been given all the benefits that I know of that he can be given under the law. The court has furnished tens of thousands of dollars in litigation expenses, expert expended, **the attorneys have applied for court-appointed status, and that will be granted. . .** Mr. Rubenstein has a- you can hire anybody you want to represent you. Mr. Rubenstein, I don't care who you hire, as long as that person is qualified and licensed in Mississippi. I'm not going to allow this motion to - I'm not going to allow Ms. Janous to withdraw for all of the reasons that have been stated in this hearing and the other hearing. The case was continued from November at the request of the defendant. It was reset and it needs to go forward.

| | |
|---|---|
| Defense: | Would you grant him a continuance to get another attorney? |
| Court: | No, sir. |
| Defense: | No extension at all? |
| Court: | No, sir. Mr. Shields, this case has been- I mean, if this was the first time this case had come up, it would be different, but both of you attorneys have participated in eleven trial days, and who knows how many days of preparation preparing this case from trial. You have been through it one time. I can't imagine a lot of extra things that you would have to do to prepare this case for trial. I have stated my reasons in the first hearing, Motion to Withdraw and Motion for Continuance, but **it would be a travesty of justice to require somebody else to come in and pick upon this case.** But, if Mr. Rubenstein chooses to hire somebody else, that's fine. |
| Defense: | As long as he's ready by the 25th [of this month]. |
| Court: | As long as he's ready for trial, yes, sir. |

(emphasis added).

¶335. On January 13, 2000, the trial court granted the motion filed by Shields & Shields, APIC requesting that Shields and Janous be appointed attorneys for Rubenstein. The order stated:

122

That this Court has previously determined that Alan Michael Rubenstein is indigent and that it is obvious that Alan Michael Rubenstein stands charged with a capital offense; and

That at a prior time the attorneys herein, James E. Shields, Sr. and Leigh Triche Janous, represented Mr. Rubenstein and were not compensated by Pike County. Said attorneys accepting representation based on certain funds that Mr. Rubenstein may possibly obtain; and

**That the Court finds that James E. Shields, Sr. and Leigh Triche Janous were previously given the opportunity to withdraw as counsel because of the absence of present payment and declined to do so and continued to represent Mr. Rubenstein honorably and effectively;** and

That there has been an **apparent change in circumstances and the anticipated funds coming into Mr. Rubenstein's possession are not forthcoming** and the Court finds that James E. Shields, Sr. and Leigh Triche Janous should be appointed to represent Mr. Rubenstein. . .

(emphasis added).

¶336. In *Taylor v. State,* 435 So.2d 701, 703 (Miss. 1983), this Court held:

We have held that the trial court has discretion in considering a motion of an attorney to be discharged. *Burnett v. State,* 285 So.2d 783 (Miss. 1973); *Evans v. State,* 273 So.2d 495 (Miss. 1973). *See also, United States v. Pigford,* 461 F.2d 648 (4th Cir. 1972); *United States v. Dilworth,* 524 F.2d 470 (5th Cir. 1975). In *McKee v. Harris,* 649 F.2d 927 (2d Cir. 1981), we find the following:

This Court has long recognized that certain restraints must be put on the reassignment of counsel lest the right be "manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. Bentvena,* 319 F.2d 916, 936 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

¶337. Here, the record does not reflect that the trial court erred by denying the motions to withdraw. The trial court heard the motions and made a detailed finding that no conflict

123

existed. The trial court also determined the motions were pretextual designed to delay the trial setting. We find that this assignment of error is without merit.

### XXIV.       Proposed Instructions D-19, D-20, D-24, D-27 and Handwritten Instruction 1

¶338. Rubenstein next argues that a number of refused jury instructions should have been given to the jury. The main reason for giving these instructions, according to Rubenstein, was because the evidence presented was circumstantial. Rubenstein argues that there were no eyewitnesses to the crime scene. Further, Rubenstein relies upon testimony that a van was parked outside his cabin, but he did not own this type of vehicle. Another witness testified about seeing one of the victims on December 2, 1993. Dr. Ward and Dr. Krouse argued the time of death was two weeks, not one month, prior to finding the bodies.

¶339. Rubenstein relies upon *Jones v. State,* 797 So.2d 922, 928-29 (Miss. 2001), for authority that a defendant must receive a two theory instruction if the State relies on circumstantial evidence for a conviction. The specific proposed instructions at issue are D-19, D-20, D-24, D-27, and handwritten Instruction 1. The instructions are cited below.

¶340. Proposed instruction D-19 stated:

> The Court instructs the jury that if there be a fact of [sic] circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable to the Accused, and when the jury has considered such fact or circumstances with all the other evidence, if there is a reasonable doubt as to the correct interpretation, they must resolve such doubt in favor of the Accused and place upon such fact of [sic] circumstance the interpretation favorable of the Accused.

¶341. Proposed instruction D-20 stated:

> The Court instructs the jury that a person charged with a crime is presumed to be totally innocent. A person is not required to prove himself innocent, or to put on any evidence at all upon the subject. In considering the charges against

124

Alan Michael Rubenstein in this case, you must consider the testimony and evidence in the light of that presumption, guaranteed to Alan Michael Rubenstein under the Constitution of the United States, that he is totally innocent. It is a presumption that abides with Alan Michael Rubenstein throughout the trial, and unless the evidence convinces you to the contrary beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, it is your sworn duty to find Alan Michael Rubenstein not guilty.

¶342. Proposed instruction D-24 stated:

The Court instructs the Jury that the circumstan[t]ial evidence used by the prosecution in this case to maintain its theory of Alan Michael Rubenstein must be so strong, in every part and parcel, as to establish guilt beyond a reasonable doubt but must also be so strong as to exclude every other reasonable hypothesis or supposition, except that of guilt.

¶343. Proposed instruction D-27 stated:

The Court instructs the Jury that if the prosecution has resorted to any degree, to the use of circumstantial evidence for the prosecution and every part and parcel of it not only must be so strong as to establish guilt beyond a reasonable doubt, but must also exclude every other reasonable hypothesis consistent with his innocence.

¶344. Proposed handwritten instruction 1 stated:

[The] Court instructs the jury that if there be any fact or circumstances in this case susceptible of [two] interpretations, one favorable [and] the other unfavorable to the [defendant], [and] is a reasonable doubt as to the correct interpretation, they must resolve such doubt in favor of the [defendant] and place upon such fact or circumstance the interpretation favorable to the [defendant].

¶345. This Court has set forth the standard of review on jury instructions issues numerous times. In *Scott v. State,* 878 So.2d at 966, this Court held:

When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed. *Burton ex rel. Bradford v. Barnett,* 615 So.2d 580, 583 (Miss. 1993). Similarly, this Court has stated that "[i]n determining whether error lies in the granting or refusal of various instructions, the

125

instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State,* 697 So.2d 777, 782 (Miss. 1997) (quoting *Collins v. State,* 691 So.2d 918 (Miss. 1997)). In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results. *Milano v. State,* 790 So.2d 179, 184 (Miss. 2001). *See Austin v. State,* 784 So.2d 186, 193 (Miss. 2001). *See also Agnew v. State,* 783 So.2d 699, 701 (Miss. 2001).

*Scott,* 878 So.2d at 966.

¶346. In regard to jury instructions involving the issue of circumstantial evidence, this Court held in *Manning v. State,* 735 So.2d 323, 338 (Miss. 1999), the following:

"Where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict." *Givens v. State,* 618 So.2d 1313, 1318 (Miss. 1993). "A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant." *Ladner v. State,* 584 So.2d 743, 750 (Miss. 1991). "[C]ircumstantial evidence which, without going directly to prove the existence of a fact, gives rise to logical inference that such fact does exist. Conversely, eye witness testimony is thought of as direct evidence." *Givens,* 618 So.2d at 1318. Direct evidence may also consist of a confession by the defendant, including the defendant's admission to a person other than a law enforcement officer. *Ladner,* 584 So.2d at 750.

*Manning,* 735 So.2d at 338. This Court also stated that there was no reason why "an admission by the defendant on a significant element of the offense should not also operate to render unnecessary the circumstantial evidence instruction." *Id.* (citing *Mack v. State,* 481 So.2d 793, 795 (Miss. 1985)).

¶347. In the second trial, the trial court readopted its findings on the instructions from the first trial. The trial court stated:

All right ladies and gentlemen, we need to move on with the jury instructions now.

126

> As I said earlier, I intend to assume that all of the instructions submitted last time have been resubmitted. And for the purposes of the record, and the ones that were refused will be considered refused this time, and the ones that were given will be considered to be given this time, with the exception of there was one that states the elements of the crime. . . .

Looking back to the first trial, the trial court judge addressed the issue of whether the case was circumstantial. The trial court ruled that it was not a circumstantial case and stated:

> The State has cited cases that say that this is not, because of the confession, that it's not a circumstantial case. I agree with what the case law says. I mean, I agree that that is what has been proven. This will not be a circumstantial case, and I'm going to have to go back and take that out of the instructions.

Also, the handwritten instruction 1 was submitted to the trial court at the second trial. The trial court denied the instruction finding that it was covered by other instructions. The trial court stated:

> I have been handed this morning six pages of instructions or proposed instructions, handwritten instructions that I have reviewed. And I find that all these instruction are covered in other instructions. Not exactly worded the same, but they are all covered. And these are all refused.

¶348. Rubenstein argues that the State will likely assert testimony of jailhouse informants, or snitches, as direct evidence of his guilt. This is in fact exactly what the State does rely upon, in addition, to some other statements which will be discussed later. Rubenstein basically requests that this Court disregard the testimony of Ballinger because much of the information is incorrect, and disregard the testimony of Stevens because much of his testimony is outlandish with embellishments and extravagant details. Further, Rubenstein contends that the case is almost entirely circumstantial and the "so-called 'direct' evidence is obviously false."

¶349. Prior to a discussion of whether the testimony demonstrates that the case, in general, is not circumstantial, the State cites to a number of notations on the instructions. The State

127

contends that instruction D-20 has notation from the trial judge that it was "[r]efused not a circumstantial case" and instruction D-27 has notations from the trial judge that it was "[r]efused incorrect statement of law." The State also asserts that D-24 is so similarly worded to D-27 that it should also be considered an incorrect statement of law. Frankly, the trial courts notations cannot be deciphered, but there are definite notations by the trial judge on these two, refused instructions. Instructions D-24 and D-27 are similarly worded. Likewise, instruction D-19 and the handwritten instruction 1 are almost identical. Nevertheless, it is clear from the trial court's ruling from the second trial, which relied upon jury instruction rulings from the first trial, that the trial court did not consider the case to be circumstantial; and therefore, the trial court refused instructions D-19, D-20, D-24 and D-27. As for handwritten instruction 1, the trial court found that this instruction was covered by other instructions. As noted above, instructions D-19 and the handwritten instruction 1 are almost identical.

¶350. The State sets out numerous instances which demonstrate that the case was not circumstantial. We agree that the evidence at trial was direct evidence in the form of confessions and admissions by Rubenstein to other people.

¶351. In regards to Ballinger, he stated that while in a Louisiana jail awaiting extradition, Rubenstein told Ballinger that he was wanted for shooting his wife, daughter, and either the daughter's boyfriend. Ballinger also stated:

> And after a while we was talking about, he mentioned that he was wanted for killing, he mentioned he had shot his wife, his daughter, and his daughter's boyfriend, was his exact words. And the reason he had shot them was because his wife was being a bitch and causing problems with drinking. And the daughter was running around with, according to him, his daughter with fucking niggers and their drugs. He said dope and not drugs. And he didn't mention any reason for killing her boyfriend. So we continued talking.

As it turned out these facts were incorrect, nevertheless, Ballinger stated what Rubenstein told him.

¶352. Stevens, an inmate housed in Pike County with Rubenstein in 1999 testified:

At that time [Rubenstein] told me that he had planned to hire somebody to kill his stepson, daughter-in-law and the granddaughter. He changed his mind. He was coming to his camp in Summit about two weeks before Thanksgiving. He went there, he killed his stepson, his daughter-in-law with a knife. He did not specifically say how he killed his granddaughter, it was strangulation, choked, or suffocation. And that after he left, he went to the Jackson's house. These were neighbors of his. He asked if they saw them. They told him- I forgot what he said they told him. He left there, went back to New Orleans to wait. Nobody ever found the bodies.

Later on in December he went back. The bodies were still there, same places. His granddaughter was on the bed nude. His stepson, the eyes were gone, there were maggots on him. And his daughter-in-law was laying where she was at. She had a hole in her stomach the size that you could put our fist in. And basically that was it.

Rubenstein also told Stevens about the insurance policy on Krystal. A Pike County jailer, Phelps, escorted Rubenstein to the restroom during trial. Rubenstein asked his opinion of Stevens testimony and whether Phelps thought it was damaging to his case. Then Rubenstein stated: "I told him [Stevens] what went on up there at Summit, but I didn't know he was going to turn it into a confession." At this point, Phelps informed the prosecution.

¶353. Further, Rubenstein told numerous people how the victims died prior to the autopsy reports. This is significant because the bodies were decomposed and the cause of death was not initially clear to officials.

¶354. We find that there was enough direct evidence to make this a non-circumstantial case. The trial court found in the first trial that the case was not circumstantial and denied instructions D-19, D-20, D-24 and D-27 on that basis. In the second trial, the trial court incorporated its

same rulings on instructions from the first trial. Handwritten jury instruction 1 is almost exactly the same as instruction D-19.

¶355. We find that the case was not circumstantial. Therefore, no circumstantial instructions were warranted. Clearly, case law does not allow circumstantial instructions when there is a direct confession or the defendant made an admission to another person who is not a law enforcement officer. *See Manning,* 735 So.2d at 338. Here, there is ample testimony from other witnesses about crime information that Rubenstein told them. All the jury instructions at issue are circumstantial instructions and, therefore, not appropriate under the facts of this case. We find that the trial court did not err by refusing all five of the circumstantial instructions. The testimony demonstrated that Rubenstein made admissions about the crime to other witnesses thereby precluding these types of instructions. Accordingly, this issue is without merit.

### XXV. Officer Donald Lindley[25]

¶356. Donald Lindley testified that from the early 1990's until April of 1998, he was employed by the Pike County Sheriff's Department. The defense called Lindley to question him about his role in the investigation of the murders. The defense questioned Lindley regarding his interview of Dora Fales. The State objected as to hearsay regarding what Fales told Officer Lindley. The

---

[25] On appeal, Rubenstein argues an equal protection violation in the trial court's decision to sustain the State's hearsay objection as to Officer Lindley testifying as to what Fales told him that Page had told her. Rubenstein did not raise any contemporaneous objection that the defense was receiving disparate treatment. There is no valid equal protection argument made. As discussed in the previous issues, the defense either raised no contemporaneous objection to any alleged hearsay or the trial court properly allowed the testimony as an hearsay exception. Therefore, since the defense has not established any improper hearsay or favorable treatment of the State by Judge Starrett's rulings, this argument does not merit further discussion.

130

trial court allowed the questioning as long as it related to the actions taken by Lindley in his investigation and not as to what Fales stated. When the defense then asked Lindley what Fales uttered to him the trial court sustained the objection as to hearsay. The trial court, outside the jury's presence, heard the proffer testimony of Lindley. The substance of the proffered testimony from Lindley was that Fales told him that Page told her that he had seen Darrell in Mississippi around Thanksgiving. The trial court then again sustained the objection as to hearsay. After further discussion outside the presence of the jury, the trial court stated:

> I have not seen a showing that this witness, that this testimony is necessary to explain the actions of this witness, what he did. What, it's pretty obvious what you're trying to do. You're trying to get in the testimony of these people through this witness. And that is not, that is not proper. If what they said was such that caused this witness to act, and if his actions in furthering his investigation just don't make sense without that coming in, then it could come in to explain his actions. Not submitted for the truth of what was said, but to explain his actions. I just don't think that there has been a showing made.

After further examination of Lindley and discussion by the attorneys, the trial court stated again that the objection was sustained.

¶357. On appeal, Rubenstein argues the trial court erred in refusing hearsay testimony of Lindley. The only authority cited by Rubenstein on appeal to support the introduction of the double hearsay is the pre-rules case, *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). In *Chambers,* the court determined that the combination of two rulings regarding a witness, Gable McDonald, violated the defendant's due process rights. Chambers was charged and tried for the murder of Policeman Aaron "Sonny" Liberty. *Id.* at 286-87, 93 S.Ct. at 1041-42. McDonald had allegedly confessed to various individuals to the shooting of Liberty. *Id.* McDonald's confession was transcribed, and he was placed in

jail.  **Id.**  At his preliminary hearing, McDonald reputiated his prior sworn confession.  **Id.** at 288, 93 S.Ct. at 1042.

¶358.  The Court limited its holding in **Chambers** to "the facts and circumstances of this case." **Id.** at 303, 93 S.Ct. at 1049.  Chambers sought the right to treat McDonald as an adverse witness in questioning him about his prior confession to the crime that Chambers was charged with committing.  **Id.** at 291, 93 S.Ct. at 1043.  Chambers also sought to use hearsay testimony of three other witnesses who would have testified that McDonald had confessed to them that he shot Liberty.  **Id.** at 287-90, 93 S.Ct. at 1042-43.  The Court held that the exclusion of the critical evidence and failure to permit Chambers to cross-examine McDonald "denied him a trial in accordance with traditional and fundamental standards of due process." **Id.** at 302, 93 S.Ct. at 1049.

¶359.  Here, the facts are clearly distinguishable from **Chambers.**  The defense attempted to introduce the double hearsay of Fales telling Lindley what Page told her.  In the case at hand, Page testified.  The defense had ample opportunity to cross-examine Page regularly seeing Darrell.  The record does not reflect that the defense was limited for this line of questioning. Whether or not Page saw Darrell did not have to come in through hearsay from Lindley. Moreover, the proffered testimony was that Page saw Darrell in Mississippi around Thanksgiving.  There was no confession that Page had murdered Darrell, Annie or Krystal. Therefore, the facts and circumstances are not in any way similar to **Chambers**, which was limited the facts and circumstances of that case.  We find that Rubenstein fails to demonstrate

that the trial court erred in denying the hearsay testimony or that his rights were affected. Therefore, this issue is without merit.

### XXVI.  Cross-examination of defense witnesses at sentencing phase

¶360.  Rubenstein argues that the trial court erred by allowing evidence of his alleged prior bad acts on cross-examination by the State in the sentencing phase of the trial.  He claims that the testimony was not elicited for rebuttal purposes but rather as an impermissible non-statutory aggravating circumstances in violation of Miss. Code Ann. § 99-19-101, which denied a fair sentencing proceeding guaranteed by the Eighth and Fourteenth Amendments.  Rubenstein also cites to *Edwards v. State,* 737 So.2d 275 (Miss. 1999) for authority.  He also argues that the trial court violated M.R.E. 403, 404(a) and 404(b) by allowing this testimony.  We find that the language of M.R.E. 1101(b)(3) states that the Mississippi Rules of Evidence do not apply to sentencing proceedings.

¶361.  Rubenstein bases this issue on the prosecution's cross-examination of four witnesses during the sentencing phase of the trial, those being: (1) Cheryl Rubenstein, sister of Rubenstein; (2) Doris Rubenstein, wife of Rubenstein; (3) David Perry, step-son of Rubenstein; and (4) Rubenstein.  Rubenstein relies upon *Edwards v. State,* 737 So.2d 275 (Miss. 1999) and claims that reversal is mandated.  In *Edwards,* this Court reversed and remanded a death penalty case for a new trial on sentencing because the trial court allowed the prosecution to question a defense witness on cross-examination, during the sentencing phase of trial, about a prior arrest for rape with no conviction.  *Id.* at 290.  On direct examination, Edwards's mother testified that she had problems with him as he grew up.  *Id.* at 289.  She also testified to disciplining him, and he was evaluated at a State mental hospital.  *Id.*

¶362. On cross-examination the prosecution asked Edwards's mother whether she knew that he had been arrested for rape. *Edwards,* 737 So.2d at 289. The State did acknowledge that the charges were dropped and there was no conviction. *Id.* This Court held:

> The prosecution has no right to introduce evidence of wrongs and bad acts to prove Edwards' character or to show he acted in conformity therewith, unless it is competent rebuttal evidence in the face of the showing of Edwards's good character made on direct examination of this witness. *Hansen v. State,* 592 So.2d 114, 148 (Miss. 1991) (citing *Simpson v. State,* 497 So.2d 424, 428-29 (Miss. 1986)[)]; *Winters v. State,* 449 So.2d 766, 771 (Miss. 1984).

*Id.* This Court analyzed the testimony of Edwards's mother and further stated:

> The State questioned Edwards' mother about a prior bad act, an arrest for rape, for which Edwards was not convicted. On direct examination, Edwards' mother did not testify that Edwards' character was good, that he had never raped anyone, that he had never been incarcerated, or that the prospect of a prolonged period of incarceration would change him for the better. Consequently, her direct examination testimony in no way opened the door to the State to ask this improper and prejudicial question. *Nicholson v. State,* 704 So.2d 81, 87 (Miss. 1997). The State should not have questioned Edwards' mother on rebuttal as to specific acts, as there was no testimony of good character in direct.

*Id.* at 290. This Court, therefore, found that Edwards's mother did not testify as to Edwards's good character on direct examination, thereby finding the State's questioning to be improper. *Id.* This Court also held that "[a]ggravating circumstances are limited to the eight factors enumerated in Miss. Code Ann. § 99-19-101(5)." *Id. See also Stringer v. State,* 500 So.2d 928, 941 (Miss. 1986).

¶363. Turning to the specific witnesses and statements at issue, some of Rubenstein's complaints about the statements are procedurally barred for failure to make a contemporaneous objection. In *Scott v. State* this Court held:

134

Although we review death penalty cases under a heightened standard or scrutiny, our contemporaneous objection rule nevertheless remains unaltered and applicable in such cases. *Williams,* 684 So.2d at 1203. That is the contemporaneous objection rule applies with equal force in death penalty cases and we have long "held that trial errors cannot be raised in this Court for the first time on appeal." *Id.*

*Scott,* 878 So.2d at 988. *See also Moawad v. State,* 531 So.2d at 634.

### A.    Cheryl Rubenstein

¶364.  Rubenstein contends that the prosecution improperly asked Cheryl what she knew about Rubenstein having sex with Annie.  Cheryl stated that she did not know about Rubenstein's relationship with Annie.

¶365.  Contrary to Rubenstein's contention, he did not object to this line of questioning on cross-examination.  Only after the prosecution stated that it had no more questions for Cheryl did Rubenstein argue that "you can't go into prior bad acts in the sentencing phase."  This Court has held that even in death penalty cases, where there is heightened scrutiny, the contemporaneous objection rule applies. *Scott v. State,* 878 So.2d at 988; *Moawad,* 531 So.2d at 634.  Therefore, Rubenstein's complaints about these statements are procedurally barred on appeal.

¶366.  Notwithstanding the procedural bar, we will briefly address the issue.  Following Rubenstein's argument about the prosecutions questions, the trial court informed Rubenstein that it would consider the issue if some authority on the subject was provided.  Rubenstein provided no authority, noted his objection, and then he continued with testimony from the next witness without further action.  Therefore, Rubenstein has no basis to complain on appeal.  During Cheryl's direct examination she stated that Rubenstein had "always been there for [his

135

family]." When asked whether Rubenstein had a propensity for kindness, she stated that he was there for the family, if anyone needed anything he would help. Cheryl also stated that she never saw Rubenstein hurt anyone, including Darrell and David Perry. When asked whether she felt that Rubenstein was capable of doing the crimes, she stated "no."

¶367. The prosecution's questions concerning Annie on cross-examination are clearly within the scope of allowable inquiry based on the fact that Rubenstein questioned Cheryl on direct examination about his propensity for kindness, the type of person he was, whether she saw him hurt anyone and whether he could have committed the murders. In addition, the questions elicited by the prosecution did not really touch on a prior bad act as such. The questions would not necessarily be qualified as a prior bad act as they actually concerned his relationship with Annie.

### B. Doris Rubenstein

¶368. Rubenstein complains that the prosecution questioned Doris on cross-examination about the death of Harold Conner. In addition, he contends that questions concerning other insurance scams and whether Doris ever stated that Rubenstein should receive the death penalty were improper.

¶369. On direct examination, Doris testified that Rubenstein loved her children, supported them, helped them and was always there for them. She also stated the Rubenstein took care of them and had "never ever laid a hand on (Darrell) in any kind of way." Doris stated that Rubenstein did not kill the victims because he could never harm any of them, especially Krystal. She also stated that Rubenstein "could not take another human life." As for the life insurance

policies on Krystal and Brittany, Doris stated that they were bought so that Krystal and Brittany would have money of their own when they were older and not have to depend on anyone.

¶370. The trial court overruled Rubenstein's objection to questions concerning Harold Conner, finding that Rubenstein opened the door to this type of questioning on direct examination. Indeed, Doris stated why insurance policies were taken out in the past, and she spoke about the insurance policies in general. She also stated that Rubenstein never harmed anyone, loved Darrell and Krystal, and could not take another's life. Therefore, the prosecution's question regarding whether Doris ever stated that Rubenstein should receive death was proper. Further, Doris was allowed to qualify this answer by stating: "And I feel that it was very unjustice [sic] call on [the jury's] behalf, that they did not think it through very thoroughly."

¶371. Accordingly, the prosecution's questions to Doris were proper. Here, the door was opened for this line of questioning given the questions and responses elicited on direct examination by Rubenstein.

### C. David Perry

¶372. Rubenstein next argues that the prosecution improperly asked David about whether Rubenstein was capable of committing murder, as well, as insurance scams.

¶373. On direct examination, David testified that he loved Rubenstein, Rubenstein had supported him throughout his life and he had given custody of his child, Brittany, to Doris and Rubenstein, when she was less than a year old. David also stated that he did not believe that Rubenstein killed Darrell.

¶374. On cross-examination, the prosecution asked David whether Rubenstein was capable of committing murder. This question, we find was appropriate given the fact that the defense asked

137

David whether he thought Rubenstein could have killed Darrell. There was also objection to a tape being played where David told police in 1994 that he thought Rubenstein was capable of killing Darrell, Annie and Krystal. David admitted to the statement after viewing this tape outside the presence of the jury. The questioning was appropriate given the defense's questions on direct examination. As for the questions concerning insurance scams, Rubenstein failed to make a contemporaneous objection, and therefore, it is barred on appellate review. *Scott,* 878 So.2d at 988. Despite this procedural bar David stated that Rubenstein supported him throughout his life, the insurance scams was a means of that support. Also, much of this information already came out in the guilt phase of the trial.

### D.    Rubenstein

¶375. Rubenstein argues that the prosecution improperly questioned him concerning a death on Bourbon Street, an affair that he had, a friend Larry Rosen who was missing, and his business partner Harold Conner. On direct examination, Rubenstein gave a lengthy narrative in which he mentioned numerous issues. Rubenstein mentioned the insurance policy for Krystal. The purpose of the policy was to give Krystal and her cousin a "start" in life.

¶376. Rubenstein himself spoke about Conner on direct examination. He told the jury about the events that led to Conner's death and his business and insurance dealings with him. Rubenstein also admitted that he "pulled some phony car accidents." He also related a number of other insurance schemes to the jury which involved Michael and David Perry.

¶377. However, Rubenstein even went so far as to tell the jury that there was a "big difference" between auto insurance schemes and murdering somebody for insurance. Rubenstein also mentioned that he was tired of this whole situation and met an old girlfriend and lived with her

138

in Texas for about six months. Later, when he returned to New Orleans, he realized that he made a mistake by spending time with this girl. Reviewing the statements at issue, the record reveals that there were no objections by Rubenstein. Therefore, Rubenstein's complaints about the statements at issue are procedurally barred. *Scott,* 878 So.2d at 988.

¶378. Notwithstanding the procedural bar, clearly as to questions concerning Krystal's insurance policy, insurance scams, his affair with an old girlfriend, and details of Harold Conner's death, Rubenstein opened the door to cross-examination on these issues. He spoke about all these events in his direct testimony, which can be more accurately described as a narrative. As for questions concerning a shooting on Bourbon Street and Larry Rosen, Rubenstein volunteered lengthy and detailed testimony on cross-examination without objection.

¶379. In addition, these responses were in keeping with Rubenstein's direct testimony in which he claims he cared and supported his family, did not murder the victims, was involved in insurance scams and had taken out various insurance policies for different reasons in the past. Therefore, we find that Rubenstein's complaint about the cross-examination testimony is procedurally barred for lack of a contemporaneous objection. Despite the procedural bar, the questions and responses were proper cross-examination given that Rubenstein, himself, brought up most of the testimony on direct examination or cross-examination.

¶380. Accordingly, we find that *Edwards* is not applicable to the facts of this case.

### XXVII.  Proposed Instructions D-1, D-3 and D-10

¶381. Rubenstein argues that the trial court erred by denying proposed jury instructions D-1, D-3 and D-10. The trial court disallowed the instructions for failing to state an accurate

statement of the sentencing options. The trial court also determined that proposed instruction D-1 was "covered in D-8" which was given.

¶382. Jury instructions are within the sound discretion of the trial court. *Goodin v. State,* 787 So.2d 639 (Miss. 2001). This Court has repeatedly held that jury instructions are to view as a whole. *See Smith v. State,* 835 So.2d 927, 937 (Miss. 2002) ("Jury instructions are to be read together and taken as a whole with no one jury instruction taken out of content"); *Milano v. State,* 790 So.2d 179, 183 (Miss. 2001) ("When considering a challenged to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instruction").

¶383. Proposed instruction D-1, which was refused, provided:

> The Court instructs the Jury that if you see fit, whether mitigating circumstances exist or not, you may recommend mercy for the Defendant and sentence him to imprisonment for the rest of his natural life. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶384. Instruction D-8, as given, provided:

> The Court instructs the Jury that, whether mitigating circumstances exist or not, you may recommend mercy for the defendant and sentence him to life imprisonment. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶385. The trial court also gave instruction D-7:

> A mitigating circumstances is any fact relating to defendant's character or history, or any aspect of the crime itself, which may be considered extenuating or reducing the moral culpability of the killing or making the defendant less deserving of the extreme punishment of death. In offering mitigating circumstances, the defendant is not suggesting that the crime is justifiable or excusable. Mitigating circumstances are those circumstances that tend to justify the penalty of life imprisonment as opposed to death.

140

¶386. The trial court refused instructions D-3 and D-10. Proposed instruction D-3 provides:

> The Court instructs the Jury that a decision to afford an individual defendant mercy and thereby sentence him to life imprisonment without possibility of parole or probation or to life imprisonment with the possibility of parole would not violate the laws if this State or your oath as jurors. Even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence defendant [sic] to life imprisonment without possibility of probation or parole or life imprisonment with the possibility of parole.

¶387. Proposed instruction D-10 states:

> If you sentence defendant to life imprisonment without possibility of probation or parole, defendant will never be eligible for parole or probation.

> If you sentence defendant to death, he will be executed by lethal injection.

¶388. Both proposed instructions D-3 and D-10 are not correct statements of sentencing options. Part of proposed instruction D-3, regarding mitigating circumstances is covered in instruction D-7. The mercy language in proposed instruction D-3 is also covered by instruction D-8. However, proposed instruction D-3 provides no sentencing option of death. Therefore, it is not an accurate or proper instruction.

¶389. The trial court was also not required to give proposed instruction D-10 providing the meaning of life without parole. In *Flowers v. State,* 842 So.2d 531, 556-58 (Miss. 2003), this Court held that the trial court was not required to inform the jury of the meaning of life without parole. The Court stated:

> This Court has repeatedly held that except in habitual offender cases, where a life sentence would automatically mean life without parole, the parole issue should not be considered by the sentencing jury. *Smith v. State*, 724 So.2d 280, 293-94 (Miss.1998); *Blue v. State*, 674 So.2d 1184, 1194-96 (Miss.1996); *Mackbee v. State*, 575 So.2d 16, 40-41 (Miss.1990); *Williams v. State*, 544 So.2d 782, 798 (Miss.1987); *Cabello v. State*, 471 So.2d 332, 346 (Miss.1985). In this

141

state's original case on this issue, *Williams v. State*, 445 So.2d 798, 812-14 (Miss.1984), this Court held that:

> A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue. Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
>
> First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Miss. Code Ann. § 47-7-3(1). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. *Johnson v. State*, 416 So.2d 383, 392 (Miss.1982).
>
> Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, 677 (1979); *Davis v. State*, 429 So.2d 262, 263 (Miss.1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).

> *Williams*, 445 So.2d at 813 (emphasis in original). This Court has reaffirmed this holding on several occasions. *See Smith v. State*, 724 So.2d 280, 293-94 (Miss.1998); *Blue v. State*, 674 So.2d 1184, 1194-96 (Miss.1996); *Mackbee v. State*, 575 So.2d 16, 40-41 (Miss.1990); *Williams v. State*, 544 So.2d 782, 798 (Miss.1987); *Cabello v. State*, 471 So.2d 332, 346 (Miss.1985).

842 So.2d at 557.

¶390. Besides instruction D-8, the jury was given instruction D-6 which provides:

The Court instructs the Jury that it is now your duty to determine what punishment must be imposed upon Alan M. Rubenstein. You must determine

142

which of the following punishments is appropriate to impose on Alan M. Rubenstein (1) Life imprisonment or (2) Death by lethal injection.

Rubenstein argues that he should have received an instruction that provided the jury the option of sentencing him to life without parole.

¶391. The statutes relevant to this discussion are Miss. Code Ann. § § 97-3-21 (1994), 47-7-3 (1994), and 99-19-1. Miss. Code Ann. § 97-3-21(1994), the penalty for murder or capital murder, provides:

> Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.

> Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Miss. Code Ann. § 47-7-3 (1994) provides the conditions for eligibility for parole. Miss. Code Ann. § 47-7-3(1)(f) states:

> No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101.[26]

¶392. Further, Miss. Code Ann. § 99-19-1 provides:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding

---

[26] Miss. Code Ann. § 99-19-101 is the separate death penalty statute to determine the punishment in capital cases. Miss. Code Ann. § 99-19-101, provides the aggravating and mitigating circumstances to be considered and the separate sentencing proceedings to be held. Here, Miss. Code Ann. § 99-19-101 is applicable as Rubenstein was sentenced to death for the murder of Krystal.

amendatory or repealing statutes, unless otherwise specially provided in such statutes.

¶393. The State contends that Rubenstein's assignment of error is procedurally barred as Rubenstein raised no contemporaneous objection to the trial court's judgment that the option of life without parole was inapplicable because "this case falls within the gap between the two laws." Likewise, the State asserts that the defense "never presented the option of life without parole to the trial court in a legally correct instruction and/or objected to the absence of the life without parole option in the instructions that were given." *See Williams,* 684 So.2d at 1203 (contemporaneous objection applies in death penalty cases); but *see Watts v. State,* 733 So.2d 214, 236-37 (Miss. 1999).

¶394. The State asks this Court to reconsider our holding in *Watts,* 733 So.2d at 237. In an opinion written by Justice Chuck McRae, the Court in *Watts* held:

> Watts next complains that the circuit court's instructions to the jury during both the guilt and sentencing phases of his trial were constitutionally deficient. *The assignments of error are barred because of Watts' failure to object to the complained of instructions at trial or even raise them in his motion for a new trial. Berry v. State,* 703 So.2d 269, 277 (Miss. 1997). Moreover, he fails to cite any authority or provide any meaningful argument in support of most of the objections he now raises to many of the instructions. *Brown,* 690 So.2d at 297; *McClain,* 625 So. 2d at 781; *Baine,* 604 So.2d at 255.
>
> *Procedural bar notwithstanding*, sentencing Instruction No. 2 erroneously instructed the jury that it had only two sentencing options: life in prison or the death penalty. A third option, life imprisonment without the possibility of parole, should have been presented pursuant to Miss. Code Ann. § § 97-3-21 and 99-19-101. Watts, therefore, is entitled to re-sentencing proceedings.

*Watts,* 733 So.2d at 236-37 (emphasis added).

¶395. The State argues that "at a minimum, the defendant who is charged with a capital murder that occurred prior to the enactment of the 1994 statutory amendment should be required to:

144

(a) voice a contemporaneous objection to the absence of an instruction on the option of life without parole, and/or (b) clearly request a legally correct instruction as to the option of life without parole." We agree.

¶396.  In *Watts,* the Court found that the assignments of error were procedurally barred because of  Watts's failure to object to the complained of instructions at trial.   However, the Court found reversible error, procedural bar notwithstanding.  We today abrogate our holding in *Watts* as it relates to ignoring the procedural bar.   As the State contends, Rubenstein is procedurally barred on appeal.   Rubenstein raised no contemporaneous objection at trial nor offered a legally correct instruction to the trial court.   Accordingly, the procedural bar applies to prevent appellate review. *See Williams,* 684 So.2d at1203.

### XXVIII.        Heinous, atrocious or cruel limiting instruction

¶397.  Rubenstein next argues that the trial court failed to give a limiting instruction for the heinous, atrocious or cruel (HAC) aggravator .   He claims the instruction is constitutionally vague and overbroad.   The prosecution sought the death penalty based in part on the aggravating circumstance of "[w]hether the capital murder of Krystal Ryan Perry was especially heinous, atrocious and cruel."

¶398.  The sentencing instruction 3 stated:[27]

> The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

---

[27] Also known as Instruction SS-5.

145

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders -- the conscienceless or pitiless crime which is unnecessarily torturous to the victim.  If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilations, that the defendant inflicted physical or mental pain before death or that there was mental torture and aggravation before death, that you may find this aggravating circumstances.

¶399.  The record reveals that Rubenstein did not object to this instruction because it was vague or overbroad.  Instead, he argued that the instruction was prejudicial, not vague or overbroad. The trial court even asked Rubenstein if he had any other objections to which he replied that "[e]verything else is fine."

¶400.  We find that this issue is procedurally barred for failure to make a contemporaneous objection.  *Scott,* 878 So.2d at 988.  *See also **Byrom v. State,*** 863 So.2d 836, 878 (Miss. 2003).

¶401.  Notwithstanding the procedural bar, we will briefly address the merits of this issue.  This Court upheld an instruction with almost identical language in ***Knox v. State,*** 805 So.2d 527, 533 (Miss. 2002).  The only difference between the two instructions was that the ***Knox*** instruction included additional language concerning dismemberment and a lingering and torturous death. Both instructions had the same language concerning mutilations, infliction of physical and mental pain and mental torture. This Court in ***Knox,*** held:

> Knox maintains that language identical to the first paragraph of the above instruction was held unconstitutional by the United States Supreme Court in ***Shell v. Mississippi,*** 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed2d 1 (1990).  In ***Shell,*** the Supreme Court found that, used alone, language identical to that used in the first paragraph of instruction S 8 was not constitutionally sufficient.  ***Id.*** at 2, 111 S.Ct. at 314.  However, the language used in the first sentence of the second paragraph was determined by the Supreme court to be a proper limiting instruction to the ***Shell*** language in ***Clemons v. Mississippi,*** 494 U.S. 738, 110

146

S.Ct. 1441, 108 L.Ed.2d 725 (1990). This Court has repeatedly held this instruction to be constitutionally sufficient. *See, e.g., Puckett v. State,* 737 So.2d 322, 359-60 (Miss. 1999); *Jackson v. State,* 684 So.2d 1213, 1236-37 (Miss. 1996). This argument is wholly without merit.

*Knox,* 805 So.2d at 533.

¶402. Accordingly, we find that this Court has upheld the language of this instruction. This issue is without merit.

### XXIX. Evidence to support HAC instruction

¶403. Rubenstein argues that the evidence was insufficient to support the heinous, atrocious and cruel aggravating circumstance. Specifically, Rubenstein, cites to *Taylor v. State,* 672 So.2d 1246, 1276 (Miss. 1996), for authority. In *Taylor,* this Court found the evidence to be insufficient to support the HAC aggravating circumstance where the victim died of strangulation, even though a doctor testified that "strangulation . . . is a slow way to kill anybody." *Taylor,* 672 So.2d at 1275-76.

¶404. We find that Rubenstein failed to make a contemporaneous objection to the HAC instruction based on the fact that there was insufficient evidence to support the instruction. This procedural bar is more fully addressed in the proceeding issue XXVIII. Rubenstein objected to the instruction because it was prejudicial, not that there was insufficient evidence. Therefore, the issue is procedurally barred from appellate review. *Scott,* 878 So.2d at 988. In the alternative and without waiving the procedural bar, we will briefly address the issue on the merits.

¶405. In *Knox,* this Court held that the standard of review in challenges to the sufficiency of the evidence is to view "all of the evidence in the light most consistent with the verdict." *Knox,*

805 So.2d at 533. In *Knox,* this Court also addressed whether there was sufficient evidence to support a HAC instruction for strangulation. This Court held:

> This Court has stated that the number of wounds and the fact that death was not immediate, but prolonged may be properly considered as evidence supporting a jury's finding of the aggravating factor at issue. *Davis v. State,* 684 So.2d 643, 662 (Miss. 1996). Dr. Steven Hayne, who performed the autopsy on Spears, testified that the cause of death was manual strangulation. The proof demonstrates that the strangulation. The proof demonstrates that the strangulation caused large amounts of blood to accumulate in Spears's lungs, which would have resulted in a slow, heinous death, taking anywhere from one to three minutes. Dr. Hayne testified that death by manual strangulation is painful and that Spears's body showed that she had struggled against her attacker. Spears suffered extensive bruising on the face, chest, and neck as well as cuts and abrasions on those areas. Dr. Hayne testified that there was extensive bleeding from by cuts on the forehead as well as from the nose and mouth. Dr. Hayne explained that Spears's blood had escaped from the blood vessels, traveled up the airway, mixed with air forming bloody froth, and eventually left the nose and mouth and flowed over the external surface of her body.
>
> Knox relies on *Taylor v. State,* 672 So.2d 1246 (Miss. 1996), for the proposition that death by strangulation cannot be an "especially heinous" manner of death. *Taylor* is distinguishable from the case sub judice. In *Taylor,* the victim's badly decomposed body was found nearly two months after her disappearance. There was no evidence before the jury as to how the crime was actually committed or that the victim was even conscious or aware of her impending death at the time of the murder. *Id.* at 1276 (majority), 1278 (Lee, C.J., concurring). This Court concluded that whether the victim's death was "especially heinous" was purely a matter of speculation. *Id.* at 1276.

*Knox,* 805 So.2d at 533-34.

¶406. We find that there is sufficient evidence to support a HAC instruction based on Krystal's strangulation and other factors. The testimony from Dr. Hayne and autopsy report from Dr. Ward revealed that unlike *Taylor,* Krystal was killed by strangulation. In *Taylor,* the cause of death was only assumed to be probably by strangulation. *Taylor,* 672 So.2d at 1276. Here, the strangulation was certain. *See Knox,* 805 So.2d at 533-34; *Cabello v. State,* 471 So.2d 332,

349 (Miss. 1985) (finding strangulation was heinous atrocious and cruel). Dr. Hayne testified that Dr. Ward's report indicated "a probable hemorrhage had occurred around the hyoidbone and laryngeal cartilage of the neck." Dr. Ward determined that the death was caused by strangulation. Dr. Hayne also testified as follows:

| | |
|---|---|
| Hayne: | With considerable pressure on the side of the neck, there would be compression of the major vessels of the side of the neck, both the right and the left sides, to include the carotid arteries and the jugular veins. With compression of those structures, blood flow to the brain would cease and unconsciousness would intervene in a period of a few seconds to a few tens of seconds. If complete occlusion occurs, it's estimated any where from approximately four seconds to fifteen seconds from unconsciousness would occur. |
| | Certainly during that time frame, or even longer, if compression were not complete initially, there would be pain and suffering from compression of those structures of the neck, not only light headedness, but certainly air starving and the like. |
| State: | During that period of time, would the child have experienced panic? |
| Hayne: | Yes, sir. |
| State: | Terror? |
| Hayne: | Yes, sir. |

¶407. Therefore, Dr. Hayne testified that Krystal experienced pain and suffering from the strangulation. In addition, he testified that she would have experienced panic and terror from infliction of this cause of death.

¶408. There is also other evidence of the HAC aggravator from the record. Krystal was found naked and spread eagled on the bed indicating potential sexual assault. While there could be no positive determination of sexual assault due to the maggot infestation of her genital area, there is a reasonable inference of sexual activity. Further, Krystal was a four- year-old child weighing approximately 40 pounds. Her age and weight indicate her vulnerability to the crime. Annie,

149

Krystal's mother, had no defensive wounds, and Darrell had defensive wounds. There is an inference that Krystal was likely to have witnessed either her mother's or both her parents' deaths prior to enduring her strangulation.

¶409. Krystal's death occurred approximately two years and one month after the insurance policy was in effect, just after the expiration of the contestability period for the life insurance policy. Although Doris was entitled to the proceeds, Rubenstein accompanied Doris to the insurance company to make the death claim. After receiving the proceeds, Rubenstein admitted during the sentencing phase to spending most of the proceeds, at the time he had an affair with another woman in Houston.

¶410. We find that there is ample evidence to uphold the HAC aggravating circumstance in this case. *See Stevens v. State,* 806 So.2d 1031, 1060 (Miss. 2001) (this Court looked at mental anguish and psychological torture suffered prior to death where two children witnessed the murders of friends and family members prior to their own death). *Edwards v. State,* 737 So.2d 275, 319-20 (Miss. 1999) (child leaning over his dead parent before he was shot and killed himself). *See also Dycus v. State.* 875 So.2d 140, 164 (Miss. 2004) (age, physical condition, and strength considered); *Evans v. State,* 725 So.2d 613, 692 (Miss. 1997) (Court considered ten-year-old child begged to be with her mother and pain of strangulation). *See also Underwood v. State,* 708 So.2d 18, 39 (Miss. 1998) (length of time to die is not dispositive in a case). Accordingly, this issue is without merit.

### XXX. Prosecutor's closing argument

¶411. Rubenstein contends that the prosecutor committed misconduct by misstating the law during the closing argument at the sentencing phase of the trial. The basis for this argument is

that the prosecutor allegedly misstated the law by asking the jury to find the HAC aggravator based on the age of the child only.

¶412. We find that Rubenstein failed to object to the closing argument statements made by the prosecution, let alone on the basis of misconduct. Therefore, this issue is procedurally barred on appellate review. *Scott,* 878 So.2d at 988-90 (finding the contemporaneous objection rule applies in death penalty cases and applying a procedurally bar for failure to object to an alleged misstatement of law); *Simmons v. State,* 805 So.2d at 489; *Williams,* 684 So.2d at 1203.

¶413. Notwithstanding the procedural bar, we will briefly address the merits of this issue. The prosecutor's comments at issue are as follows:

> You consider whether it was especially heinous, atrocious, or cruel. Folks, as we talked earlier, I frankly can't see anything that's any more heinous, atrocious, or cruel than killing a child.

However, the prosecutor continued his argument on the subject and further stated:

> And one other thing I want you to think about is that Crystal would not have been the first to die. You understand that? That Crystal would not have been the first to die. She would have been the last to die. That's why there are no defensive wounds on the mother. Because while the mother and father were being executed, frankly, in a small cabin that you've been in, Crystal would have been aware of that. She would have known what was going on. And I'm sure she would have called out, Pawpaw, stop.

> And when you consider how heinous, atrocious, and cruel it is as a factor that you can consider that would make this crime so extraordinary, then it is one that, as you told me, is a proper case for the death penalty.

> And there is no question that it was, occurred while the child was, that she died from being strangled, tortured, her lasts moments would have been certainly been panic filled, pain filled, and unbelievably horrible for the child, especially at the hands of her pawpaw. And I mentioned in my closing argument that I wondered if she tried not to cry when she was being strangled.

151

And even at that point in time he would have had the chance to have stopped. But for greed, but for money, he could have stopped and chose not to do that.

You can find any mitigating factors that are available. But, ladies and gentlemen, when a man gets on the stand and continues to deny that, continues to look you in the eye and say that everyone else is lying and I'm the only one that's telling the truth, then that shows an absolute lack or remorse, absolute lack of concern, and it shows the pitilessness - - I mean, he doesn't to this day get it. He doesn't to this day understand what he has done and he still thinks that somehow he can make you people feel sorry for him when he killed his granddaughter and his stepson and his step-daughter-in-law.

¶414. This Court has found that statements have to be read within their context "in light of that which the prosecutor was in fact arguing to the jury at the time." *Holland v. State,* 705 So.2d 307, 347 (Miss. 1997). Interestingly, Rubenstein presented only the first portion of the prosecutor's comments at issue. The more expansive version of the prosecutor's comments, continued above, demonstrates that the prosecutor relied on more than age for the HAC aggravating circumstance. The prosecutor also relied upon the inference that Krystal was most likely not the first victim to die but the last. Therefore, Krystal would have known what was happening to her parents. During her own strangulation, Krystal would have been filled with panic, pain and the shock of her grandfather killing her. Therefore, the prosecutor based the HAC factor on more than just Krystal's age.

¶415. Furthermore, Rubenstein failed to show what the prosecutor misstated nor how it was unfair. In *Holland v. State,* this Court held:

Holland claims the prosecutor misstated the law. To reverse on a misstatement of law, there must first be a misstatement of the law, and second, the misstatement must make the trial fundamentally unfair. *United States v. Goodapple,* 958 F.2d 1402, 1409 (7th Cir. 1992). Any statements may also be mitigated if the evidence is sufficient to support the jury's finding and the trial court instructs they jury that counsel's arguments are not evidence. *United*

152

*States v. Fierro,* 38 F.3d 761, 771 (5th Cir. 1994), cert. denied, 514 U.S. 1051, 115 S.Ct. 1431, 131 L.Ed2d 312 (1995).

*Holland,* 705 So.2d at 346.

¶416. Additionally, this Court has already addressed in Issues XXVIII and XXIX that the jury was properly instructed on the HAC aggravator in sentencing instruction 3. Therefore, the jury was properly instructed on the HAC aggravator.

¶417. The prosecutorial comment was taken out of context by Rubenstein. The HAC aggravator comments were based on more than just the age of Krystal. Also, this Court has held that closing arguments are not evidence and the jury was properly instructed on the HAC aggravator. Accordingly, we find that this issue is procedurally barred, and, in the alternative, it is without merit.

### XXXI. Sympathy Instruction

¶418. Rubenstein next argues that the trial court erred by instructing the jury that it could not consider sympathy. The instruction C-1 provides in pertinent part:

> It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.

¶419. The State asserts that this issue is procedurally barred as Rubenstein did not raise a contemporaneous objection to this instruction. *See Dycus v. State,* 875 So.2d at 162; *Foster,* 639 So.2d at 1302; *see also* **Williams,** 684 So.2d at 1203. As there was no contemporaneous objection, this assignment of error is procedurally barred. Alternatively, without waiving any

153

procedural bar, this assignment of error is likewise without merit. Rubenstein's assignment of error has been repeatedly rejected by this Court.

¶420. In *Scott,* 878 So.2d at 981-82, this Court stated:

Scott next argues that the trial court erred by instructing the jury that it could not consider sympathy. He cites to three portions of the record to support his proposition. These three instances occurred (1) soon after the jury pool gathered together, (2) at the sentencing phase closing statements and (3) an "antisympathy" instruction during guilt phase closing arguments. He claims that he has a right to not have the jury instructed that they can disregard sympathy in toto. . . . In *Jordan v. State,* 786 So.2d at 1025 (Miss. 2001), this Court addressed a similar issue concerning sympathy instructions. This Court held:

> Jordan claims that the court should not have given Instruction No. C-1, that the jury was not to be influenced by sympathy. We have considered this exact issue in *Holland v. State,* 705 So.2d at 351, where we approved a jury instruction which reads verbatim like the one about which Jordan complains. In *Holland,* we found that such an instruction does not mean that the jury should totally disregard sympathy and is, therefore, permissible.

*Jordan,* 786 So.2d at 1025. Jordan does not give the language of the instruction other than to say the language is "verbatim" in Holland. Accordingly, the language in Holland at issue was the following:

> **The trial court instructed the jury in C-1 that it could not be influenced by bias, sympathy, or prejudice, and that the verdict could not be based upon speculation, guesswork or conjecture.** Holland states that this instruction was error. *See Pinkney v. State,* 538 So.2d 329, 351 (Miss. 1988), vacated on other grounds by *Pinkney v. Mississippi,* 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990). Holland's proposed instruction left out the word sympathy.
>
> Recent Mississippi case law permits a C-1 type instruction if the instruction does not totally shut off consideration of sympathy. *Willie v. State,* 585 So.2d 660, 677 (Miss. 1991). Court has also held that the use of the words "not to be influenced by sympathy" does not mean that the jury is instructed to disregard sympathy. *Ladner v. State,* 584 So.2d 743, 759 (Miss. 1991), cert. denied, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

154

*Holland,* 705 So.2d at 351 (emphasis added).

¶421. In *King v. State,* 784 So.2d 884, 889 (Miss. 2001), this Court held:

In *Blue v. State,* 674 So.2d 1184, 1225 (Miss. 1996), we approved an instruction which read in pertinent part as follows:

[Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion prejudice, public opinion or public feeling.

"[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy . . . the instruction is a proper statement of the law." *Id.* While we have approved this type of general instruction admonishing the jury not to be swayed by "sympathy" unrelated to the evidence, we have guarded against any undue emphasis of the anti-sympathy admonition so as not tot fetter unduly reasoned consideration of factors offered as mitigating. *See Willie v. State,* 585 So.2d 660, 677 (Miss. 1991). We do this in full recognition of the fact that the line between a rational and an emotional response is often dim.

*King,* 784 So.2d at 889.

¶422. In the case at hand, the trial court never instructed the jury to completely disregard sympathy in toto in violation of the Eighth Amendment. *King,* 784 So.2d at 899. "We have repeatedly held that under the Eighth Amendment to the U.S. Constitution, 'a jury may not be instructed to disregard, in toto, sympathy' in a capital case." *Id.* (citing *Pinkney v. State,* 538 So.2d 329, 351 (Miss. 1988), *vacated and remanded on other grounds*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990)). Here, the Court merely instructed the jury to "not be influenced by bias, sympathy or prejudice."

¶423. Further, this language has already passed muster with this Court. *See Scott,* 878 So.2d at 981-82; *Holland,* 705 So.2d at 351, *Blue v. State,* 674 So.2d at 1225; *Ladner v. State,* 584 So.2d at 759 ("not be influenced by sympathy does not" mean that the jury is instructed to

155

disregard sympathy). Accordingly, we find that the trial court did not err in giving these instructions, and this issue is without merit.

### XXXII. Cumulative Error

¶424. Rubenstein argues that the cumulative effect of the errors in his trial warrant reversal. In *Wilburn v. State*, 608 So.2d 702, 705 (Miss. 1992), this Court held that "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." The question that must be asked in these instances is whether the defendant was deprived of a "fundamentally fair and impartial trial" as a result of the cumulative effect of all errors at trial. *Id*. If there is "no reversible error in any part, so there is no reversible error to the whole. *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

¶425. None of the issues raised by Rubenstein in this assignment or any of those discussed previously, rise to the level of reversible error either standing alone or when considered together. The verdict finds substantial support in the evidence, and Rubenstein failed to demonstrate any procedural or substantive errors that warrant reversal. Based on the finding of no error, this Court finds that there is no cumulative effect for all the alleged errors and, therefore, his convictions and sentences should be affirmed by this Court.

### XXXIII. Proportionality Review of Death Penalty Sentence

¶426. Miss. Code Ann. § 99-19-105(3) (2000) requires this Court to perform a proportionality review of a death sentence in a capital case. Section 99-19-105(3) states:

(3)     With regard to the sentence, the court shall determine:

(a)     Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

156

(b)     Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c)     Whether the sentence of death is excessive of disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d)     Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstances was harmless error, or both.

¶427.    After reviewing the record in this appeal as well as the death penalty cases listed in the attached appendix, we conclude that Rubenstein's death sentence was not imposed under the influence of passion, prejudice, or any other factor. We further find that the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances. In comparison to other factually similar cases where the death sentences was imposed, the sentence of death is neither excessive nor disproportionate in this case. Finally, the jury did not consider any invalid aggravating circumstances.

## CONCLUSION

¶428.  For these reasons, we affirm the judgment of the Pike County Circuit Court.

¶429.  **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS TOGETHER WITH A PAYMENT OF A FINE OF $10,000.00, ALL OTHER COSTS AND COURT COSTS, AFFIRMED. COUNT III: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN COUNTS II AND III SHOULD RUN CONSECUTIVELY WITH EACH OTHER AND WITH THE SENTENCE IN COUNT I.**

      **SMITH, C.J., WALLER, P.J., CARLSON AND RANDOLPH, JJ., CONCUR. COBB, P.J., AND GRAVES, J., CONCUR IN RESULT ONLY. DICKINSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, SPECIALLY CONCURRING:**

¶430. Sheriff C.V. Glynnis included in his report a racially inflammatory comment[28] he heard Rubenstein make shortly after discovering the three bodies of the victims. As the majority notes, the comment was not "recorded or mentioned until shortly before trial...[and] the sheriff did not immediately write down Rubenstein's remarks. The sheriff wrote the statement after discussing the matter with the district attorney five years later." (Maj. Op. ¶¶ 144-45). The comment, which included a racial epithet considered to be the most offensive to Africans-Americans, found its way into evidence without objection. Even though Rubenstein's comment may have provided some value to the jury in understanding the sequence of events, the epithet provided no value or purpose other than to prejudice African-American jurors and anyone else offended by the use of the word. Rubenstein's attorney failed to move in limine to exclude admission of the epithet and also failed to object at trial to the sheriff's testimony which included the epithet. Likewise, Rubenstein's counsel failed to request that the trial court take judicial notice of the racial make-up of the jury and failed to move for a mistrial after the comment was in evidence.

¶431. The majority agrees with the trial court that the comment was more probative than prejudicial and that the statement was Rubenstein's attempt "to cast suspicion on another person, Page." (Maj. Op. ¶ 152). While I agree that the statement was an attempt to make Page a suspect, I disagree that the entire statement was more probative than prejudicial. The substance of the statement was that Rubenstein accused Page of sexually abusing Krystal. The

---

[28]Rubenstein's alleged comment to the sheriff was "'that niger [sic] Sydney' sexually assaulted Krystal." (Maj. Op. ¶ 145).

racial slur directed at Page does not make this statement any more or less probative or helpful to the jury. Neither the inclusion nor deletion of the racially derogatory comment affects the substance of Rubenstein's allegation. Therefore, Rubenstein's attorney abdicated his role to provide effective representation by failing to move for the epithet's exclusion.

¶432. This Court has found reversible error where a trial judge allowed into evidence unnecessary elements of racial prejudice. For example, in *Gaston v. State*, we held, "The jury had the duty and right to evaluate the testimony independently of that emotional factor being injected into the case by the state's counsel and witnesses." 239 Miss. 420, 123 So.2d 546, 548 (1960). In *Gaston,* the sheriff, on direct examination, testified that they were trying to find a "Negro." We held that the trial judge committed reversible error when he overruled defense counsel's objection that the statement was irrelevant and inflammatory.

¶433. However, here trial counsel was not as astute. Not only did he fail to object when the sheriff inserted the racially charged comment, but he failed to move in limine to prevent the State from admitting this epithet from the report into evidence. He also failed to place on the record the racial make-up of the jury as did trial counsel in *GMAC v. Baymon*, 732 So.2d 262 (Miss. 1999). This move by GMAC's trial counsel aided this Court in finding as reversible error the introduction into evidence of unfounded declarations of racial bias.

¶434. The majority attempts to equate this case to *Whitten* and distinguish it from *Gaston*. In *Whitten*, the comment directly related to the plaintiffs' claim of false imprisonment. Whitten was holding the three plaintiffs at gunpoint for an alleged trespass and informed them that the n----- judge could not remedy the situation. This comment, though not about the plaintiffs, was directed toward them in an attempt to solidify Whitten's control of the situation. While

159

Whitten's comment directly related to the plaintiffs' claim of false imprisonment, Rubenstein's comment has no relation to whether or not he committed the murders for which he was on trial.

¶435. It is not my purpose to assign error or blame to the trial court, the prosecutor, or even the sheriff, but to express my view that the performance by Rubenstein's counsel was deficient. A zealous defense attorney would take every possible step to prevent a client's alleged statement including the N-word from coming before a jury which, in all likelihood, included African-American jurors. However, because the record before this Court is void of matters which should have been placed therein by trial counsel,[29] I must agree with the majority to affirm Rubenstein's conviction.

---

[29] Rubenstein's trial counsel participated in this appeal, including being present at oral arguments, which diminished his appellate counsel's incentive for raising ineffective assistance of counsel on direct appeal. Thus, the issue should be preserved.

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Hodges v. State,* — So.2d — (Miss. 2005).

*Walker v. State,* — So. 2d — (Miss. 2005).

*Le v. State,* — So.2d — (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).      *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

**Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**Davis v. State**, 551 So. 2d 165 (Miss. 1989).

**Minnick v. State**, 551 So. 2d 77 (Miss. 1989).

**Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

**Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Woodward v. State**, 533 So. 2d 418 (Miss. 1988).

**Nixon v. State**, 533 So. 2d 1078 (Miss. 1987).

**Cole v. State**, 525 So. 2d 365 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1346 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1317 (Miss. 1987).

**Faraga v. State**, 514 So. 2d 295 (Miss. 1987).

**Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

**DEATH CASES REVERSED AS TO GUILT PHASE**
**AND SENTENCE PHASE**
(**continued**)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**
**AS TO PUNISHMENT AND REMANDED**
**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 486 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5ᵗʰ Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.